1  BRIGGS LAW CORPORATION [FILE: 2061.05]
   Cory J. Briggs (SBN 176284)
2  99 East "C" Street, Suite 203
   Upland, CA 91786
3  Telephone: 909-949-7115

4  Attorneys for Defendants Mosaic Ag, LLC (erroneously sued
      as MosaicAg, Inc.), and Edward ("Ned") Fussell

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    NORTHERN DISTRICT OF CALIFORNIA

10

11  TPCO US Holding, LLC, a Delaware limited )   CASE NO. 5:23-cv-1324
    liability company,                       )
12                                           )   **NOTICE OF REMOVAL OF ACTION**
            Plaintiff,                       )   **BASED ON FEDERAL-QUESTION**
13                                           )   **JURISDICTION (28 U.S.C. § 1441(a))**
            vs.                              )
14                                           )
    Ned Fussell, an individual, MosaicAg. Inc., a )
15  California corporation; Paula Bruning, an )
    individual; Christopher Potter, an individual, )
16  Sukanya Lauer, an individual, Lacy O'Callaghan, )
    and DOES 1 through 10, inclusive,        )
17                                           )
            Defendants.                      )
18

19          **TO THE CLERK OF THE DISTRICT COURT:**

20          **PLEASE TAKE NOTICE** that Defendant Mosaic Ag, LLC (erroneously sued as Mosaic Ag,

21  Inc.), and Defendant Edward ("Ned") Fussell (collectively, "Defendants") now remove to this Court

22  the state-court action described below.

23          1.      On December 16, 2022, an action was commenced against Defendants and others in the

24  Superior Court of the State of California in and for the County of Santa Clara with the same caption as

25  indicated above as case no. 22CV408899.  A copy of the complaint served on Defendants is attached

26  hereto as Exhibit "A."

27          2.      The first on which Defendants received a copy of the complaint was March 2, 2023,

28  which is when they were served.  A copy of the proofs of service are attached hereto as Exhibit "B."

3.     This action is a civil action of which this Court has original jurisdiction under Section 1331 of Title 28 of the U.S. Code; and is one which may be removed to this Court by Defendants pursuant to the provisions of Section 1441(a) of Title 28 of the U.S. Code in that it arises under the Controlled Substances Act (21 U.S.C. § 801 *et seq.*).  *See also Sauk-Suiattle Indian Tribe v. City of Seattle*, 56 F.4th 1179 (2022) (recognizing that "action arises under federal law when 'a well-pleaded complaint establishes . . . that the plaintiff's right to relief necessarily depends on resolution of a substantial question of federal law'").

4.     Defendants will use reasonable efforts to notify the other named defendants of this action's removal to federal court.

Date: March 21, 2023.                    Respectfully submitted,

BRIGGS LAW CORPORATION

By:  _Cory J. Briggs_____
     Cory J. Briggs

Attorneys for Defendants Mosaic Ag, LLC (erroneously sued as Mosaic Ag, Inc.), and Edward ("Ned") Fussell

**NOTICE OF REMOVAL OF ACTION BASED ON FEDERAL-QUESTION
JURISDICTION (28 U.S.C. § 1441(a))**

Exhibit "A"

E-FILED
12/16/2022 8:55 PM
Clerk of Court
Superior Court of CA,
County of Santa Clara
22CV408899
Reviewed By: D. Alfaro

1   Krista M. Enns (CA206430)
    James Thompson (CA 240979)
2   Benesch, Friedlander, Coplan & Aronoff LLP
    100 Pine Street, Suite 3100
3   San Francisco, California 94111
    Telephone:  628.600.2250
4   Facsimile:    628.221.5828
    kenns@beneschlaw.com
5   jimthompson@beneschlaw.com

6   Attorneys for Plaintiff TPCO US Holding,
    LLC
7

8               **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

9                        **COUNTY OF SANTA CLARA**

10  TPCO US Holding, LLC, a Delaware limited      Case No.  22CV408899
    liability company,
11                                                **COMPLAINT FOR BREACH OF**
                           Plaintiff,             **CONTRACT AND DECLARATORY**
12                                                **RELIEF**
               v.
13                                                **REDACTED**
    Ned Fussell, an individual, MosaicAg. Inc., a
14  California corporation, Paula Bruning, an
    individual, Christopher Potter, an individual,
15  Sukanya Lauer, an individual, Lacy
    O'Callaghan, and DOES 1 through 10,
16  inclusive,
17                         Defendants.
18
         **PUBLIC - REDACTS MATERIALS FROM CONDITIONALLY**
19       **SEALED RECORD**
20
21
22
23
24
25
26
27
28

1    Plaintiff TPCO US Holding, LLC (hereinafter "TPCO"), brings this Complaint against defendants

2    Ned Fussell (hereinafter "Fussell"), Mosaic. Ag, Inc. (hereinafter "Mosaic"), Paula Bruning ("Bruning"),

3    Christopher Potter ("Potter"), Sukanya Lauer ("Lauer"), and Lacy O'Callaghan ("O'Callaghan," and with

4    Bruning, Potter, and Lauer, the "Company Holders") and hereby alleges as follows:

5                                    **SUMMARY OF CLAIMS**

6        1.    This action seeks to recover over $7,000,000 that Fussell and Mosaic owe to and are

7    wrongfully refusing to pay TPCO and a declaration that TPCO properly terminated certain of its

8    agreements with Defendants.

9        2.    In mid-May 2021, TPCO entered into a contract with Fussell and the Company Holders.

10   With this contract—the Membership Interest Purchase Agreement ("Purchase Agreement")—TPCO was

11   to acquire four acres licensed for outdoor cannabis cultivation located in Sonoma County, California. The

12   four acres were on four separate parcels of one acre each.

13       3.    As part of the purchase price, TPCO advanced Fussell $5,650,000 in the form of a personal

14   loan (the "Loan") that would be deemed satisfied if the deal closed but for which Fussell would be

15   personally liable and required to repay if the transaction did not close on or before June 1, 2022. After he

16   signed the agreements and after TPCO funded the Loan, Fussell took the advance he received and put an

17   almost-$2 million down payment on a $4.1 million house for himself.

18       4.    In mid-May 2021, TPCO also entered into a cultivation and supply agreement for each of

19   these parcels with one of Fussell's companies, Mosaic (collectively, the "Supply Agreements"). Pursuant

20   to the terms of the Supply Agreements ███████████████████████████████████████

21   ████████████████████████████████████████████████████████████████████████

22   ██████████████████████████████████

23       5.    During negotiations, Fussell also insisted that TPCO ████████████████████

24   ████████████████████████████████████████████████████████████████████████

25   ████████████████████████████████████████████████████████████████████████

26   ████████████████████████████████████████████████████████████████████████

27   ████████████████████████████████████████████████████████████████████████

28

6.      Closing the transaction—and thus ensuring the Loan would be deemed satisfied—depended on the success of Fussell's efforts to fulfill his obligations under the Purchase Agreement. Among other things, the Purchase Agreement required him to provide Disclosure Statements within thirty (30) days of the Purchase Agreement's effective date.  The Purchase Agreement also required him to obtain state and local regulatory approvals to transfer the cultivation licenses to TPCO, secure from the landlords consents to assign the licenses to TPCO and agreement from the landlords to extend the terms of the existing leases to 10 years in length, and provide certain due diligence information and documents that were satisfactory to TPCO.  Last, but not least, the Purchase Agreement required that the lands at issue produce a minimum quantity of cannabis that met certain, identified criteria of at least 12,000 pounds total after it was dried and bucked.

7.      Fussell, however, did not fulfill these (or his other) obligations under the Purchase Agreement.  Therefore, the transaction could not close.

8.      Fussell also defaulted on the Loan.  Because the transaction did not close before June 1, 2022, on June 1, 2022, the Loan became due and owing.  Fussell, however, has made no payments on the Loan.

9.      As with the Purchase Agreement and the Loan, Fussell defaulted on Mosaic's obligations under the Supply Agreements, and, thus, in addition to the $5,650,000 loan he will not repay, he is holding another $1,499,086 of TPCO's money.

1

2   ███████ Mosaic owes TPCO $1,499,086. Despite have confirmed multiple times that it owes this

3   amount to TPCO, Mosaic has refused to pay any of it.

4       10.    Ultimately, the parties could not close the deal. As such, on June 1, 2022, the Loan came

5   due and Fussell was obligated to repay TPCO the full amount of the Loan, $5,650,000. On June 30, 2022,

6   TPCO exercised its right to terminate the Purchase Agreement and the Supply Agreements.

7       11.    It is now almost six months later and despite repeated demands, neither Mosaic nor

8   Fussell—who, on information and belief, continues to live in the house he bought using the TPCO loan

9   he promised to repay if the deal did not close—has made a single payment to TPCO. Instead, they are

10   seeking to evade their payment obligations by attempting to renegotiate and redraft these bargained-for

11   agreements. Therefore, TPCO had no option other than to sue to recover the over $7,000,000 Fussell and

12   Mosaic owe it.

13   <center>**PARTIES**</center>

14       12.    TPCO is, and at all material times was, a limited liability company registered in the State

15   of Delaware with its principal place of business in San Jose, California. It is on a mission to create the

16   most impactful cannabis company in the world, by combining best-in-class operations with leading voices

17   in popular culture and social impact. Its direct-to-consumer offerings include an integrated e-commerce

18   platform with a popular mobile app that offers in store or curbside pickup at one of its retail locations and

19   express and scheduled delivery from its delivery depots, providing its customers throughout northern and

20   southern California with consistent access to its best-in-class portfolio of cannabis products.

21       13.    Fussell is, and at all material times was, a resident of the State of California. On

22   information and belief, in 2007, he moved to Northern California to pursue his interest in cannabis

23   cultivation. On information and belief, in 2014, he was one of the co-founders of and remains the co-

24   CEO of CannaCraft, a company that claims to have "created markets for some of the most popular

25   cannabis products that we see today like 100% cannabis oil vape pens, microdosed edibles, and CBD:THC

26   ratio products."[1] At least one recent media outlet has referred to CannaCraft as a "multimillion-dollar

27

28   [1] https://www.cannacraft.com/about (last visited November 28, 2022).

cannabis powerhouse,"[2] and other media outlets have reported that in April 2022, CannaCraft announced plans to merge with March and Ash (a Southern California dispensary chain). The March and Ash website refers to this as the "CannaCraft takeover."[3]

14.     Mosaic is, and at all material times was, a corporation registered in the State of California with its principal place of business in Santa Rosa, California. On information and belief, it was formed on March 2, 2021, and since that time, "has expanded steadily to establish a statewide footprint in cultivation management, cannabis processing and manufacturing of branded products."[4]   On further information and belief, Fussell is the Chief Executive Officer, Secretary, Chief Financial Officer, and a director of Mosaic.

15.     On information and belief, Bruning is, and at all material times was, a resident of the State of California. She holds all of the outstanding limited liability company membership interests of Digg It Gardens, LLC ("Digg It"). If the deal had closed, she would have transferred these membership interests to TPCO. She entered into a Company Holder Acknowledgment Document with Fussell and TPCO pursuant to which she agreed to the terms of the Purchase Agreement.

16.     On information and belief, Potter is, and at all material times was, a resident of the State of California. He holds all of the outstanding limited liability company membership interests of Potter Family Farm(z)(s) ("Family Farm(z)(s)").  If the deal had closed, he would have transferred these membership interests to TPCO. He entered into a Company Holder Acknowledgment Document with Fussell and TPCO pursuant to which she agreed to the terms of the Purchase Agreement.

17.     On information and belief, Lauer is, and at all material times was, a resident of the State of California. She holds all of the outstanding limited liability company membership interests of Rain Gardens, LLC ("Rain"). If the deal had closed, she would have transferred these membership interests to TPCO. She entered into a Company Holder Acknowledgment Document with Fussell and TPCO pursuant to which she agreed to the terms of the Purchase Agreement.

---

[2] https://cannabisnow.com/cannacraft-is-raising-the-bar-one-brand-at-a-time/ (last visited December 13, 2022).
[3] https://marchandash.com/cannacraft/ (last visited December 13, 2022).
[4] https://www.linkedin.com/company/mosaicag (last visited November 28, 2022).

**COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF**
**Case No.**

18.     On information and belief, Lacy O'Callaghan is, and at all material times was, a resident of the State of California. She holds all of the outstanding limited liability company membership interests of Wild Heart Farms, LLC ("Wild Heart"). She entered into a Company Holder Acknowledgment Document with Fussell and TPCO pursuant to which she agreed to the terms of the Purchase Agreement.

19.     TPCO is unaware of the true names and capacities of the defendants sued herein as Does 1 through 10, and thereby sues each of these defendants by such fictitious names. TPCO will amend the complaint to allege each of these defendants' true names and capacities when ascertained. Collectively, Fussell, Mosaic, and Does 1 through 10 are referred to herein as "Defendants."

20.     On information and belief, Does 1 through 10, inclusive, are responsible to TPCO on the facts and theories alleged herein. On further information and belief, each Defendant is the agent, joint venturer, employee, principal, member, and/or control person of at the other Defendants; each Defendant aided and abetted, conspired with, and acted in concert with, the other Defendants in committing the acts and omissions described herein; and/or each Defendant is responsible for his/her own actions and the actions of the other Defendants.

## JURISDICTION AND VENUE

21.     The Court has jurisdiction over the subject matter of and the parties to this action pursuant to California Code of Civil Procedure § 410.10. The agreements that are the subject of this dispute were made and entered into within California. No statutory exemption to jurisdiction exists and the amount in controversy exceeds the jurisdictional minimum of this Court. The Court has jurisdiction to grant the relief requested herein.

22.     Venue is proper in Santa Clara County pursuant to California Code of Civil Procedure § 395, as well as by agreement of the parties.

## GENERAL ALLEGATIONS

23.     During the spring of 2021, TPCO was negotiating with Fussell and Mosaic to acquire four acres of licensed high-quality outdoor cannabis cultivation property located in Sonoma County, California, and to retain Mosaic to provide cultivation services for this acreage. Based on Fussell's representations and its own initial diligence, TPCO believed that acquisition of this acreage would provide a turnkey operation and an immediate cannabis supply for use in the Company's branded product lines

**COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF**
**Case No.**

and other products.  In mid-May 2021, the parties came to terms and documented the deal in a series of binding agreements.

### I.     The Membership Interest Purchase Agreement

24.     On or about May 16, 2021, Ned Fussell, on his own behalf and on behalf of the Company Holders (collectively, the "Seller") entered into a Membership Interest Purchase Agreement (the "Purchase Agreement") with TPCO, a true and correct copy of which is attached hereto as Exhibit 1.

25.     Under the Purchase Agreement, TPCO agreed to buy, and Seller agreed to sell, all right, title, and interest in all of the outstanding limited liability company membership interests (the "Membership Interests") in four California limited liability companies (collectively, the "Companies"): Digg It, Family Farm(z)(s), Rain, and Wild Heart.

26.     Each of these Companies (a) held a leasehold interest in a one-acre parcel of real property located in Sonoma County, California (the "Properties"); (b) held state and local licenses pursuant to which it operated a commercial cannabis cultivation operation; and (c) was engaged in cannabis cultivation on the Properties.

27.     Therefore, by acquiring the Membership Interests and entering into the Supply Agreements, TPCO believed that it would acquire a "turnkey" operation and a licensed, reliable source of quality outdoor-cultivated cannabis from these four acres of real property, all of which were on Spring Hill Road.

#### *The Purchase Price*

28.     Section 2.02 of the Purchase Agreement, entitled "Purchase Price," provides that the purchase price for the Properties would be as follows:

a.     A loan in the amount of $5,650,000 "in immediately available funds" pursuant to the terms of a note and pledge agreement (the "Note") that the parties negotiated and agreed to before signing the Purchase Agreement.  *Id.* § 2.02(a).  Under the Note, Fussell agreed that if the deal did not close on or before June 1, 2022, he, personally, would pay the Loan back in full.  TPCO agreed that if the transaction close, it would deem the Loan paid in full.

b.     The issuance at closing of a specified number of shares by its parent company— TPCO Holding Corp. ("TPCO Parent")—to Fussell.  *Id.* §§ 2.02(b), (c).

1

*Conditions Required to Close the Transaction*

2      29.    The Purchase Agreement also set forth numerous, specific bargained-for conditions that

3    Fussell agreed to satisfy before the Closing could occur.  Fussell's failure to satisfy any one of these

4    conditions was fatal to triggering TPCO's obligation to close.

5      30.    Among other things, the Purchase Agreement required Fussell to:

6          a.    "Within thirty (30) days" of the Effective Date of the Purchase Agreement,

7    "provide any and all Disclosure Schedules required by th[e Purchase] Agreement. *Id.* § 5.01(e).

8          b.    Obtain state and local regulatory approvals to transfer the cultivation licenses to

9    TPCO. *Id.* §§ 6.02(f), (g).

10         c.    Obtain from the landlords of the Properties consents to the assignment of the

11   existing leases to TPCO and extensions of the existing leases to ensure a 10-year term from the date of

12   Closing. *Id.* § 6.02(e).

13         d.    Provide certain due diligence information and documents that were satisfactory to

14   TPCO. *Id.* § 6.02(k).

15         e.    Ensure that during the period between signing and Closing, the Properties

16   collectively "produced in the aggregate Conforming Cannabis at an annual rate of at least 12,000 pounds,

17   dried and bucked, ***irrespective of any external or internal cause, factor or impediment*** (other than direct

18   actions or omissions of Buyer)." *Id.* § 6.02(h) (emphasis added).

19                        *What to Do If the Licenses Could Not Be Transferred*

20     31.    When negotiating the Purchase Agreement, the parties recognized that certain "Regulatory

21   or Consent Conditions," including the ability to transfer the control of one or more of the Company's state

22   or local licenses to TPCO, could be an impediment to closing the deal.

23     32.    To that end, in Section 2.08 of the Purchase Agreement, the parties agreed that if a

24   Regulatory or Consent Condition occurred or was reasonably expected to occur prior to June 1, 2022, the

25   parties agreed that "Seller and Buyer will work in good faith to mutually identify a suitable replacement

26   cannabis operation (cultivation business and access to property, whether owned or leased by Seller) from

27   among Seller's other holdings (a 'Replacement Property'), and the acceptance or rejection of a property

28

as a Replacement Property hereunder shall ultimately be the subject to the agreement of Buyer in its good faith reasonable discretion."

33.     But any Replacement Property business or company had to meet certain conditions specifically enumerated in the Purchase Agreement.

34.     As set forth in section 2.08(b), the Replacement Property had to be:

a.      "owned by Seller (or a nominee thereof) and capable of being subject to change of ownership to Buyer free and clear of liabilities and liens at such time of the replacement (as contemplated the same way hereunder with respect to the Companies);"

b.      "be of substantially the same, similar or better acreage as a Company;"

c.      "be either owned or with substantially similar assignable leasehold rights;"

d.      "have substantially similar regulatory rights (permitting and licensing) and water access;" and

e.      "have produced an average yield over the preceding two years of Conforming Cannabis of at least 12,000 pounds per acre."

35.     Any property proffered under section 2.08 that failed to meet any one of these conditions would not meet the definition of Replacement Property.

36.     But even if every single criteria were met, TPCO did not have to accept the Replacement Property—"the acceptance or rejection of a property as a Replacement Property hereunder shall ultimately be the subject to the agreement of Buyer in its good faith reasonable discretion." *Id.* § 2.08(b)

*The Closing Date*

37.     The Purchase Agreement did not identify a date certain for the Closing.

38.     Rather, the Purchase Agreement set forth that the Closing would not occur unless or until "the date thirty (30) days after all of the conditions to the obligations of the parties hereto set forth in . . . 6.02 have been satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date)."

*Termination*

39.     The Purchase Agreement also had a termination clause that provided either TPCO or Fussell could terminate the agreement under certain conditions.

9

**COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF**
**Case No.**

40.     TPCO and Fussell agreed, among other things, that TPCO could terminate the Purchase Agreement "subject to Section 2.08 (to the extent applicable), at the election of the Buyer if the Closing shall not have occurred on or before June 1, 2022 . . . ."

41.     Section 2.08 sets forth that if on June 1, 2022, "less than three Companies and/or Replacement Properties have met such Closing conditions (or any such conditions have not been waived in writing by Buyer), then Buyer will have the right to terminate the transaction, subject to Seller's right to extend the Closing by up to 90 days to continue to locate and produce a Replacement Property."

42.     There is no force majeure clause in the Purchase Agreement. The only reference to "force majeure" therein is that "Regulatory or Consent Conditions do not include the failure of a Company or applicable portion of a Property to meet yield minimums set forth herein (unless such failure is due to a force majeure event impacting the specific Property, and in which case Buyer may choose in its discretion to accept a Replacement Property)." *Id.* § 2.08(a). Moreover, the minimum crop yield condition was required to be met "irrespective of any external or internal cause, factor or impediment." *Id.* § 6.02(h)

## II.     The Note and Pledge Agreement

43.     As contemplated by the Purchase Agreement, or about May 21, 2021, TPCO and Fussell entered into a Note and Pledge Agreement (the "Note"), a true and copy of which is attached hereto as Exhibit 2.

44.     With the Note, the parties memorialized the terms under which TPCO made the Loan. Pursuant to section 1 of the Note, Fussell (the "Borrower") personally agreed to repay the Loan to TPCO (the "Lender") in the full amount of $5,650,000 no later than June 1, 2022 unless the Closing had occurred by that date.

45.     The parties anticipated that some or all of the Loan would be "deemed satisfied and paid in full or pro rata in part" if (but only if) the transaction closed. *Id.*

46.     Specifically, the Note provides: "Borrower's indebtedness hereunder will be reduced by One Million Five Hundred Thousand Dollars ($1,500,000) upon each Company Closing (e.g. upon the acquisition by Lender (or an affiliate or assignee thereof) of 100% of the membership interests of the applicable Company or Replacement Property under the Purchase Agreement)." *Id.*

47.     Thus, if the parties closed on all four companies, 100% of the Loan would have been deemed satisfied and paid in full. *Id.*

48.     However, the parties also agreed that:

a.     "[u]nless previously satisfied or terminated . . . , the outstanding balance of this Note shall mature and be due and payable in full *on the earlier of* (i) June 1, 2022 or (ii) Five (5) business days after the termination of the Purchase Agreement in accordance with its terms (the "Maturity Date")" (emphasis added);

b.     failure to pay any sum due under the note on or before the Maturity Date would be an event of default ("Event of Default");

c.     "[u]pon the occurrence of an Event of Default, which shall be continuing, interest shall accrue on the unpaid balance of this Note from the date of such default at a rate per annum equal to six percent (6%), or the highest rate allowed by applicable law, whichever is less . . . upon declaration of such default delivered" to Fussell by TPCO; and

d.     subject to limitations not relevant here, Fussell also agreed to "pay all expenses (including reasonable outside attorneys' fees), incurred by Lender in connection with any Event of Default, including its endeavoring to collect any amounts payable hereunder which are not paid when due."

49.     Thus, at all times, Fussell knew or should have known that if the transaction did not close, and an Event of Default occurred, he, personally, would be responsible for repaying the Loan.

50.     On May 21, 2021, at Fussell's personal direction, TPCO funded one of Mosaic's bank accounts in the full amount of the Loan—$5,650,000.

### III.     The Cultivation and Supply Agreements

51.     On or about May 21, 2021, TPCO entered into four separate cultivation and supply Agreements (hereinafter the "Supply Agreements," or, singularly, "Supply Agreement")—one each with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ which are attached hereto as Exhibit 3, 4, 5, and 6. Defendant Mosaic also was a party to each of the Supply Agreements.

1    *Mosaic's Obligation Under the Supply Agreements*

2    52. ███████████████████████████████████████████

3    ███████████████████████████████████████████████

4    ███████████████████████████████████████████████

5    ███████████████████████████████████████████████

6    ███████████████████████████████████████████████

7    ███████████████████████████████████████

8    53. ███████████████████████████████████████████

9    ███████████████████████████████████████████████

10   ████████████

11   54. ███████████████████████████████████████████

12   ███████████████████████████████████████████████

13   ███████████████████████████████████████████████

14   ██████████████████████

15   55. ███████████████████████████████████████████

16   ███████████████████████████████████████████████

17   ███████████████████████████████████████████████

18   ███████████████████████████████████████████████

19   ██████████████████████████████████

20     ████████████████████████████

21   56. ███████████████████████████████████████████

22   ███████████████████████████████████████████████

23   ███████████████████████████████████████████████

24   ███████████████████████████████████████████████

25   ███████████████████████████████████████████████

26

27   ₅ _____
     ███████████████████████████████████████

28   ██████████████████

**COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF**
Case No.

57.

59.

60.

61.

62.

63.

**COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF**
Case No.

1    64.    ████████████████████████████████████

2    ████████████████████████████████████████████

3    ████████

4    **IV.    Fussell Purchases a 3,200 Sq. Ft. House Paying Almost $2 Million Cash**

5    65.    On or about June 30, 2021, according to public records, Fussell purchased a 3,200 square

6    foot house in Sebastopol, California (the "House").

7    66.    Also according to public records, Fussell purchased the House for $4.1 and financed it with

8    a 30-year, $2.2 million senior secured first position mortgage.

9    67.    Subtracting the purchase price from the mortgage suggests that Fussell made a cash down

10    payment of almost $2 million for the House.

11    68.    On information and belief, Fussell purchased the House using the Loan from TPCO.

12    **V.    Fussell Fails to Provide Deliverables Required by the Purchase Agreements**

13    69.    Although he had time to purchase the House within approximately 30 days of the Effective

14    Date of the Purchase Agreement, apparently, he did not have time to submit to TPCO the Disclosure

15    Statements that he promised to provide within 30 days of the Effective Date.

16    70.    Not only did he miss the 30-day deadline for this deliverable, Fussell never provided TPCO

17    with the Disclosure Statements.  Nor did he ever provide the due diligence that the Purchase Agreement

18    obligated him to provide.  Further, he also failed to secure with the landlords either consents to the

19    assignment of the existing leases to TPCO or any of the 10-year extensions, each of which was required

20    under the Purchase Agreements.

21    **VI.    TPCO Starts** ████████████ **Required by the Supply Agreements**

22    71.    ████████████████████████████████████

23    ████████████████████████████████████████████

24    ████████████████████████████████

25    72.    ████████████████████████████████████

26    ████████████████████████████████████████

27    73.    ████████████████████████████████████

28    ████████

14

**COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF**
**Case No.**

1

**VII.**   **Mosaic Has Issues with Cultivation and Harvesting at the Properties**

2   74.   ███████████████████████████

3   ████████████████████████████████████████████

4   ████████████████████████████████████████████

5   ████████████████████████████████████████████

6   ███████████████

7   75.   ████████████████████████████████████████

8   ████████████████████████████████████████████

9   █████████████████████████████

10   76..   █████████████████████████   TPCO also visited the cultivation sites.

11   During those visits, it documented that various cannabis strains had powdery mildew and/or botrytis (a

12   systematic mold infection) and insect damage (by caterpillars and/or mites).  Separately, TPCO noted that

13   specific trellising was down and there were broken plants.

14   77.   Further, TPCO regularly reviewed the "harvest tracker" Mosaic provided, a document that

15   set forth the dates by which Mosaic would harvest the cannabis on the Properties.  According to the harvest

16   tracker, Mosaic was committed to harvesting 90% of the remaining full-term flower plants between

17   October 12 and 19.  TPCO also was monitoring and documenting plant maturity and agreed that 90% of

18   the plants would be ready to harvest on or before October 19.

19   78.   But whether Mosaic would be able to successfully harvest all of the mature plants was

20   questionable.  Based on the information the Mosaic team provided to TPCO, TPCO understood that

21   Mosaic did not have enough drying capacity to meet all of its cultivation needs and that this was going to

22   impact the harvest on the Properties.  Indeed, only approximately 25% of the plants slated to be harvested

23   by October 19 were, in fact, harvested by that date.  Thus, despite being ready for harvest, the bulk of the

24   crop remained unharvested as November approached.

25   **VIII.**   **Mosaic Loses a Substantial Amount of the Crop to a Storm**

26   79.   On October 24, 2021, northern California experienced a forecasted and substantial rain

27   event.  In addition to abnormally heavy and sustained rainfall, winds with peak gusts between 70 and 80

28   miles per hour were seen at higher elevations.

80.     The rainfall drenched the crops that had not yet been harvested and the winds caused substantial damage to the plants.  Although the plants were in hoop houses—plastic-covered "tunnels" that are designed to protect the cannabis plants from rain and wind—the rain and wind destroyed large sections of the hoop houses, thus exposing the crops to the weather.

81.     On October 27, 2021, Mosaic (and, specifically, Fussell) reported to TPCO that the storm "caused major damage to cannabis farms in and around [Mosaic's] region including Spring Hill."  Among other things, Mosaic reported that given the weather event, the wet unripe flowers were susceptible for aggressive botrytis mold growth.  It also reported that it anticipated losses that would affect its yields. That said, and although only 25% of the mature plants had been harvested, Mosaic further reported "we were able to harvest as much as we could that qualified as 'ready' prior to the storm."

**IX.     Mosaic Agrees that TPCO** ████████████████████████

82.     Based on Fussell's October 27, 2021 report, TPCO reached out to Mosaic to discuss

████████████████████████████

83.     The parties agreed that because Mosaic's projected yields would be adjusted downward significantly because of the storm, and, therefore, ████████████████████████

████████████████████████████████████

████████████████

**X.     TPCO Notifies Mosaic About the Problems with the Cannabis Delivered**

84.     On or about December 13, 2021, TPCO wrote to Mosaic about the low harvest yields.

85.     It explained that ████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████ It also reminded Mosaic that ████████

████████████████████████████████████

86.     In response, Mosaic admitted ████████████████████

████████████████████ But it claimed that ████████

████████████████████

**COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF**
**Case No.**

**XI.   TPCO and Mosaic Negotiate and Agree on** █████████████████

87.   Throughout the end of 2021 and into the spring of 2022, TPCO and Mosaic were negotiating about ███████████████████████████████████████████.

88.   Eventually, they agreed ██████████████████████████████████
████████████████████

89.   Although ██████████████████████████████████████████
██████████████████████████████████, it reflected a negotiated agreement between TPCO and Mosaic ███████████████████████████████████████████
██████████████

**XII.   TPCO and Mosaic Agree that Mosaic Owed TPCO $1,499,086**

90.   In the April 17 Letter, TPCO also ████████████████████████
██████████████████████████████████████████████
████████████████████████████████████
█  █████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████████

92.   ████████████████████████████████████████
██████████████████████████████████████████

93.   ████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████

94.   As of the filing of this Complaint, Mosaic ████████████████████
████████████ owes TPCO $1,499,086.

**XIII.   Mosaic Proposes, Among Other Things, an Unidentified "Makeup" Property**

95.   After the parties reached a negotiated compromise about █████████████
██████████████████ Mosaic reached out to TPCO to address, among other things, the next growing season.

1    96.     With a memorandum dated May 16, 2022 (the "Memo"), Mosaic made a three-fold

2    proposal to TPCO, raising the issues of (a) Makeup Property; (b) how it intended to provide for TPCO's

3    cannabis "needs for the 2022 season;" and (c) payment of the $1,499,086 it owed TPCO under the Supply

4    Agreements.

5    *Fussell's Attempt to Pedal Unlicensed and Unidentified Makeup Property Instead of Replacement*

6    *Property*

7    97.     In the Memo, Mosaic invoked Section 2.07 of the Purchase Agreement and wrote "with

8    regards to 'Property Make-Whole Opportunity' we would like to offer 6 acres of 'Makeup Property' in

9    lieu of the originally intended Spring Hill Road property (4 acres)."

10   98.     But as of May 16, 2022, Section 2.07 was irrelevant.

11   99.     Section 2.07 of the Purchase Agreement was titled "Property Make-Whole Opportunity,"

12   it did not apply until at least two years after the parties signed the Purchase Agreement, and only if and

13   after the Closing were to occur.

14   100.     Specifically, Section 2.07 provides that "if the Total Production Value as shown on the

15   final Earnout Statement is less than $9,600,000 (a "Production Deficiency"), Seller may at his option elect

16   to make up the Production Deficiency as set forth in this Section 2.07."

17   101.     The final Earnout Statement would not be prepared until "[n]ot later than thirty (30) days

18   following the end of the Earnout Management Period" (Purchase Agreement § 2.06(a)(i)), and the Earnout

19   Management Period was defined the "period of twenty-four (24) consecutive months beginning on the

20   month following the Effective Date" (*id.* § 1.01 at p.4), which was defined as the "date of the Agreement"

21   (*id.* § 2.02(a)), which was May 16, 2021 (*id.* at p.1).

22   102.     Mosaic also did not actually identify the exact six (6) acres it was proposing.

23   103.     Rather, it stated only that "[t]hese 6 acres *will be held* in Lake County, California, with the

24   predetermined conditions for consolidation, long term leases, and a long-term management agreement tied

25   in and permissible under governmental codes and regulations therein." (Emphasis added.)  Arguably, use

26   of the phrase "will be held" suggests that the property was not even under Mosaic's control.

27   104.     Separately, while there were two Lake County properties identified in documents that

28   Mosaic sent TPCO along with the Memo, those documents indicated that as of the date of the Memo,

18

**COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF**
**Case No.**

1  neither of Mosaic's Lake County properties were fully licensed for cannabis cultivation. One was a 15-

2  acre parcel in Lake County for which there was a notation: "Expected Licensing by 6/29/22." The other

3  was a 10-acre parcel in Lake County for which there was a notation: "Pending Licensing."

4  *How Mosaic Intended to Provide for TPCO's Cannabis Needs for the 2022 Season*

5  105.    For all intents and purposes, Mosaic admitted to TPCO that the Properties would be

6  insufficient to provide for TPCO's cannabis needs in 2022.

7  106.    Specifically, Mosaic proposed that to "establish and carry out TPCO['s] . . . needs for the

8  2022 season" "[w]e are willing to enter into a separate Cannabis Futures Agreement."

9  107.    Mosaic also transmitted the proposed Cannabis Futures Agreement. Under the terms of

10  that agreement, TPCO would, "on an ongoing harvest basis" select acreage from a list of farms to be

11  dedicated to the production of cannabis for it, with Mosaic managing the cannabis cultivation for a fee.

12  Not one of the Properties was on this list. In effect, Mosaic wanted TPCO to enter into a new agreement

13  for new properties, under new management terms.

14  *The $1,499,086 Mosaic Owed and Mosaic's Attempt to Rewrite the Purchase Agreement*

15  108.    Mosaic also acknowledged that it owed TPCO "$1.499mm." Further, it informed TPCO

16  that it was "prepared to trade $850,000.00 USD worth of Closing Shares, waive the $350,000.00 Sunset

17  owed to [Mosaic] on 5/16/2022, and agree to negotiate TPCO US HOLDING, LLC dedicated

18  acres/futures agreement to reflect an additional $330,000.00 worth of savings. As of 5/16/2022; this is

19  valued at $1,532,207.60."

20  109.    Claiming that TPCO owed $350,000 to Mosaic on May 16, 2022, was a transparent attempt

21  to rewrite the Purchase Agreement.

22  110.    As set forth by the Purchase Agreement, $350,000 was held back from the Loan given to

23  Fussell (the "Holdback Amount").

24  111.    The Holdback Amount was "to be held by Buyer from the Effective Date payment and

25  thereafter payable to the Seller pursuant to Section 7.07 and subject to the other terms and conditions of

26  this Agreement."

27  112.    Section 7.07 provided that "[o]n the first anniversary of the Closing the Buyer will pay the

28  Holdback Amount to Seller subject to Section 7.07(b)."

19

113.   As of May 16, 2022, the Closing had not occurred.  Accordingly, "the first anniversary of the Closing" had not occurred either.

114.   Thus, TPCO did not owe the Holdback Amount to Mosaic.

115.   Regardless, although Mosaic claimed that switching from the existing contracts to the futures agreement it proposed would result in "an additional $330,000.00 worth of savings" to TPCO, Mosaic provided no basis for calculating that number.

## XIV.   TPCO, Fussell, and Mosaic Try to Negotiate a Resolution

116.   Throughout May and into June 2022, TPCO tried to negotiate a resolution with Mosaic and Fussell.  For example, TPCO inquired whether Mosaic had any biomass that it could provide to TPCO in lieu of repaying TPCO in cash.  Initially Mosaic said that it might, but on or about May 24, it let TPCO know that it had no biomass at that time.

117.   On or about June 8, 2022, Fussell and Mosaic wrote to TPCO, providing certain financial information TPCO had requested and making two inquires.

118.   First, incorrectly assuming that the Purchase Agreement "ha[d] a closing date approaching for the purchase of the LLC memberships," they asked "Is it your position that your performance is excused? Can you please explain the reason?"  The Purchase Agreement did not have a "closing date approaching."  As noted above, the Closing would not occur unless or until "the date thirty (30) days after all of the conditions to the obligations of the parties hereto set forth in . . . 6.02 have been satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date)."  Although the failure of Fussell to satisfy even one Closing condition was sufficient to prevent a Closing Date from being scheduled, as of the date Fussell and Mosaic sent this email, Fussell had failed to fulfill almost all of the Closing conditions.  Therefore, TPCO had no obligation to close the deal.

119.   Second, claiming that "We also have not received any explanation as to the specifics of why the replacement properties that were offered are unacceptable as per Section 2.08(a)," they asked "Can you please elaborate the reason(s) for rejecting the Replacement Properties offered?"  But Fussell and Mosaic had not offered any replacement properties "as per Section 2.08(a)."  As noted above, Mosaic had offered an unidentified property "under Section 2.07" that "will be held in Lake County," and

1    regardless of the Lake County property to which Mosaic was referring, that property was not even

2    licensed.

3         120.    Fussell and Mosaic also reiterated "the need to enter into the separately offered Futures

4    contract, alluded to in the memorandum sent 5/16/2022, to begin cultivation for this year's needs of

5    TPCO," which also "encompasse[d] [their] offer to make whole the 1.499mm owed to TPCO that we are

6    offering to pay back in lieu of being able to offer replacement pounds from other entities when offered."

7    They also noted that they would "have approximately 2500# at Lemire in the coming weeks to put towards

8    your bio needs and our 1.499mm debt." But TPCO had already fulfilled its biomass needs.

9         **XV.**   **The Note Matures and Fussell Defaults**

10        121.    As of June 1, 2022, the deal had not closed.  Nor had Fussell paid off any of the Note.

11   Thus, under the terms of the Note, its outstanding balance—the entire $5,650,000—matured and became

12   "due and payable in full."

13        122.    But Fussell did not reach out to TPCO.  Nor did he offer a payment plan pursuant to which

14   he would repay the Loan.  Therefore, TPCO was faced with the prospect of recovering $5,650,000 from

15   its delinquent debtor.

16        **XVI.**  **TPCO Terminates the Agreements**

17        123.    After months of waiting on Fussell to fulfill his obligations under the Purchase Agreement,

18   only to be presented with a new agreement and new terms to sign by a party who was in default on a

19   $5,650,000 loan, by letters dated June 30, 2022, TPCO exercised its right to terminate the Purchase

20   Agreement and the Supply Agreements, sending letters to Fussell and Mosaic, respectively, to that effect.

21        *The June 30, 2022 Letter Terminating the Purchase Agreement*

22        124.    One of the letters TPCO sent on June 30, 2022 was to Fussell terminating the Purchase

23   Agreement (the "Purchase Agreement Termination Letter").

24        125.    In the Purchase Agreement Termination Letter, TPCO rejected the false claim that there

25   was a "Closing date approaching," explaining that "[o]ver one full year has passed since this date, but

26   various conditions set forth in Section 6.02 have not yet been satisfied and it has become apparent that

27   many of the conditions may never be satisfied" and stating that these conditions had not been waived by

28   TPCO, and "TPCO ha[d] no intention of doing so."  TPCO further identified various example of

1    unsatisfied Closing conditions, specifically that that Seller had not yet "obtained all of the 'Consents and
2    Permits material and necessary for the Companies to operate the Property consistent with past practice'
3    as required by Section 6.02(c)" of the Purchase Agreement, "obtained Local Approval, as required by
4    Section 6.02(f)," "obtained the lease consents and modifications required by Section 6.02(e)," "delivered
5    the land, water use, and other legal due diligence or disclosure schedule information required by Section
6    6.02(k)," or "produced in the aggregate Conforming Cannabis at an annual rate of at least 12,000 pounds,
7    dried and bucked, *irrespective of any external or internal cause, factor or impediment* . . ." as required
8    by Section 6.02(h)." (Emphasis added.)

9    126.    TPCO also addressed the claim that Fussell and Mosaic had "not received any explanation
10   as to the specifics of why the replacement properties that were offered are unacceptable as per Section
11   2.08(a)." TPCO first explained that "no Replacement Property ha[d] been proposed under 2.08." Rather,
12   "Seller proposed 'Makeup Property' in connection with Section 2.07 of the Purchase Agreement," a
13   provision that was "inapplicable until June 2023." Then, TPCO explained that to the extent Fussell and
14   Mosaic had intended to invoke Section 2.08, they had provided "only has a vague and general proposal
15   that did not provide anywhere enough information to determine whether the 6 acres . . . fulfill the criteria
16   of 2.08(b)." TPCO also noted that while the additional documents provided identified Lake County
17   properties, based on the notations, TPCO "believe[d] that they [were] not currently licensed."

18   *The June 30, 2022 Letter Terminating the Supply Agreements*

19   127.    With another letter dated June 30, 2022, TPCO terminated the Supply Agreements.

20   128.    As set forth therein, TPCO ███████████████████████████████████
21   ██████████████████████████████████████████████████████████████████
22   ██████████████████████████████████████████████████████████████████
23   ██████████████████████████████████████████████████████████████████
24   ████████████████████████

25   129.    Among other things, TPCO explained that █████████████████████████
26   ██████████████████████████████████████████████████████████████████
27   ████. It also noted that while Fussell now claimed that neither he nor Mosaic had "the liquid resources
28   to immediately pay" what Mosaic owed TPCO, ████████████████████████████████

130. TPCO also recounted how without prejudice to its right to demand the $1,499,086 owed and/or " ███████████████████████████████████ " TPCO had "offered to engage in good faith discussions over the past many weeks to develop a negotiated alternative arrangement specifically and solely for the purpose of ensuring that TPCO receive[d]" what it was owed "through the delivery of biomass" and how "Mosaic first communicated that it may be able to provide the necessary levels of biomass to make such an agreement practicable, but . . . later clarified that Mosaic had no available biomass." TPCO also noted that three weeks prior, Mosaic stated that it would have "approximately 2500# at Lemire coming weeks to put towards [TPCO's] bio needs" and Mosaic's "1.499mm debt," and set forth, "We remain open to hear such proposal." But neither Fussell nor Mosaic followed up.

131. Further, TPCO addressed Mosaic's "cannabis-futures" proposal, which Mosaic had linked to its repayment of the $1,499,086: "The Memorandum contains at least one fundamental error-- that there is a '$350,000.00 Sunset owed to [Mosaic] on 5/16/2022.' Nothing was owed to Mosaic on May 16, 2022 (let alone $350,000). As such the counterproposal is a non-starter." TPCO also wrote, "Moreover, we do not understand how the ostensible 'additional $330,000.00 worth of savings' is calculated."

## XVII. **TPCO Sends Fussell a Notice of Default**

132. With a third letter dated June 30, 2022, TPCO notified Fussell that the full $5,650,000 principal amount of the Note became due on June 1, 2022 (the "Maturity Date") and remained unpaid.

133. The letter also explained, "Because you have failed to pay the Note on the Maturity Date, under Section A(3)(i) of the Note, an Event of Default has occurred and is now continuing."

134. As such, TPCO "declare[d] the full amount of the Note to be immediately due and payable" and "demand[ed] payment in full forthwith." It also notified him that "under Section A(3) of the Note interest has begun to accrue on the Loan 'at a rate per annum equal to six percent (6%).'"

135. Further, TPCO noted that Fussell had "claimed that [he did] not have the liquid resources to repay the Loan, but [he had] not provided TPCO with any reasonable plan for partial or full repayment and ha[d] provided little financial documentation."

**COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF**
**Case No.**

1    136.   Notwithstanding that TPCO could start charging Fussell interest immediately, TPCO

2    informed him that it would forbear from applying the interest while the parties were having good faith

3    discussions around a resolution.

4    **XVIII. Fussell Proposes Repayment by Transferring Rights to an Unlicensed Property**

5    137.   On or about July 20, 2022, Fussell reached out to TPCO to propose repayment by

6    transferring to TPCO rights to a property located in Lake County.  TPCO responded that it was not

7    interested in Lake County property but that it would consider any proposal in good faith.

8    138.   Thereafter, on or about July 21, 2022, Fussell sent TPCO a video of a property in Lake

9    County.  TPCO responded by asking for additional information about the property, which he sent on July

10   29, 2022.

11   139.   As set forth therein, the proposed property was located in Lake County—at 1111 Sulphur

12   Bank Drive, Clear Lake Oaks, California (the "Sulphur Bank Drive Property").  According to Fussell, the

13   property was permitted for 11 acres of outdoor cannabis cultivation, was leased by Kind Dog, Inc. (a

14   company in which he had a 100% ownership interest), and had a four-year lease term with a "5-10 year

15   extension."  Fussell also set forth that the lease amount was $6,000 per month and Kind Dog, Inc. had

16   grown on the property for two years, thus suggesting that there only were two more years on the original

17   lease.  According to Fussell, the Sulphur Bank Drive Property met all of the qualifications to be a

18   Replacement Property under the already-terminated Purchase Agreement.

19   140.   The Sulphur Bank Drive Property was one of the Lake County properties that Mosaic had

20   referenced in mid-May 2022 that was not fully licensed for cannabis cultivation at that time.  Nor was it

21   fully licensed when Fussell proposed it in July 2022.  Therefore, to the extent it was proposed in May

22   2022 and when it was proposed in July 2022, it did not meet the Replacement Property criteria (to the

23   extent those criteria were even relevant given that TPCO had terminated the Purchase Agreement).

24   141.   Publicly available information also indicates that the Sulphur Bank Drive Property is

25   owned by a company that has given a third party (an individual, but not Fussell or the owner of Kind Dog,

26   Inc.) permission to establish a cultivation operation and conduct cannabis cultivation activities once

27   appropriate permits and licenses have been obtained.  There is no reference to Kind Dog, Inc. in the

28   publicly available information about the Lake County license.  Therefore, it was unclear whether Kind

24

**COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF**
**Case No.**

1  Dog, Inc. had a license with the owner of the Sulphur Bank Drive Property or the third party that was
2  granted the license. Moreover, Fussell provided no information about the relationship between Kind Dog,
3  Inc. and the owner or the third party.

4      142.    Further, publicly available information suggests that over the past several years, cannabis
5  cultivation was happening at the Sulphur Bank Drive Property that was not fully licensed. For example,
6  the public comments generated during the licensing process report that law enforcement had visited the
7  Sulphur Bank Drive Property on several occasions. One of the comments was: "It is our understanding
8  that the grow was raided by the DEA November 2020." Another referenced "the drug raids – 2 that I
9  know of." Yet another stated "We are aware that the location has warranted visits and corrective action
10  taken by the DEA . . . ." The public comments also that in 2021, a member of the public "submitted Code
11  Enforcement Complaint SR21-00362" to Lake County because he "noticed the plants and white plastic"
12  at the Sulphur Bank Drive Property and "was advised that the operator . . . did not have a permit to grow
13  but that the County would assist him in becoming compliant."

14      143.    For example, one comment sets forth, "On January 23-24, 2022, the 1111 Sulphur Bank
15  grow was burning piles of cannabis damaged by the early rain in October." Another reported that someone
16  was cited for burning a damaged crop without a burn permit during a high wind time. And a third claimed
17  that the applicant was given two air quality notice violations on or about January 22, 2022, for burning
18  vegetative waste, including cannabis. Thus, Fussell was offering TPCO a property with a history of
19  enforcement issues, which is a red flag in and of itself and did not inspire confidence in Fussell's
20  management or the viability of the parcel to fulfill TPCO's needs..

21      144.    Moreover, while a review of the California Department of Cannabis Control ("DCC")
22  website reflects that Kind Dog, Inc. has various licenses for cannabis cultivation in Lake County, the
23  license status for all but one is "Not in Operation" (and the last one is listed as "Expired").

24      145.    Based on this and other publicly available information, the Sulphur Bank Property did not
25  meet the criteria for being a Replacement Property (again, were that even relevant) and TPCO was not
26  interested in the Sulphur Bank Drive Property.

27      **XIX.**   **Fussell Reiterates His Inability to Pay and TPCO Requests a Repayment Plan**

28

146.   On or about September 16, 2022, Fussell reached out to TPCO claiming again that he and and Mosaic were unable to pay what they owed to TPCO.

147.   Still attempting to find an amicable resolution, TPCO responded by stating that in that case, Fussell and Mosaic should be focused on putting together on a repayment plan. TPCO also offered that if Mosaic had outdoor flower that met TPCO's specifications, TPCO was willing to do spot "buys" and credit the fair market value of the buy against their debt. Further, TPCO reiterated that it was not interested in the Sulphur Bank Drive Property.

148.   Thereafter, on or about September 20, 2022, TPCO again requested a payment plan from Fussell and Mosaic. And it again reiterated that it would stand by its promise to not apply contractual interest to the Note while the parties were having good faith discussions around a resolution. That said, it reserved its right to apply contractual interest in the future and stated that it would start applying interest if the parties did not make significant progress toward a resolution.

## XX.   Fussell and Mosaic Re-Raise the Same Issues

149.   Fussell and Mosaic responded with a letter dated September 22, 2022 that did not offer to repay TPCO in whole or in part. Instead, it sought to justify their nonpayment with meritless complaints against TPCO that were contrary to past correspondence, the terms of the Purchase Agreement, the terms of the Note and to engage in a transparent attempt to renegotiate those bargained-for terms.

150.   First, they complained "the Mosaic Group ha[d] repeatedly offered Replacement Property satisfying the conditions of Section 2.08(a)" but that TPCO had "provided no basis on which the offered Replacement Property does not meet the conditions set forth in Section 2.08(a)." But this was not the case. In May 2022, Mosaic offered unidentified and unlicensed Lake County property as "Makeup Property" under Section 2.07 and not "Replacement Property" under Section 2.08. In June 2022, TPCO explained why Section 2.07 was inapplicable, and, also, assuming it had been offered under Section 2.08, Mosaic's offer was inadequate. Thereafter, in July 2022—after TPCO terminated the Purchase Agreement—Mosaic offered an identified Replacement Property, the Sulphur Bank Road Property. But at that time, the Sulphur Bank Road Property did not meet the criteria of Section 2.08 (which was inapplicable in any event) because, among other reasons, it was not fully licensed. Moreover, information in the public record suggested that there were any number of issues that made the Sulphur Bank Road

Property unattractive. Nevertheless, Fussell and Mosaic offered the Sulphur Bank Road Property to TPCO again, asking that TPCO "respond in good faith with its contractually based reasons for rejecting the offered Replacement Property in the context of those criteria" notwithstanding all of the problems readily apparently from the public record.

151.    Fussell and Mosaic also sought to renegotiate the already-agreed-upon true-up that had been reached following the deficiencies in Mosaic's cannabis cultivation and delivery. They claimed for the first time that the parties had not yet reached an agreement as to the accounting under the Supply Agreements. Specifically, they claimed that ███████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ This false assertion is contrary to the ████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ████████

152.    Further, they sought to rewrite the Note, claiming that TPCO cannot recover against Fussell personally for the money owed under the Note. Specifically, they claimed that "the note itself makes clear that the extent of the borrower's personally liability thereunder, if any, is for any deficiency in the collateral that is pledged as security for repayment." This flies in the face of the plain language of the Note, which sets forth, "if an Event of Default occurred, TPCO "shall have all remedies available at law and in equity to enforce and collect this Note *from Borrower*," namely, Fussell. (Emphasis added.) While TPCO also has "the right at any time and from time to time to take such actions as it deems appropriate with respect to the Pledged Units and other Collateral," it need not do so first. The language on which the Letter relies—"Borrower shall be personally liable for any deficiency"—does nothing more than set forth that if TPCO elects "to take such actions as it deems appropriate with respect to the Pledged Units and other Collateral" and it does not recover the full amount owed, it can pursue Fussell for the remainder.

153.    As of the date of the filing of this Complaint, Fussell has not repaid any of the $5,650,000 TPCO loaned him and Mosaic has not repaid any of the $1,499,086 it has admitted that it owes TPCO. Thus, together, Defendants owe TPCO over $7,000,000.

**COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF**
**Case No.**

## FIRST CAUSE OF ACTION

**(BREACH OF CONTRACT AS AGAINST FUSSELL AND DOES 1 THROUGH 10)**

154.    TPCO incorporates herein by reference the allegations set forth in Paragraphs 1 through 153, above.

155.    On or about May 21, 2021, TPCO and Fussell entered into the Note.

156.    32.    By signing the Note, Fussell and TPCO entered into a valid, binding, and enforceable contract.

157.    As required by the terms of the Note, TPCO advanced Fussell $5,650,000. TPCO also did all, or substantially all, of the other significant things that the Note required of it.

158.    The Maturity Date of the Note was the earlier of (i) June 1, 2022, or (ii) five business days after the termination of the Purchase Agreement.  June 1, 2022 was the earlier of the two.  Thus the Maturity Date of the Note was June 1, 2022.

159.    Fussell was required to pay back the advance in full no later than the Maturity Date (i.e., June 1, 2022).

160.    Fussell breached the Note by, among other things, failing to pay back any of the Loan to TPCO on or before the Maturity Date.  At no time before the filing of this complaint has Fussell repaid any part of the Loan.

161.    As a result of Fussell's breach, TPCO has been harmed, to wit, it has not been repaid for any part of the Loan, let alone the entirety.

162.    Fussell's breach of the Note was a substantial factor in causing TPCO's harm.

163.    Accordingly, TPCO has sustained monetary losses and damages in an amount not less than $5,650,000, plus contractual and statutory interest, and all expenses, including attorneys' fees and costs, incurred by TPCO in connection with the Event of Default, and any amounts spent endeavoring to collect the full principal amount due.

## SECOND CAUSE OF ACTION

**(BREACH OF WRITTEN CONTRACT AS AGAINST MOSAIC AND DOES 1 THROUGH 10)**

164.    TPCO incorporates herein by reference the allegations set forth in Paragraphs 1 through 163, above.

**COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF**
**Case No.**

165. Under the Supply Agreements, Mosaic agreed that █████████████████

███████████████████████████████████████████████████████████

██████████████████████████████████

166. TPCO satisfied all, or substantially all, of the obligations that the Supply Agreements required of it, including that ███████████████████████████████████

█████████

167. After extensive negotiations, solely for the purposes of █████████████

█████████████████████████████████, TPCO and Mosaic agreed that ████████████

████████████████████████████████████. Once they reached this agreement, █████████

████████████████████████████████████████████████████████████

████████████████████████. Because █████████████████████████████

█████████████████████████████████. Under the terms of the Supply

Agreement, ████████████████████████████████████████████████████

████████████████████████████████████████████████████

168. Mosaic breached the Supply Agreements by ██████████████████████

169. As a result of Mosaic's breach, TPCO was harmed.

170. Mosaic's breach of the Supply Agreements was a substantial factor in causing TPCO's harm.

171. Accordingly, TPCO has sustained monetary losses and damages in an amount not less than $1,499,086.00, plus statutory interest, and costs.

## THIRD CAUSE OF ACTION

### (BREACH OF IMPLIED-IN-FACT CONTRACT AS AGAINST MOSAIC AND DOES 1 THROUGH 10)

172. TPCO incorporates herein by reference the allegations set forth in Paragraphs 1 through 171, above.

173. There was an implied-in-fact agreement between TPCO and Mosaic.

174. By entering into the agreement, TPCO and Mosaic agreed to the following terms.

175. Mosaic agreed to manage, cultivate, and harvest cannabis on the Properties.

176. TPCO agreed to ████████████████████████████████████████

1      177.   Mosaic agreed that █████████████████████████████████

2      ████████████████████████████████

3      178.   TPCO and Mosaic agreed that ████████████████████████████

4      █████

5      179.   TPCO and Mosaic agreed that ██████████████████████████

6      █████████.

7      180.   TPCO satisfied all, or substantially all, of the obligations the agreement required of it,

8    including by ███████████████████████████████████.

9      181.   After the harvest, █████████████████████████████████████.

10     182.   With a letter dated April 17, 2022, TPCO informed Mosaic that ████████████

11    ███████████████████████ Mosaic owes it, $1,499,086.  Mosaic has confirmed that it

12    owes TPCO this amount.

13     183.   Mosaic should have paid TPCO $1,489,086 ████████████████████████

14     184.   ████████████████████████████████

15     185.   As of the date of the filing of this Complaint, Mosaic has not paid TPCO any of the

16    $1,499,086.

17     186.   Mosaic is in breach of the agreement.

18     187.   As a result of Mosaic's breach, TPCO has been harmed.

19     188.   Mosaic's breach of the agreement is a substantial factor in causing TPCO's harm.

20     189.   Accordingly, TPCO has sustained monetary losses and damages in an amount not less than

21    $1,499,086, plus any prejudgment interest thereon.

22                  **FOURTH CAUSE OF ACTION**

23   **(DECLARATORY RELIEF AS AGAINST FUSSELL AND THE COMPANY HOLDERS—TERMINATION OF THE**

24                           **PURCHASE AGREEMENT)**

25     190.   TPCO incorporates herein by reference the allegations set forth in Paragraphs 1 through

26    189, above.

27

28

**COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF**
**Case No.**

191.    Under California Code of Civil Procedure section 1060, where an actual controversy exists relating to the interpretation of a contract, any interested party may seek a declaratory judgment of its rights and duties.

192.    An actual controversy has arisen between TPCO and Fussell regarding whether TPCO properly terminated the Purchase Agreement with its letter dated June 30, 2022.

193.    A judicial declaration resolving this dispute is necessary and appropriate.

## PRAYER FOR RELIEF

**WHEREFORE**, TPCO prays for the following relief against Fussell, Mosaic, the company Holders and Does 1 through 10 inclusive:

A.  Against Fussell and Does 1 through 10 for breach of the Note:

    1.    For the sum of $5,650,000, plus contractual interest of 6% per annum;

    2.    For attorneys' fees and costs; and

    3.    For prejudgment and postjudgment interest;

    4.    For such other and further relief as this Court deems just and proper.

B.  Against Mosaic and Does 1 through 10 for breach of the Supply Agreements:

    1.    For the sum of $1,499,086;

    2.    For costs; and

    3.    For prejudgment and postjudgment interest;

    4.    For such other and further relief as this Court deems just and proper.

C.  In the alternative, against Mosaic and Does 1 through 10 for breach of implied-in-fact contract:

    1.    For the sum of $1,499,086;

    2.    For costs;

    3.    For prejudgment and postjudgment interest; and

    4.    For such other and further relief as this Court deems just and proper.

D.  Against Fussell and the Company Holders and Does 1 through 10 for declaratory relief:

    1.    That with its June 30, 2022 letter, TPCO properly terminated the Purchase Agreement; and

    2.    For such other and further relief as this Court deems just and proper.

**COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF**
**Case No.**

1    Dated:  December 16, 2022                    Respectfully submitted,

2

3                                                *s/ Krista Enns*
                                                 KRISTA M. ENNS (CA 206430)
4                                                JAMES THOMPSON (CA 240979)
                                                 Benesch, Friedlander, Coplan & Aronoff LLP
5
                                                 Attorneys for Plaintiff TPCO US Holding, LLC
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY RELIEF**
**Case No.**

# EXHIBIT 1

## MEMBERSHIP INTEREST PURCHASE AGREEMENT

This MEMBERSHIP INTEREST PURCHASE AGREEMENT (this "Agreement"), dated as of May 16, 2021, is by and between Ned Fussell, on behalf of Ned Fussell, the individual ("Fussell"), and affiliated parties of Fussell in connection herewith, namely the Company Holders (collectively, "Seller") on the one hand, and TPCO US Holding, LLC, a Delaware limited liability company (the "Buyer"), on the other hand.

WHEREAS, Seller, through one or more nominee agreements or similar arrangements with the Company Holders (defined below), is the beneficial owner of all of the membership interests in each of Digg It Gardens, LLC, a California limited liability company ("Digg It"), Potter Family Farm(z)(s), LLC, a California limited liability company ("Potter"), Rain Gardens, LLC, a California liability company ("Rain"), and Wild Heart Farms, LLC, a California limited liability company ("Wild Heart," and together with Digg It, Potter and Rain, each, a "Company" and collectively, the "Companies");

WHEREAS, each Company holds a valid leasehold interest in certain real property located in Sonoma County, California, forming part of the Property (defined below) and a Local License (defined below), pursuant to which such Company operates a commercial cannabis cultivation operation at the Property (collectively, all such operations by the Companies, are referred to herein as the "Business");

WHEREAS, Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, all right, title, and interest in and to all of the outstanding limited liability company membership interests of each Company (collectively, the "Company Securities") upon the terms and subject to the conditions hereinafter set forth; and

NOW, THEREFORE, in consideration of the promises and the mutual agreements and covenants hereinafter set forth, and intending to be legally bound, the parties hereby agree as follows:

### ARTICLE I
### DEFINITIONS

SECTION 1.01.      Certain Defined Terms.   In addition to terms defined elsewhere herein, for purposes of this Agreement the following terms are defined as follows:

"Acquisition Proposal" means any proposal relating to a possible (i) merger, consolidation, share exchange or similar transaction involving any Company, (ii) sale, lease or other disposition, directly or indirectly, of any material assets of any Company, (iii) issuance, sale or other disposition of any securities (or options, rights or warrants to purchase or securities convertible into, such securities) of any Company, (iv) liquidation, dissolution, or other similar type of transaction with respect to any Company, or (v) other transaction which is similar in form, substance or purpose to any of the foregoing transactions.

"Action" means any claim, action, suit, arbitration, audit, hearing, litigation, proceeding or suit (whether civil, criminal, administrative, investigative or informal) commenced, brought, conducted or heard by or before any Governmental Authority or arbitrator.

"Adjusted Wholesale Market Value" expressed on a per pound basis, means the net sum of (i) the average wholesale market price per pound of Conforming Cannabis, based on a mutually agreed market reference, during the Earnout Measurement Period, as reported on Buyer's verified third party sale reports delivered by Buyer to Seller with respect to each month during the Earnout Measurement Period, less (ii) the Excess Cost, if any.

"Advance Note Documents" means, collectively, the secured promissory note of Seller, payable to the order of Buyer, evidencing the contingent repayment obligation of the Effective Date Payment, and any and all associated security instruments and documents granting a lien on the Company Securities, all in substantially the form attached hereto as Exhibit B.

"Affiliate" means, with respect to any specified Person, any other Person that directly, or indirectly through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such specified Person.

"Annual Licenses" means the annual State of California cannabis licenses awarded to the Companies that shall supersede, replace, or otherwise supplemental the Provisional Licenses.

"Anti-Corruption Laws" means the US Foreign Corrupt Practices Act, and any other applicable federal, state, local, municipal, or foreign anti-corruption laws or regulations.

"Books and Records" means all books and records of the Companies, including, but not limited to, all records, files, papers, sales and purchase correspondence, books of account and financial and employment records, whether in tangible or digital form.

"California Approval" means with respect to each Company, the approval of the California Department of Food and Agriculture or its successor Department of Cannabis Control, and any other applicable California state agencies, for the change in ownership of such Company and in order for Buyer to maintain such Company's California License to own and operate the legal cannabis cultivation business on the Property with respect to such Company.

"California Licenses" means, with respect to each of the Companies, collectively, the Provisional Licenses and the Annual Licenses, except, for the avoidance of doubt, to the extent that any Annual License has superseded a related Provisional License, and then the California License, shall mean the Annual License in such case.

"CEQA Certificate" means collectively the evidence of compliance with the California Environmental Quality Act in connection with cannabis cultivation of the Properties subject to sale hereunder, as customarily so evidenced (such as, if applicable, all analyses, determinations, exemptions, notices, certifications, and the like related to the California Environmental Quality Act with respect to cannabis cultivation, the California Licenses and the Permits.

"Code" means the Internal Revenue Code of 1986, as amended.

"Company Holders" means, each of (i) Paula Bruning, who holds all of the Company Securities of Digg It, (ii) Christopher Potter who holds all of the Company Securities of Potter, (iii) Sukanya Lauer, who holds all of the Company Securities of Rain, and (iv) Lacy O'Callaghan, who holds all of the Company Securities of Wild Heart.

"Company Holder Acknowledgement Document" means an agreement in substantially the form of Exhibit C attached hereto, executed as of the date hereof by each of the Company Holders with respect to the Company Securities of the Company held by such Company Holder and with respect to the related matters herein.

"Conforming Cannabis" has the meaning set forth on Schedule 2.06.

"Consent" means any approval, consent, ratification, waiver or other authorization from any Person (including any approvals under applicable Law).

"Continuing Owner" means the Company Holder of each Company solely for an interim period to fulfill an executive officer position constituting an "Owner" under applicable State cannabis Laws, at the applicable Company for a temporary period until Buyer is approved as an additional "Owner" as required pursuant to applicable State cannabis laws or for such other period as mutually agreed between Buyer and the Company Holder and then to be removed as an "Owner" as soon as possible, subject to applicable State law requirements, if the foregoing is required for the purposes of sustaining the California Licenses.

"Contract" means any oral or written contract, commitment, purchase order, mortgage, instrument, indenture, sales order, license, lease and other agreement or arrangement.

"Control" (including the terms "controlled by" and "under common control with"), with respect to the relationship between or among two or more Persons, means the possession, directly or indirectly or as trustee, personal representative or executor, of the power to direct or cause the direction of the affairs or management of a Person, whether through the ownership of voting securities, as trustee, personal representative or executor, by contract, credit arrangement or otherwise.

"Cost Per Pound" means the weighted average cost per pound of the Total Production, as incurred and verified by Buyer.

"Cultivation and Supply Agreement" means that certain Cultivation and Supply Agreement, in a form substantially in the form attached hereto as Exhibit D.

"Cultivation Know-How" means, with respect to each of the Companies or Business, all Company data and information owned by, used by, or held for use by or on behalf of or licensed to (to the extent sublicensable) each Company (or otherwise controlled by) Seller or the Companies, as the case may be, and for which Seller and/or the Companies, the Production Companies, and/or any of Seller's other Affiliates, take reasonable steps to maintain in confidence regarding the Companies or the Business, including all Company or Business trade secrets, processes, plans, designs, research, operating manuals, methods, compounds, formulae, discoveries, developments, designs, drawings, technology, techniques, procedures, specifications, inventions, computer programs, and any other scientific or technical data or information designed,

developed, created and/or reduced to practice with respect to cultivation at the Properties in respect of the Companies or Business, in each case whether or not patentable in any jurisdiction, all of the foregoing utilized by Seller, the Production Companies or the Companies in furtherance of the Business, and any Intellectual Property related thereto.

"Earnout Measurement Period" means the period of twenty-four (24) consecutive months beginning on the month following the Effective Date.

"Earnout Shares" means an amount, if any, of shares of TPCO Common Stock equal to the product (i) the Maximum Earnout Shares, multiplied by (ii) the result of a fraction (not to exceed 1.0), the numerator of which is the Excess Production Value, and the denominator of which is (ii) $3,600,000. For avoidance of doubt, the total number of Earnout Shares shall not exceed the Maximum Earnout Shares and if the Total Production Value does not exceed $6,000,000 then, subject to Section 2.07, the number of Earnout Shares will be zero (0).

"Excess Cost" means the amount, if any, by which the Cost Per Pound exceeds $255 (or $128 for dried/bucked Conforming Cannabis product).

"Excess Production Value" means the amount, if any, by which the Total Production Value exceeds $6,000,000.

"GAAP" means United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means any federal, national, supranational, state, provincial, local or other government, governmental, regulatory or administrative authority, agency, commission, self-regulatory organization or any court, tribunal, or judicial or arbitral body.

"Governmental Official" means (i) any director, officer, employee, agent or representative (including anyone elected, or appointed to be an officer, employee, or representative) of any Governmental Authority, or anyone otherwise with the authority to act in an official capacity on behalf of a Government Governmental Authority; (ii) any political party, political party official, or political party employee; or (iii) any agent or representative of any of those persons listed in subcategories (i) through (ii).

"Governmental Order" means any order, writ, judgment, injunction, decree, stipulation, determination or award entered by or with any Governmental Authority.

"Holdback Amount" means the amount of $350,000 to be held by Buyer from the Effective Date payment and thereafter payable to the Seller pursuant to Section 7.07 and subject to the other terms and conditions of this Agreement.

"Indebtedness" means with respect to any Person (i) all obligations of such Person for borrowed money, whether current or funded, secured or unsecured, (ii) all obligations of such Person for the deferred purchase price of any property or services (other than trade accounts payable arising in the ordinary course of the business consistent with past practice of such Person), (iii) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, (iv) all obligations of such

Person secured by a purchase money mortgage or other Lien to secure all or part of the purchase price of property subject to such mortgage or Lien, (v) all obligations under leases which shall have been or are required to be, in accordance with GAAP, recorded as capital leases in respect of which such Person is liable as lessee, (vi) any obligation of such Person in respect of bankers' acceptances or letters of credit, (vii) any obligations secured by Liens on property acquired by such Person, whether or not such obligations were assumed by such Person at the time of acquisition of such property, (viii) interest, principal, prepayment penalty, fees, or expenses, to the extent due or owing in respect of those items listed in clauses (i) through (vii) above, whether resulting from their payment or discharge or otherwise, (ix) any refinancing of any of the foregoing obligations, and (x) all obligations of a type referred to in clause (i) through (ix) above which are directly or indirectly guaranteed by such Person or under which it has agreed (contingently or otherwise) to purchase or otherwise acquire or in respect of which it has otherwise assured a credit against loss.

"Indemnified Party" means a Buyer Indemnified Party or a Seller Indemnified Party, as the case may be.

"Indemnifying Party" means Fussell pursuant to Section 7.02 and the Buyer pursuant to Section 7.03.

"Intellectual Property" means intellectual property, in any and all medium, including digital, and in any jurisdiction, including, but not limited to, all (i) patents and patent applications (including all reissuances, continuations, continuations-in-part, revisions, extensions and reexaminations thereof) and patent disclosures and inventions (whether or not patentable and whether or not reduced to practice); (ii) trademarks, service marks, trade dress, trade names, internet domain names, assumed names and corporate names, in each case, whether or not registered, together with the goodwill of the business associated therewith; (iii) published and unpublished works of authorship, whether copyrightable or not, including all statutory and common law copyrights associated therewith; (iv) all registrations, applications, extensions and renewals for any of the items listed in clauses (ii) and (iii); (v) trade secrets; (vi) websites and the contents thereof; (vii) computer programs, including operating systems, applications, routines, interfaces, and algorithms, whether in source code or object code; (viii) databases and the information contained therein; (ix) lists of clients and potential clients (including any lists of electronic mail addresses of clients and potential clients); (x) pricing and cost information and business and marketing plans and proposals; (xi) ideas, compositions, know-how, research and development information, artwork and graphic design, drawings, specifications, manuals and documentation, data, improvements, databases and promotional materials; (xii) without limiting the generality of clause (xi), trading models, strategies and algorithms, (xiii) any information concerning trading or investment performance, including the profits and losses therefrom, return on investment and other performance or "track record" information; and (xiv) all proprietary rights relating to any of the foregoing, including, but not limited to, all causes of action, damages and remedies related thereto.

"Investigation" means any current inquiry or investigation (whether civil, criminal or administrative, investigative or informal) commenced, brought, conducted or heard by or before any Governmental Authority or arbitrator.

"Knowledge" means to the actual knowledge of the Person in the course of their ordinary roles, positions and duties, and in the case of the Companies, includes such actual knowledge of the Seller, the senior executives of the Production Companies and the applicable Company Holder with respect to such Company.

"Law" means (i) the common law of any state, province or territory, or any provision of any foreign, federal, state, provincial or local law, statute, rule, code, ordinance, regulation, treaty, Governmental Order, Permit or other codified requirement of any Governmental Authority applicable to the relevant Person or its properties, and (ii) the constitution, by-laws, rules, regulations, orders, regulatory circulars, customs and usage of any foreign, federal or state governmental, regulatory or self-regulatory organization, in each case having jurisdiction over the relevant Person or its properties (except Federal law with respect to commercial cannabis operations).

"Leasehold Interests" means collectively those certain leases and related documents listed on Schedule 1.01 that grant a leasehold interest in the Property to each of the Companies, for a term (including unilateral tenant options) of approximately ten years from the Effective Date.

"Liability" or "Liabilities" means any and all debts, liabilities, commitments and obligations of any kind whatsoever, whether accrued or fixed, absolute or contingent, matured or unmatured or determined or determinable, whether or not required to be recorded or reflected on a balance sheet (or footnotes thereto) prepared in accordance with GAAP, including those arising under any Law, Action, Investigation or Governmental Order and those arising under any contract, agreement, arrangement, commitment or undertaking.

"Licenses" means collectively the California Licenses and the Local Licenses.

"Liens" means any claims, liens, charges, rights, restrictions, options, preemptive rights, mortgages, deeds of trust, hypothecations, assessments, pledges, encumbrances, claims of equitable interest or security interests of any kind or nature whatsoever. A leasehold interest in property shall not constitute a Lien.

"Local Approval" means the approval of each applicable county and municipal agency, as applicable or required, for the change in ownership of each of the Companies (and with them, the change in ownership of each such Local License) in order for Buyer to maintain such Company's California License to own and operate the respective Company Business on the respective Property.

"Local Licenses" means collectively all local and municipal licenses and permits granted by Sonoma County, California, and any other county or local Governmental Authority that grant the Companies the right to operate a cannabis cultivation business at the Property.

"Material Adverse Effect" means, with respect to any Person, any fact, circumstance, condition, event, occurrence or change that, individually or in the aggregate, has had or is reasonably likely to have a material adverse effect on the condition (financial or otherwise), results of operations, business, assets or liabilities of such Person.

"Maximum Earnout Shares" means a total of 1,309,263 shares of TPCO Common Stock.

14357356 v13

"Payment Shares" means, collectively, the Closing Shares and any Earnout Payment Shares.

"Permit" or "Permits" means all permits, licenses, certifications, approvals, consents, notices, waivers, qualifications, filings, exemptions and authorizations by or of, or registrations with, any Governmental Authority other than the Licenses.

"Person" means any individual, partnership, firm, corporation, limited liability company, association, trust, unincorporated organization or other entity, as well as any syndicate or group that would be deemed to be a person under Section 13(d)(3) of the Exchange Act.

"Production Companies" means 2351 Circadian Way, LLC, a California limited liability company, and Mosaic. ag, Inc., a California corporation.

"Property" means collectively approximately four (4) acres of cannabis canopy in the aggregate, and associated additional land necessary for cultivation on cannabis on such acreage, and any improvements thereon located at respective addresses, in each case in accordance with and subject to the terms and conditions of the Leasehold Interests (and as legally described) set forth on Exhibit A.

"Provisional Licenses" means those provisional State of California cannabis cultivation licenses listed on the California Licenses Scheduled attached hereto.

"Qualified Investor" means a Person that either (a) qualifies as an accredited investor, as that term is defined in Rule 501(a) of Regulation D promulgated under the Securities Act, or (b) otherwise may receive TPCO Parent shares pursuant to an available exemption from the registration requirements of the Securities Act.

"Qualifying Additional Property" means agricultural property that (i) is located within a 100 mile radius of the Property and meets the zoning, land use, water rights and applicable state, county and municipal cannabis regulatory criteria set forth on Exhibit C attached hereto; and (ii) during the Earnout Measurement Period produced Conforming Cannabis having an Adjusted Wholesale Market Value of at least 200% of the Production Deficiency, in each case to Buyer's satisfaction in its reasonable discretion.

"Tax" or "Taxes" means (i) taxes assessments, charges, dues, duties, rates, fees, imposts, levies and similar charges of any kind (together with interest, penalties, additions to tax and additional amounts imposed with respect thereto) lawfully levied, assessed or imposed by any Governmental Authority under any applicable Tax Law, (ii) any liability for the payment of any items described in clause (i) above as a result of: (A) being (or ceasing to be) a member of an affiliated, consolidated, combined, unitary or aggregate group or (B) being included (or being required to be included) in any Tax Return related to such group, and (iii) any liability for the payment of any amounts as a result of any express or implied obligation to indemnify any other Person, or any successor or transferee liability, in respect of any of the item described in clause (A) or (B) above.

"Tax Laws" means the Code and all foreign, federal, state, local or other statutes imposing a Tax, including all treaties, conventions, rules, regulations, orders, and decrees of any jurisdiction.

"Tax Returns" means all reports, elections, returns (including information returns), claims for refund, and other documents required to be filed under the provisions of any Tax Laws and any tax forms required to be filed, whether in connection with a tax return or not, including any schedule or attachment thereto, under any provisions of any applicable Tax Laws, and including any amendment thereof.

"Title Documents" means all leasehold assignments, subleases, leases, lease restatements, landlord consent documents with respect to the Property identified by Buyer during the Interim Period.

"Total Production" means the total amount pounds of Conforming Cannabis produced on the Property and delivered to Buyer during the Earnout Measurement Period.

"Total Production Value" means the product of (i) the Total Production, multiplied by (ii) the Adjusted Wholesale Market Value, multiplied by (iii) 0.5.

"TPCO Parent" means TPCO Holding Corp., a corporation incorporated under the law of the Province of British Columbia, Canada.

"VWAP" means, the volume weighted average price per share of the TPCO Common Shares on the NEO Exchange, Inc. (or on the principal exchange on which the TPCO Common Shares are then traded) for the period of the ten (10) consecutive trading days prior to such date of determination, as reported by Bloomberg Financial L.P.

ARTICLE II
PURCHASE AND SALE

SECTION 2.01.    Purchase and Sale.  Subject to Section 2.08, upon the terms and subject to the conditions of this Agreement, at the Closing (defined below), Fussell shall (and shall cause the Company Holders to) sell, transfer, and deliver to Buyer, and Buyer shall purchase from such Sellers (including the Company Holders), all of the Company Securities of each of the Companies, free and clear of all Liens, in each case representing 100% of the membership interests (100% of the equity ownership) of each Company.

SECTION 2.02.    Purchase Price.  The aggregate Purchase Price for the Company Securities shall be paid as follows:

(a)    At a mutually agreed date within five business days of the date of this Agreement (the "Effective Date"), Buyer will make an advance to Seller in immediately available funds (the "Effective Date Payment"), which shall be delivered in exchange for the Advance Note Documents, in an amount equal to (i) $6,000,000, less (ii) any Indebtedness incumbering any of the Companies or the Leasehold Interests as of the Closing ("Seller Debt"), less (iii) the Holdback Amount.

(b)    At the Closing Date, subject to Section 2.08, Buyer will cause TPCO Parent to issue to Fussell, a number of shares of TPCO Parent common stock equal to (i) $2,500,000 divided by (ii) the VWAP (the "Closing Shares").

(c)     Buyer will issue up to the Maximum Earnout Shares to Fussell, subject to the terms and conditions described in Sections 2.06 and Section 2.07.

SECTION 2.03.     Closing.  Subject to the terms and conditions of this Agreement, the closing of the transactions contemplated hereby (the "Closing") shall be held at the offices of TPCO US Holding, LLC, 1550 Leigh Ave., San Jose, California, 95125, or remotely via the exchange of documents and signatures in ".pdf" format, effective as of 12.01 a.m. Pacific time, with respect to each Company, on the date thirty (30) days after all of the conditions to the obligations of the parties hereto set forth in 6.01 and 6.02 have been satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other place, at such other time or on such other date as the Seller and the Buyer may mutually agree upon in writing (the date on which the Closing occurs, the "Closing Date"). The Parties acknowledge and agree that the Closing and delivery of the Closing Date deliverables set forth herein may not occur simultaneously with respect to each of the Companies, and the parties agree to work together in good faith to consummate the Closing of the sale of each Company.

SECTION 2.04.     Deliveries by Seller

(a)     Effective Date Deliveries. At the Effective Date, the Seller shall deliver or cause the following to be delivered to the Buyer:

(i)     payoff letters in respect of any and all Seller Debt, if any, in form and substance customary and reasonably acceptable to Buyer, providing for the release and termination of any Liens on the assets of the Companies including without limitation the Leasehold Interests ("Payoff Letters");

(ii)     a counterpart to each of the Cultivation and Supply Agreement and the Advance Note Documents, duly executed by Seller and the Production Companies, as applicable;

(iii)     full use and access to the Property, including sufficient ingress, egress, property access by vehicle, subject to the Cultivation and Supply Agreement and the Leasehold Interests and Lease terms and subject to applicable laws and regulations (e.g. until such time of the Local Approval and California Approval, Buyer may not be permitted to access or conduct certain activities on the Property other than as permissible under the regulations with respect to "visitors" until such time as the change of ownership is consummated and the Closing occurs; provided that the Production Companies shall have full use and access as necessary to perform under the Cultivation and Supply Agreement), to the greatest extent possible by the Companies and the Seller; and

(iv)     The Company Holder Acknowledgement Documents, duly executed by each of the respective Company Holders.

(b)     Closing Date Deliveries. At the Closing Date, Seller shall deliver or cause the following to be delivered to Buyer:

(i)　　a true and complete copy of the documents evidencing the Local Approval and the California Approval in such form, terms, conditions, and substance as are acceptable to Buyer in its good faith discretion and as customarily provided by the locality or the State.

(ii)　　executed assignments, endorsements, and other sufficient instruments of conveyance and transfer, executed and delivered by the Company Holders, as are effective to vest the Buyer with full, complete, and marketable right, title, and interest in and to the Companies Securities, free and clear of all Liens;

(iii)　　[intentionally omitted- not applicable];

(iv)　　a resignation letter from each manager or officer, if applicable, of each Company (other than any Continuing Owner if requested by Buyer), effective as of the Closing Date, in form and substance reasonably satisfactory to Buyer;

(v)　　articles of organization and certificate of good standing of each Company, each certified by the Secretary of State of California as of a date not more than thirty (30) days prior to the Closing Date;

(vi)　　A certificate signed by Fussell certifying as to the matters set forth in Section 6.02(k) (CEQA compliance);

(vii)　　If the Cultivation Know-How is not otherwise transferred to Buyer as a result of the change of ownership of the Companies (pursuant to the purchase of the member interests in the Companies) (e.g. if the Companies do not own their own Cultivation Know-How), an instrument or instruments executed by the Seller providing Buyer with a fully-paid, non-exclusive license to all right, title, and interest in and to the Cultivation Know-How from Seller to Buyer;

(viii)　　The Title Documents and Leasehold Interests (if not automatically transferred to Buyer as a result of the purchase of the member interests in the Companies), executed as applicable by Companies and Buyer and, if necessary, applicable landlord parties pursuant to the Leases, including without limitation, an instrument executed by the landlord and the Companies evidencing such landlord's consent to the change of control of the Companies under the Leases (as applicable or required pursuant to the Leases);

(ix)　　Without limiting the generality of the Local Approvals and the California Approvals, evidence as applicable that all Permits necessary to operate the Business on the Property pursuant to the Licenses shall remain with the Companies, in full force and effect, and transfer with the Company interests to Buyer; and

(x)　　Any instruments required by Buyer for the issuance of the Closing Shares.

SECTION 2.05.　　Deliveries and Payments by the Buyer.

(a)     Effective Date Deliveries. At the Effective Date, the Buyer shall deliver or cause the following to be delivered to Seller the following:

(i)     Payment to Seller of the Effective Date Payment, in immediately available funds, to Fussell (as directed in the Company Holder Acknowledgement Documents), and against delivery of the Advance Note Documents;

(ii)     an officer's certificate of Buyer confirming that Buyer is holding the Holdback Amount in a segregated federally insured bank account, to be held and distributed as provided in 2.09 and subject to 7.07(b) and the other terms and conditions of this Agreement. The Holdback bank account shall require the signature of a designated representative of Seller as a condition of withdrawal.

(iii)     A counterpart to the Cultivation and Supply Agreement and the Advance Note Documents, duly executed by Buyer; and

(iv)     a certificate of the Secretary or an Assistant Secretary (or equivalent officer) of Buyer, certifying: (i) that attached thereto are true and complete copies of all resolutions adopted by the board of directors (or equivalent thereof) of Buyer authorizing the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby, and (ii) the names and signatures of the officers of Buyer authorized to sign this Agreement.

(b)     Closing Date Deliveries. At the Closing Date, the Buyer shall deliver or cause to be delivered to Seller the following:

(i)     The Closing Shares;

(ii)     Counterparts, as applicable, to the Title Documents and IP Conveyance Documents, if any;

(iii)     a certificate of a duly authorized officer of the Buyer certifying as to the matters set forth in Section 6.01(d); and

(iv)     a written acceptance in a form reasonably acceptable to Seller of the Company Securities to evidence Buyer's ownership thereof (e.g. an amended operating agreement or amendment to the existing operating agreements reflecting Buyer as the equity owner of the Companies).

SECTION 2.06.     Earnout Consideration. The Seller shall be entitled to receive, as part of the Purchase Consideration, the Earnout Consideration, if any, as determined in accordance with this Section 2.06**Error! Reference source not found.**.

(a)     Earnout Statement.

(i)     Not later than thirty (30) days following the end of the Earnout Measurement Period, Buyer shall prepare and deliver to the Seller a written statement (an "Earnout Statement"), setting forth Buyer's calculation of Total

Production Value and the number of Earnout Shares, if any. Upon receipt of an Earnout Statement, the Seller and their accountants will be given reasonable access upon reasonable notice to the Buyer's relevant books and records and personnel during business hours for the purpose of verifying the calculation of Total Production Value and the Earnout Shares, as applicable.

(ii)     Prior to the date which is thirty (30) days after Buyer's delivery of an Earnout Statement (an "Earnout Protest Deadline"), the Seller may deliver written notice to Buyer (an "Earnout Protest Notice") setting forth any objections which the Seller may have to the Earnout Statement. The Earnout Protest Notice shall specify in reasonable detail any contested amounts and the basis therefor and shall include a schedule setting forth the Seller' determination of the Total Production Value and Earnout Shares, if any. If an Earnout Protest Notice is not delivered prior to the Earnout Protest Deadline, the Buyer's Earnout Statement shall be final, binding and non-appealable by the Seller. If an Earnout Protest Notice is delivered prior to the applicable Earnout Protest Deadline, any such amounts or matters not disputed therein shall be final, binding and non-appealable by the Seller.

(iii)     If Buyer and Seller are unable to resolve any disagreement with respect to an the Earnout Statement within thirty (30) days following Buyer's receipt of the Earnout Protest Notice, then only the matters in dispute will be referred to an independent accounting firm mutually or arbitration body reasonably satisfactory to the parties (the "Arbitrators") for final determination within forty-five (45) days after such referral. The determination by the Arbitrators of the amounts in dispute shall be based solely on presentations by Buyer and Seller and shall not involve the Arbitrators' independent review. Any determination by the Arbitrators shall not be outside the range defined by the respective amounts in the Earnout Statement proposed by Buyer and Seller' proposed adjustments thereto set forth in the Earnout Protest Notice, and such determination shall be final, binding and non-appealable. Each of Buyer, on the one hand, and Seller, on the other hand, shall bear that percentage of the fees and expenses of the Arbitrators equal to the proportion (expressed as a percentage and determined by the Arbitrators) of the dollar value of the disputed amounts determined in favor of the other party by the Arbitrators.

(b)     Payment of Earnout Consideration. Within ten (10) days after the date on which an Earnout Statement becomes final and binding upon the parties as set forth herein, Buyer shall cause TPOC Parent to issue to the Earnout Shares, if any, called for in the Earnout Statement, to Fussell, and/or such Persons to which Fussell directs in writing who are, to the belief and satisfaction of TPCO Parent, a Qualified Investor.

(c)     Control. For the avoidance of doubt, subject to the Cultivation and Supply Agreement and applicable State and local cannabis laws and regulations, nothing contained herein shall restrict Buyer's right to control and/or operate the Property in any respect. None of Buyer or any of its Affiliates will owe Seller any fiduciary or other similar duty or will have any obligation or be bound by any agreement or covenant of any kind, other than an obligation to comply with the covenant of good faith and fair

dealing implied in all contracts governed by applicable law, and the obligation of Buyer and/or its Affiliates to comply with the terms of this agreement and the agreements contemplated hereby, it being the parties' intention that any other covenants, agreements and/or obligations are expressly waived and disclaimed. Additionally, during such Interim Period, Buyer agrees to conduct the Business in material compliance with law (it being acknowledged that Buyer will have no responsibility for actions taken by the Manager (as defined in the Cultivation and Supply Agreement) and shall cooperate with Sellers in good faith to the end of obtaining receipt of the Local Approval and California Approvals.

SECTION 2.07.    Property Make-Whole Opportunity. Notwithstanding the foregoing, if the Total Production Value as shown on the final Earnout Statement is less than $9,600,000 (a "Production Deficiency"), Seller may at his option elect to make up the Production Deficiency as set forth in this Section 2.07. To exercise this election, Seller shall provide written notice of its intent to make up the Production Deficiency within thirty (30) days after the date that the Earnout Statement becomes final (a "Makeup Notice"). Upon delivery of a Makeup Notice, Seller shall have ninety (90) days to convey to Buyer, at Buyer's sole discretion and election, the following assets, free and clear of all Liens and for no additional consideration other than additional Earnout: (i) an interest in Qualifying Additional Property, consisting of either fee simple title or valid assignment of leasehold interests of substantially equivalent price and terms as the Leasehold Interests (the "Makeup Property"), and/or (ii) Conforming Cannabis having (to Buyer's reasonable satisfaction after inventory and inspection) an Adjusted Wholesale Market Value at least equal to 200% of the Production Deficiency (the "Makeup Cannabis"). Upon receipt of the Makeup Property and/or the Makeup Cannabis, Buyer shall cause TPCO Parent to issue to Seller a number of additional shares of TPCO Parent common stock equal to the Maximum Earnout Shares, less the number of Earnout Shares, if any, previously issued pursuant to Section 2.06 above.

SECTION 2.08.    Replacement Property.

(a)    Beginning on December 31, 2021 (or earlier if mutually agreed), the parties will determine mutually and in good faith whether any of the four Companies will not be able to be transferred to Buyer due to a Regulatory or Consent Condition. For this purpose, a "Regulatory or Consent Condition" will have occurred with respect to a Company or its applicable portion of the Property if any of the following matters shall have occurred or are reasonably expected to occur prior to June 1, 2022: (i) loss of Permit or License or related inability to legally operate in the State of California or Sonoma County to transfer control of any such Company (including its Licenses and Permits, and assuming their continued validity) to Buyer; (ii) issue or cloud over Seller/Company Holder's title to company equity or inability to transfer all such equity to Buyer free and clear of liens; or (iii) loss of Leasehold Interests or inability to obtain landlord consent to transfer of control of a company (and with it the lease rights), if applicable (if such consent is required); or certain matters concerning a Company Owner as provided in the Note. For the avoidance of doubt, Regulatory or Consent Conditions do not include the failure of a Company or applicable portion of the Property to meet yield minimums set forth herein (unless such failure is due to a force majeure event impacting the specific Property, and in which case Buyer may choose in its discretion to accept a Replacement Property) or a breach of a representation or warranty regarding the Company made by

Seller/Company Holder that has or would be reasonably likely to have a material and adverse effect on the Company or the Company Securities and which is not capable of being cured within thirty (30) days after receipt of notice thereof by Seller.

(b)     If any Company has a Regulatory or Consent Condition or if otherwise agreed by Buyer in its sole discretion if there is not a Regulatory or Consent Condition, Seller and Buyer will work in good faith to mutually identify a suitable replacement cannabis operation (cultivation business and access to property, whether owned or leased by Seller) from among Seller's other holdings (a "Replacement Property"), and the acceptance or rejection of a property as a Replacement Property hereunder shall ultimately be the subject to the agreement of Buyer in its good faith reasonable discretion. The Replacement Property business or company/licensed operation will be owned by Seller (or a nominee thereof) and capable of being subject to change of ownership to Buyer free and clear of liabilities and liens at such time of the replacement (as contemplated the same way hereunder with respect to the Companies), be of substantially the same, similar or better acreage as a Company, be either owned or with substantially similar assignable leasehold rights, have substantially similar regulatory rights (permitting and licensing) and water access, and have produced an average yield over the preceding two years of Conforming Cannabis of at least 12,000 pounds per acre.

(c)     If on June 1, 2022 the Closing conditions have been met (or otherwise been waived in writing by Buyer) with respect to at least three of the four original Companies and/or Replacement Properties (or, for the avoidance of doubt three of four of any combination thereof), then Closing will proceed.  If less than three Companies and/or Replacement Properties have met such Closing conditions (or any such conditions have not been waived in writing by Buyer), then Buyer will have the right to terminate the transaction, subject to Seller's right to extend the Closing by up to 90 days to continue to locate and produce a Replacement Property.

(d)     If the Closing occurs on fewer than four of the original Companies or Replacement Properties (or a combination thereof), then the Purchase Price and Note forgiveness will be adjusted pro rata (i.e., 25% per Company).

SECTION 2.09.     Release of the Holdback Amount. On the first anniversary of the Closing the Buyer will pay the Holdback Amount to Seller subject to Section 7.07(b).

<center>ARTICLE III<br>REPRSENTATIONS AND WARRANTIES OF THE SELLER</center>

Fussell hereby represents and warrants to the Buyer as follows:

SECTION 3.01.     Organization and Authority; Capitalization

(a)     Each of the Companies is a limited liability company duly formed, validly existing and in good standing under the laws of California and is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the operation of its business makes such licensing or qualification necessary. Each Company's formation and governance agreements, each as amended to date and together with any

equityholder agreements relating thereto (the "Organizational Documents") have been made or will be made available Buyer in true and complete copies.

(b)     The execution and delivery of this Agreement by Seller, the performance by each Seller his obligations hereunder and the consummation by Seller of the transactions contemplated hereby have been duly authorized by all requisite action on the part of Seller. This Agreement, the Advance Note Documents, and the Company Holder Acknowledgement Documents and other documents and agreements contemplated hereby have been duly executed and delivered by Seller, or as applicable, the Company Holders (the "Transaction Documents") and constitute legal, valid and binding obligations of such Persons, enforceable against them in accordance with its terms.

(c)     Assuming that the Local Approvals and California Approvals have been obtained as contemplated hereunder and the filings, notifications, consents, approvals, authorizations and other actions required therefore have been obtained, the execution, delivery and performance of this Transaction Documents by the Seller and/or the Company Holders, as applicable, do not and will not (i) violate, conflict with or result in the breach of the Organizational Documents of any Company, (ii) conflict with or violate any applicable state Law or Governmental Order that, to the Knowledge of the Companies, is applicable to the such party, or (iii) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any Contract, license, permit, franchise or other instrument or arrangement to which any Company, any Company Holder or Seller is a party.

(d)     Companies are the record owners and holder of the Leasehold Interests to the Properties and to the Licenses. Fussell has all requisite power and authority to sell, transfer, assign, and deliver the Company Securities through the Company Holders to Buyer delivered on his behalf by the Company Holders as provided in this Agreement, and such delivery will convey to Buyer at the Closing good and valid title to Company Securities. Upon consummation of the transactions contemplated by this Agreement, good and valid title to the Company Securities will pass to Buyer, free and clear of any and all Liens.

(e)     Company Holders are the record owners and holders (and Fussell is the sole beneficial owner) of all of the Company Securities, which are all duly authorized, validly issued and fully paid, free and clear of any and all Liens, except for restrictions on transfers under applicable securities laws, and not subject to, issued or held in material violation of any purchase option, call option, right of first refusal, preemptive right, subscription right or any similar right under applicable Law, the applicable Company Organizational Documents or any other Contract by which any Seller, any Company Holder or such Company is a party or such Person's properties and assets are bound. The Company Securities to be transferred pursuant this Agreement comprise 100% of the issued and outstanding equity of the Companies. There are no authorized or outstanding (i) securities convertible or exchangeable into Company Securities, including bonds, debentures, notes or other Indebtedness the holders of which have the right to vote (or

are convertible into, exchangeable for or evidencing the right to subscribe for or acquire securities having the right to vote) with the security holders of the Company on any matter, (ii) any options, warrants, convertible or exchangeable securities, purchase rights, subscription rights, preemptive rights, conversion rights, exchange rights, calls, puts, rights of first refusal or other contracts that could require Seller, any Company Holder or the Company to issue, sell or otherwise cause to become outstanding or to acquire, repurchase or redeem any Company Securities, (iii) stock appreciation, phantom stock, profit participation or similar rights with respect to the Company, or (iv) rights to purchase Company Securities from the holders thereof. No Person has preemptive rights, tag-along rights or co-sale rights with respect to the sale of Company Securities contemplated hereby and there are no agreements to which Seller, any Company Holder or the Company is a party relating to the acquisition, disposition, voting or registration of any Company Securities.

SECTION 3.02.    Contracts.

(a)    Correct and complete copies of all material Contracts related to the Companies and the Property have been delivered to Buyer in complete and correct copies (the "Material Contracts").

(b)    Each Material Contract is in full force and effect, is a legal and binding obligation of the Seller or the Company, as applicable, and, to the Knowledge of the Companies and Seller, is enforceable in accordance with its terms on each of the other parties thereto.  The Companies, and each of the other parties to each such Material Contract have performed in all material respects all obligations required to be performed by them to date under each such Material Contract, and, to the Knowledge of the Companies, no condition exists or event has occurred which (whether with or without notice or lapse of time or both) would constitute a breach or default (or has been alleged in a communication to the Companies in writing to constitute a breach or default) by the Companies or Seller or any other party thereto, under, or result in a right of termination of (and no notice of any intent to terminate has been received by the Companies or the Seller), or give rise to any right to accelerate or otherwise modify any other right or obligation under, any such contract.  As of the Effective Date, none of the Companies, Seller or their Affiliates has received written notice from any other party of its intent to cancel or terminate any such Material Contract.

(c)    All Consents of any third party (other than a Governmental Authority, including, without limitation, e.g. with respect to the California Approval and Local Approval which have not yet been obtained or made) to any Contract (collectively, the "Third Party Consents") to which any of Companies or Seller is a party or by which any of its properties are bound which is required for the execution and delivery of this Agreement and the performance by it of its obligations hereunder and thereunder and the consummation of the transactions contemplated hereby and thereby have been obtained or made.

SECTION 3.03.    Compliance with Law; Permits.

(a)     Except with respect to federal Laws relating to the manufacture, use, possession, cultivation, and distribution of marijuana, its cannabinoids, and cannabimimetic agents (including, without limitation, the Controlled Substances Act), the Seller and the Companies are, and the conduct of the Business on the Property is and at all times by Companies and the Production Companies has been, in compliance in all material respects with all Laws of any Governmental Entity applicable to the Business, the Property, Seller or the Companies (including without limitation, all labor Laws, employment Laws, land and water use Laws, and state, county and municipal cannabis Laws, and environmental laws). The Companies have not received any material written notice from a Governmental Entity that alleges that any of the Business, the Property, the Production Companies, or Seller are not in compliance with any Law, and to the Knowledge of the Companies, the Companies, none of the Production Companies or the Property (during the period while owned or controlled by the Companies) have been subject to any adverse inspection, adverse finding, adverse investigation, penalty assessment, adverse audit or other enforcement action.

(b)     The Companies hold all material Licenses and Permits that are necessary for the operation of the Business on the Property, and complete and correct copies of which have been made or will be made available to the Buyer. To the Knowledge of the Seller, such Licenses and Permits are valid and in full force and effect. The Seller is not in default under and, to Seller's Knowledge, no condition exists that with notice or lapse of time or both would constitute a default under, any such Licenses and Permits. To the Knowledge of the Companies, none of such Licenses and Permits will be terminated or impaired or become terminable, in whole or in part, as a result of the consummation of transactions contemplated hereby. The Seller and the Companies have not received any written notice from any Governmental Authority asserting that any of Fussell, the Production Companies or any of the Companies are not in compliance in any material respect with any of the statutes, regulations or ordinances under Law with respect to, or that such Governmental Authority intends to revoke or suspend any License or Permit necessary for, the operation of the Business.

(c)     Companies' activities have been and are being conducted with the good faith intent to be consistent with the following priorities (but which matters, Buyer recognizes, may, in some cases, be out of the reasonable control of Seller or the Companies): (1) Preventing the distribution of marijuana to minors; (2) Preventing revenue from the sale of marijuana from going to criminal enterprises, gangs, and cartels; (3) Preventing the diversion of marijuana from states where it is legal under state law in some form to other states; (4) Preventing state-authorized marijuana activity from being used as a cover or pretext for trafficking of other illegal drugs or other illegal activity; (5) Preventing violence and the use of firearms in the cultivation and distribution of marijuana; (6) Preventing drugged driving and exacerbation of other adverse health consequences associated with marijuana use; (7) Preventing the growing of marijuana on public lands and the attendant public safety and environmental dangers posed by growing marijuana on public lands; and (8) Preventing marijuana possession and use on federal property.

(d)    The Companies are and have been in compliance in all material respects with all environmental Laws. The Seller and the Companies have not received any written notice, report, or other information regarding any material violation of, or material Liability under, any environmental Laws. To the Seller's Knowledge, the Companies have no material Liability with respect to the presence of any toxic or hazardous substances, materials or wastes in any product, property, building or other structure. The Seller has made or will be made available Buyer all environmental, health or safety reports, audits, or assessments in its possession or control relating to the Companies and the Business. None of the Companies, Production Companies or Seller have received any communications from any Governmental Authority regarding adverse water conditions and/or water conservation other than in the ordinary course applying to agricultural and other California businesses in connection with conservation and drought conditions not specifically or uniquely adverse to the Property or use restrictions to be implemented now or within the next twelve months, and Seller has made available or will made available to Buyer the contingency plans for operation of the Business on the Property in the event that it has been made aware that water restrictions or conservation measures are to be instituted at any time during the next twelve months.

SECTION 3.04.    Litigation. There is no suit, Action, Investigation, proceeding, arbitration, mediation, claim or order pending or, to Fussell's and the Companies' Knowledge, threatened against the Companies, the Production Companies, Fussell and/or any officers, directors, members, managers, partners or employees of the Companies, the Production Companies or Fussell, in each case in connection with the Business or the Property, nor, to the Knowledge of the Companies, is there any reasonable basis for any such suit, Action, Investigation, proceeding, arbitration, mediation, claim or order. There are no outstanding judgments, orders, consents, agreements or decrees of any Governmental Authority against the Companies, the Production Companies or Fussell (with respect to the Business, the Property or the Leasehold Interests). The Companies are not currently in default under nor have failed to comply with, any judgment, order, consent, agreement or decree of any Governmental Authority.

SECTION 3.05.    Taxes. Except as set forth on Schedule 3.05:

(a)    The Companies have timely filed (or caused to be timely filed) all income and other material Tax Returns that it was required to file (taking into account any extensions of time to file), and all such Tax Returns are complete and correct in all material respects. All material amounts of Taxes of the Companies (whether or not shown as owing by the Companies on such Tax Returns) have been fully paid and the Companies have complied in all material respects with all applicable Laws relating to information reporting requirements and the withholding of Taxes and the payment thereof.

(b)    The Companies have withheld and properly paid to the appropriate Governmental Authority all Taxes required to have been withheld and paid by it in connection with amounts paid or owing to any employee, independent contractor, creditor, customer, shareholder or other party, and has complied with all information reporting and backup withholding provisions of applicable Law.

(c)     The Companies are not, as of the date hereof, the subject of a Tax audit, examination, contest or other administrative proceeding with respect to any Taxes, nor has any such proceeding been threatened in writing (or, to the Knowledge of the Companies, otherwise).

(d)     The Companies have no material Liability for Taxes of any Person as a transferee or successor, by Contract or otherwise, or under Treasury Regulations Section 1.1502-6 (or any similar provision of state, local or foreign law), nor have any of the Companies been included in any "consolidated," "unitary" or "combined" Tax Return (other than Tax Returns for which any of the Companies is the common parent) provided for under the laws of the U.S., any foreign jurisdiction or any state or locality with respect to Taxes for any taxable year.

(e)     The Companies are not currently the beneficiary of any extension of time within which to file any Tax Return. No claim has been made in writing by a Tax authority in a jurisdiction where the Companies do not file Tax Returns asserting that any of the Companies is or may be subject to Taxes imposed by that jurisdiction. The Companies have not executed or entered into with any Governmental Entity any agreement, waiver or other document extending or waiving the period for assessment or collection of any Taxes of the Companies, which extension or waiver is currently pending.

(f)     None of the Companies is not now, nor ever has been, a party to a "reportable transaction" within the meaning of Section 6707A(c)(1) of the Code and Treasury Regulations Section 1.6011-4(b). None of the Companies is not a party to or is bound by any Tax sharing, Tax indemnification or similar agreement, other than commercial agreements entered into in the ordinary course of business the principal purpose of which is not Tax.

(g)     The Companies will not be required to include any material item of income in, or exclude any material item of deduction from, taxable income for any taxable period (or portion thereof) beginning after the Effective Date as a result of any (i) change in, or use of an improper, method of accounting for a taxable period ending on or prior to the Effective Date, (ii) "closing agreement" as described in Section 7121 of the Code (or any corresponding or similar provision of state, local, or non-U.S. income Tax law) executed on or prior to the Effective Date, (iii) installment sale or open transaction disposition made on or prior to the Effective Date, (iv) prepaid amount received on or prior to the Effective Date or (v) election under Code Section 108(i).

(h)     No claim has been made in writing by a Tax authority in a jurisdiction where the Companies do not file Tax Returns that the Companies may be subject to taxation by that jurisdiction. There are no rulings, requests for ruling, closing agreements or determinations relating to the Companies which would reasonably be expected to affect its liability for Taxes for any Tax period after the Effective Date.

SECTION 3.06.     <u>Conduct of Business</u>. Since January 1, 2019, (i) the Companies and the Production Companies have operated the Business and conducted operations on the Property

in the ordinary course of business consistent in all material respects with past practices taking into consideration the industry in which they operate; and (ii) there has been no event, change, or circumstance which, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect on the Companies or the Property.

SECTION 3.07.    Intellectual Property. The Companies or Fussell, as applicable, own all right, title, and interest in and to the Cultivation Know-How. To the Knowledge of the Companies, such Persons have not infringed, conflicted, diluted, misappropriated or violated, and are not infringing, conflicting, diluting, misappropriating or violating, any Intellectual Property owned by any third party. To the Knowledge of the Companies, there is no unauthorized use, infringement or misappropriation of any of the Cultivation Know-How by any third party, including any employee or former employee of the Companies. The Cultivation Know-How, however, of Fussell is utilized in more than just the Companies, and Fussell's Cultivation Know-How may, for the avoidance of doubt continue to be utilized by Fussell outside the applicability of the Companies and in connection with Fussell's continued cannabis operations. The Companies have not received any written notice, and they have no Knowledge of any facts, alleging or otherwise indicating that the use of the Cultivation Know-How or operations on the Property are infringing, conflicting, diluting, misappropriating or is otherwise violating, any Intellectual Property owned by any third party.

SECTION 3.08.    Property.

(a)    Companies have not received written notice of any eminent domain or private purchase in lieu of such proceeding that would materially adversely affect the Leasehold Interests.

(b)    Companies have not received written notice of any action, suit, proceeding or governmental investigation pending or expressly threatened in writing against Companies or the Property that would materially adversely affect Seller's ability to perform its obligations under this Agreement or the Leasehold Interests.

(c)    Companies are the sole owners and holders of the Leasehold Interests and have not made any assignment nor sublet any Leasehold Interests to any third party.

(d)    Companies have made available to Buyer true and accurate copies of all lease documents creating Leasehold Interests (collectively, the "Leases"), including all amendments, modifications and supplements thereto.

(e)    Companies are not party to any contracts or agreements with respect to the Property which will remain in effect after the Closing other than the Leases, the Leasehold Interests, the Licenses and Permits.

(f)    Companies have received no notice of any alleged violations of any governmental requirements, environmental laws, regulations or ordinances relating to the Property or any alleged liability (including claims, suits, investigations or inquiries) associated with the presence or suspected presence of any toxic or hazardous material on the Property.

(g)     The Property has, or will have prior to Closing, (1) direct access to and entitlement to receive all water, electricity and other utilities necessary to operate a commercial cannabis cultivation operation materially consistent with the past practices of the Companies and consistent with the water requirements to produce Conforming Cannabis of the nature and extent contemplated by this Agreement and the Cultivation and Supply Agreement, and (2) access, either direct or indirect, to public roads and full ingress/egress rights from such public road to the Property.

(h)     None of the Companies, Production Companies, or Seller have information indicating drought, water shortage, or other conditions (other than those of general applicability in California) that now or within the next twelve months will cause water supply to be insufficient to operate a commercial cannabis cultivation operation at any Property materially consistent with the past practices of the Companies and consistent with the water requirements to produce Conforming Cannabis, and Seller has provided or will provide Buyer with the contingency plans for operation of the Business on the Property in the event that it has been made aware that drought, water shortage, or other conditions will cause water supply to be insufficient at any time during the next twelve months.

SECTION 3.09.     Brokers.   Except as disclosed between the Parties, no broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Seller, the Companies, or any Affiliate of the Seller or the Companies.

SECTION 3.10.     Private Placement.

(a)     Fussell is acquiring the Payment Shares solely for his own account for investment purposes and not with a view to, or for offer or sale in connection with, any distribution thereof or any other security related thereto within the meaning of the Securities Act of 1933, as amended (the "**Securities Act**"). Fussell acknowledges that Buyer nor TPCO Parent have registered the offer and sale of the Payment Shares under the Securities Act or any state securities laws, and that the Payment Shares may not be pledged, transferred, sold, offered for sale, hypothecated, or otherwise disposed of except pursuant to the registration provisions of the Securities Act or pursuant to an applicable exemption therefrom and subject to state securities laws and regulations, as applicable. Seller is an "Accredited Investor," as such term is defined in the rules promulgated under the Securities Ac, and he is able to bear the economic risk of holding the Payment Shares for an indefinite period (including total loss of its investment), and has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risk of an investment.

(b)     Payment Shares are being issued by TPCO Parent pursuant to an exemption from the registration requirements of the Securities Act pursuant to Section 4(a)(2) of the Securities Act and will not be registered under the Securities Act or any state securities laws. Such shares shall be "restricted securities" within the meaning of Rule 144 under the Securities Act and any disposition of such shares by the holder thereof will need to be made pursuant to an effective registration of the shares under the

Securities Act or pursuant to an available exemption from such registration requirements. Fussell covenants that the Payment Shares may be disposed of only pursuant to an effective registration statement under, and in compliance with the requirements of, the Securities Act, or pursuant to an available exemption from, or in a transaction not subject to, the registration requirements of the Securities Act, and in compliance with any applicable state and federal securities laws.  In connection with any transfer of the Payment Shares other than (i) pursuant to an effective registration statement or (ii) pursuant to Rule 144 (provided that the holder provides TPCO Parent with reasonable assurances (in the form of seller and, if applicable, broker representation letters) that the securities may be sold pursuant to such rule) or any other available exemption under the Securities Act, TPCO Parent may require the transferor thereof to provide to TPCO Parent an opinion of counsel selected by the transferor and reasonably acceptable to TPCO Parent, the form and substance of which opinion shall be reasonably satisfactory to TPCO Parent, to the effect that such transfer does not require registration of such transferred Payment Shares under the Securities Act.  All certificates evidencing the Payment Shares shall bear any legend as required by the "blue sky" laws of any state and a restrictive legend in substantially to the effect of this paragraph.

SECTION 3.11.     Financial Matters; Undisclosed Liabilities; Lack of other Assets or Operations; Growth Statistics

(a)     Financial statements for the Business with respect to all revenue and expense associated with all cannabis crops grown on the Property in each of the 2019 and 2020 full growing seasons, as operated by and/or on behalf the Companies (collectively, the "Financial Information") have been made or will be made available Buyer. The Financial Information has been prepared in a manner consistent with Books and Records of the Companies and the Business and fairly and accurately presents the actual financial results of operations of the Business in all material respects as conducted on the Properties for the relevant fiscal periods reflected therein.

(b)     Current cultivation statistics and yield figures for the 2019 and 2020 full growing seasons for the Property have been made or will be made available Buyer (the "Growth Statistics"). The Growth Statistics are complete and accurate in all material respects.

(c)     To the Knowledge of the Seller, none of  the Companies have any Liabilities of any nature (whether accrued or unaccrued, absolute or contingent, direct or indirect, perfected or unperfected, liquidated or unliquidated, or otherwise, and whether due or to become due) arising out of transactions entered into on or prior to the date hereof, or any transaction, series of transactions, action or inaction occurring on or prior to the date hereof, or any state of facts or condition existing on or prior to the date hereof (regardless of when such Liability is asserted), except for Liabilities under the Leases or that would otherwise not be in excess of $10,000 in the aggregate for any Company. None of the Companies have or ever owned any assets other than the Leasehold Interests and the Licenses or Permits.  Other than the Business, which has been and continues to be conducted contractually on its behalf by the Production Companies, no Company has

conducted any business or activity. None of the Companies has had or now has any direct employees.

SECTION 3.12.        Compliance with Anti-Corruption laws. Neither the Seller, nor the Companies have at any time:

(a)        violated, or engaged in any activity, practice, or conduct which would violate any Anti-Corruption Law;

(b)        used corporate funds or assets for any unlawful contribution, gift, entertainment, or other unlawful expense, or made any bribe, rebate, payoff, influence payment, kickback, or other unlawful payment; or

(c)        directly, or indirectly, offered, promised, paid, given, or authorized the payment or giving of money or anything else of value to any (i) Government Official; (ii) other Person; or (iii) Person while knowing or having reason to believe that some portion or all of the payment or thing of value will be offered, promised, or given, directly or indirectly, to a Government Official or another Person,

for the purpose of: (a) influencing any act or decision of such Government Official or such Person in his, her, or its official capacity, including a decision to do or omit to do any act in violation of his, her, or its lawful duties or proper performance of functions; or (b) inducing such Government Official or such person or entity to use his, her, or its influence or position with any Government Entity or other person or entity to influence any act or decision in order to obtain or retain business for, direct business to, or secure an improper advantage for, the Companies or the Seller.

SECTION 3.13.        Product Liability. There have been no product recalls by any of the Companies, the Production Companies or their Affiliates with regard to any cannabis products grown or produced on or with respect to the Property or otherwise by the Business on the Property. No Company product designed, cultivated manufactured, assembled, labeled, packaged, or any Company product or Company service marketed, sold, leased, licensed, distributed or otherwise delivered by any of the Companies, the Production Companies or their respective Affiliates or the Business, whether or not on the Property or other property (collectively, "Company Products"), is subject to any guaranty, warranty or other indemnity. None of the Companies or Fussell have any liability (and to Seller's Knowledge, there is no basis for any present or future action against the Companies giving rise to any such liability), arising out of any injury to any individual or property as a result of the ownership, possession or use of Company Products. To the Companies' Knowledge, all inventory of Company Products have been cultivated, processed, or otherwise manufactured in material compliance with the Licenses and with all other applicable state and local Laws.

SECTION 3.14.        Affiliate Transactions. Except as disclosed to Buyer, and except for this agreement and the transaction agreements entered in connection herewith, none of Seller, any Company Holder, any officer, director, manager or member of any of the Companies, or any relative or Affiliate of any of the foregoing, and no Affiliate of such Company (i) is a party directly

or indirectly to any Contract, commitment or transaction with such Company or (ii) directly or indirectly has any interest in the Property or any other asset used by the Company in the Business.

SECTION 3.15.     Bank Accounts.   Seller has made or will be made available Buyer a complete and correct list of (a) each bank or financial institution in which any Company has an account, safe deposit box or lockbox, or maintains a banking, custodial, trading or similar relationship, the number of each such account or box, and the names of all persons authorized to draw thereon or to having signatory power or access thereto and (b) all outstanding powers of attorney executed on behalf of any Company.

SECTION 3.16.     No Brokers.   No agent, broker, Person or firm acting on behalf of Seller, the Companies or their respective Affiliates is, or will be, entitled to any commission or broker's or finder's fee from any of the parties hereto, or from any Affiliate of any of the parties hereto in connection with any of the Contemplated Transactions.

SECTION 3.17.     Disclosure.   The Seller has made or will be made available the Buyer all material information related to the Companies and all information reasonably available to the Seller that the Buyer has requested.  No representation or warranty of the Companies or Fussell contained in this Agreement and no certificate signed by the Seller and delivered to Buyer at the Closing contains any untrue statement of a material fact or omits to state a material fact necessary in order to make the statements contained herein or therein not materially misleading in light of the circumstances under which they were made.

ARTICLE IV
REPRSENTATIONS AND WARRANTIES OF THE BUYER

SECTION 4.01.     Organization and Authority of the Buyer.   The Buyer is a limited corporation duly organized, validly existing and in good standing under the laws of the jurisdiction of its incorporation and has all necessary limited liability company power and authority to enter into this Agreement, to carry out its obligations hereunder and to consummate the transactions contemplated hereby and thereby.  The Buyer is duly licensed or qualified to do business and is in good standing in each jurisdiction in which the properties owned or leased by it or the operation of its business makes such licensing or qualification necessary, except to the extent that the failure to be so licensed, qualified or in good standing would not adversely affect the ability of the Buyer to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement.  The execution and delivery by the Buyer of this Agreement, the performance by the Buyer of its obligations hereunder and the consummation by the Buyer of the transactions contemplated hereby and thereby have been duly authorized by all requisite action on the part of the Buyer.  This Agreement has been duly executed and delivered by the Buyer, and this Agreement constitutes legal, valid and binding obligations of the Buyer, enforceable against the Buyer in accordance with their respective terms.

SECTION 4.02.     No Conflict.   Assuming that all filings, notifications, consents, approvals, authorizations and other actions described in Schedule 4.02 have been obtained and except as may result from any facts or circumstances relating solely to the Seller, the execution, delivery and performance of this Agreement by the Buyer does not and will not (a) violate, conflict with or result in the breach of the certificate of incorporation of the Buyer, or any Law or

Governmental Order applicable to the Buyer, or (c) conflict with, result in any breach of, constitute a default (or event which with the giving of notice or lapse of time, or both, would become a default) under, require any consent under, or give to others any rights of termination, amendment, acceleration, suspension, revocation or cancellation of, any note, bond, mortgage or indenture, contract, agreement, lease, sublease, license, permit, franchise or other instrument or arrangement to which the Buyer is a party, except, in the case of clauses (b) and (c), as would not adversely affect the ability of the Buyer to carry out its obligations under, and to consummate the transactions contemplated by, this Agreement.

SECTION 4.03.    Share Authorization.  All of the Payment Shares will, upon the issuance of such shares at the Closing and Earnout payment date in accordance with this Agreement, be duly authorized, validly issued, fully paid, nonassessable and free and clear of all Liens and preemptive rights.

SECTION 4.04.    No Brokers.  No agent, broker, Person or firm acting on behalf of Buyer or their Affiliates is, or will be, entitled to any commission or broker's or finder's fee from any of the parties hereto, or from any Affiliate of any of the parties hereto in connection with any of the Contemplated Transactions.

<div align="center">

ARTICLE V
ADDITIONAL AGREEMENTS
</div>

SECTION 5.01.    Efforts to Close; Further Assurances; Option.

(a)    Each of the Buyer, on the one hand, and the Seller, on the other hand, shall promptly notify the other party of any material communication it or any of its Affiliates receives from any Governmental Authority relating to the matters that are the subject of this Agreement. Each of the Buyer, on the one hand, and the Seller, on the other hand, shall and permit the other party to review in advance any proposed material communication by such party to any Governmental Authority relating to the materials that are the subject of this Agreement, the Licenses, the California Approval, the Local Approval, or the Property. Subject to the requirements of applicable Law, the parties to this Agreement will provide each other with copies of all material correspondence, filings or communications between them or any of their representatives, on the one hand, and any Governmental Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated by this Agreement.

(b)    Each of the parties hereto shall give any notices to, make any filings with, and use best efforts to obtain any authorizations, consents, and approvals of all Governmental Entities or any other regulatory authorities in connection with the matters contemplated by this Agreement.

(c)    Without limiting the foregoing, subject to restrictions under applicable local and State cannabis laws, the Seller shall act promptly to cooperate with Buyer and use his best efforts to obtain any Governmental Entity or regulatory consents, novations, approvals, licenses or authorizations required for Buyer to acquire the Companies and for the Companies to continue use the California Licenses and the Local Licenses in

substantially the same form as they are held and used by the Companies as of the date hereof but recognizing that the Provisional Licenses shall be superseded, replaced, or otherwise supplemented by the Annual Licenses, and to allow the Companies to conduct the Business as contemplated under this Agreement and in accordance with law, including by obtaining the Local Approvals and the California Approvals in connection with the Buyer's acquisition of the Companies and resulting changes of ownership in the Companies.

(d)     From the date hereof through the Closing Date, the Buyer will have the right to conduct, during normal business hours and upon reasonable notice, such physical inspections and inquiries as it may reasonably require with respect to each Company and the Business, including the books and records thereof and all operational, legal, regulatory and financial matters relating to the Companies and the Business. The Seller shall cause the officers, employees, consultants, agents, accountants, attorneys and other representatives of the Companies to reasonably cooperate with Buyer and Buyer's representatives in connection with such investigation and examination, and Buyer and its representatives shall cooperate with the Seller and its representatives and shall use their commercially reasonable efforts to minimize any disruption to the Business

(e)     Within thirty (30) days after the date hereof Seller will provide any and all Disclosure Schedules required by this Agreement ("Disclosure Schedules") and following such time any bring-downs to such Disclosure Schedules if required or as applicable under this Agreement.

SECTION 5.02.     Further Action. From and after the Closing, the parties hereto shall use commercially reasonable efforts to take, or cause to be taken, all appropriate action, to do or cause to be done all things necessary, proper or advisable under applicable Law, and to execute and deliver such documents and other papers, as may be required to carry out the provisions of this Agreement and consummate and make effective the transactions contemplated by this Agreement.

SECTION 5.03.     Additional Acreage. In addition to the Property, the Seller and his Affiliates (collectively, the "Land Holders") collectively own fee title and/or leasehold rights to an additional 25 acres in Lake, Sonoma and adjacent counties, upon on which the Land Holders are currently engaged in licensed cultivation of cannabis (the "Other Cultivation Property'). At any time on or prior to the fifth anniversary of the date of this Agreement (the "Option Period"), Buyer shall have the option in its discretion, to purchase up to an additional four (4) aggregate acres of cannabis canopy operations and associated additional access to land necessary (whether through leasehold or ownership interests) for cultivation of cannabis on such acreage (the "Option Acreage Limit") from within the Other Cultivation Property (the "Option Acreage"). The location and selection of the Option Acreage will be mutually agreed between Buyer and the applicable Land Holder, and the purchase price will be equal to appraised fair market value, on a debt free, lien free basis, with such appraiser being a neutral party mutually agreed between Buyer and Seller and if the parties cannot agree to such appraiser, each party shall have the right to submit an appraisal and the fair market value shall be determined as the average of the two such appraisals unless the parties disagree with such average in which case a neutral mutually agreed third appraisal shall be performed and shall be binding upon the parties. The Land Holders will convey

the Option Acreage to Buyer or its Affiliates pursuant to purchase agreements consistent with the terms herein, subject to applicable State and local cannabis laws, rules and regulations.  In addition to the foregoing, if at any time during the Option Period and before Buyer has acquired the Option Acreage Limit, any of the Land Holders desires to sell or transfer the any of the Other Cultivation Property (the "Subject Property") to any person or entity other than Buyer (a "Third-Party Transaction"), or receives a *bona fide* written offer for a Third-Party Transaction that the Land Holder desires to accept, the Land Holder shall, promptly following receipt of the offer relating to, or its determination to proceed with, a Third-Party Transaction, notify Buyer in writing (the "Offer Notice") of the identity of all proposed parties to such Third-Party Transaction and the material financial and other terms and conditions of such Third-Party Transaction (the "Material Terms").  The Offer Notice will be an offer by the Land Holder to sell the Subject Property to Buyer on the same Material Terms as such Third-Party Transaction, except as provided below (the "ROFR Offer").  During the thirty (30) business day period after Buyer's receipt of the Offer Notice (the "Exercise Period"), Buyer may accept the ROFR Offer by delivery to the Land Holder of a written notice of acceptance containing the Material Terms; provided, however, that Buyer is not required to accept any non-financial terms or conditions contained in any Material Terms that cannot be fulfilled by Buyer as readily as by any other person or entity, unless such non-financial terms or conditions are a substantial and material part of the Third-Party Transaction and Land Holder would be materially and adversely impacted by foregoing such non-financial terms, in such case Buyer shall be permitted to accept the Third-Party Transaction.  If Buyer has not accepted the ROFR Offer prior to the expiration of the Exercise Period, and provided that the Land Holder has complied with all of the provisions of this Section 5, at any time during the 60 day period following the expiration of the Exercise Period, the Land Holder may consummate the Third-Party Transaction with the counterparty identified in the applicable Offer Notice, on Material Terms that are the same or more favorable to the Land Holder as the Material Terms set forth in the Offer Notice. If such Third-Party Transaction is not consummated within such 60 day period, the terms and conditions of this section will again apply and the Land Holders shall not enter into any Third-Party Transaction during the ROFR Period without affording Buyer the right of first refusal on the terms and conditions of this Section 5.03. For the avoidance of doubt and purposes of clarity in respect to the above, in connection with above, the fair market valuation will either (i) be a fair market valuation of the property and cultivation business if it involves a business and property sale; or (ii) be a fair market valuation of the cultivation business (including its leasehold interests) if it's a business sale only with leasehold interests).

SECTION 5.04.    Tax Returns; Cooperation.

(a)    The Seller shall prepare or cause to be prepared at the Seller's expense all income Tax Returns required or permitted to be filed by each Company, including all state and local income Tax Returns that are flow-through Tax Returns, for all taxable periods ending prior to or on the Closing Date (each, a "Pre-Transfer Tax Period") which are to be filed after the Closing Date (the "Seller Returns") in a manner consistent with such Company's past practice, except as otherwise required by applicable Law, and in accordance with the provisions of this Agreement. The Seller shall deliver such Seller Returns to Buyer for Buyer's review and comment at least thirty (30) days prior to the due date for such Seller Returns, and shall make any changes reasonably requested by Buyer. The Seller shall pay all Taxes reflected as due and payable on all Seller Returns. The parties shall make available to each other (and to their respective accountants and

attorneys) any and all books and records and other documents and information in its possession or control relating to each Company reasonably requested by such Persons in order to prepare or review such Seller Returns.

(b)     Buyer shall prepare and file or cause to be prepared and filed when due any Tax Returns of each Company for Pre-Transfer Tax Periods that are not Seller Returns and for Tax periods which begin before the Closing Date and end after the Closing Date (each such period, a "**Straddle Period**"), which in the case of Tax Returns for a Pre-Transfer Tax Period shall be prepared in a manner consistent with each Company's past practice, except as otherwise required by applicable Law, and in accordance with the provisions of this Agreement. The Seller shall pay all Taxes for a Pre-Transfer Tax Period and all Taxes attributable to the portion of a Straddle Period ending on the Closing Date that are reflected as due and payable on all such Tax Returns and Buyer shall pay all Taxes attributable to the portion of a Straddle Period commencing after the Closing Date. Buyer shall permit the Seller to review and comment on each Tax Return described in the preceding sentence at least thirty (30) days prior to filing, and Buyer shall make any changes to a Tax Return for a Pre-Transfer Tax Period that are reasonably requested by the Seller and consistent with the past practices and customs of each Company and shall consider in good faith any requested changes to a Tax Return for a Straddle Period. For all purposes of this Agreement relating to the apportionment of Taxes between the portion of a Straddle Period ending on the Closing Date and the portion of a Straddle Period beginning after the Closing Date, in the case of any Taxes that are imposed on a periodic basis and are payable for a Straddle Period, the portion of such Tax which relates to the portion of such taxable period ending on the Closing Date (the "**Pre-Closing Straddle Period Taxes**") shall: (i) in the case of any Taxes other than Taxes based upon or related to income, sales, payroll or receipts, be deemed to be the amount of such Tax for the entire taxable period multiplied by a fraction, the numerator of which is the number of days in the taxable period ending on the First Closing Date and the denominator of which is the number of days in the entire taxable period, and (ii) in the case of any Tax based upon or related to income, sales, payroll or receipts be deemed equal to the amount which would be payable if the relevant taxable period ended on the Closing Date. To the maximum extent permitted by applicable Law (including through the potential use of the safe harbor procedures of IRS Revenue Procedure 2011-29 with respect to any success-based fees), any deductions attributable to the payment or accrual (or deemed payment or accrual) of the Company Expenses shall be treated and reported as income Tax deductions for the taxable period (or portion thereof) ending on the Closing Date.

(c)     Buyer shall promptly notify the Sellers following receipt of any notice of audit or other proceeding relating to any Seller Return or any other federal or state Tax Return filed with respect to any Pre-Transfer Tax Period or the pre- Closing Date portion of a Straddle Period (together with all Seller Returns, the "**Prior Period Returns**"). The Seller shall control any and all audits or other proceedings and litigation relating solely to any Prior Period Return (other than Tax Returns for a Straddle Period), and Buyer shall have control of any and all audits or other proceedings and litigation relating to any Tax Returns for a Straddle Period or that do not relate solely to Prior Period Returns. The Party that is not controlling such audit or other proceeding or litigation shall have the

right to participate in such audit or other proceeding or litigation at its own expense, and the Party controlling the defense of such audit or other proceeding or litigation may not settle or compromise such audit or other proceeding or litigation without the prior written consent of the non-controlling Party, such consent not to be unreasonably withheld, delayed or conditioned.

(d)     The parties shall cooperate (and cause their respective Affiliates to cooperate) fully, as and to the extent reasonably requested by the other parties, in connection with the preparation and filing of Tax Returns pursuant to this <u>Section 5.04</u> and any Tax audit, litigation or other proceeding with respect to Taxes and payments in respect thereof. Such cooperation shall include the retention and (upon the other parties' request) the provision of records and information which are reasonably relevant to any such Tax audit, litigation or other proceeding, making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder, and the provision of any powers of attorney or similar authorizations. In furtherance of the foregoing, prior to the Closing Date, the Company shall provide Buyer with a copy of any written correspondence or communication with a Governmental Authority promptly after receipt thereof, and shall provide a summary to Buyer of any other communication with a Governmental Authority, in each case in connection with any Tax audit or other proceeding, and the Company further shall consult with Buyer in good faith in connection with any action to be taken in connection with such Tax audit or proceeding. Buyer and each Company shall retain all books and records with respect to Tax matters pertinent to such Company relating to any taxable period beginning before the Closing Date until the expiration of the statute of limitations (and, to the extent notified by Buyer, any extensions thereof) of the respective taxable periods, and to abide by all record retention agreements entered into with any Governmental Authority. Each of the parties shall furnish the other parties with copies of all relevant correspondence received from any Governmental Authority in connection with any Tax audit or information request with respect to any Taxes for which any other party may have an indemnification obligation under this Agreement.

SECTION 5.05.     <u>No-Shop</u>. In consideration of the substantial expenditure of time, effort and expense undertaken by the Buyer in connection with its due diligence review and the preparation and negotiation of this Agreement, from and after the date of this Agreement until the earlier of the termination of this Agreement and the Closing, none of the Seller, the Company Holders or the Companies will, and none of them will permit any of their Affiliates, or any of their respective representatives or other agents to, directly or indirectly, (i) solicit or initiate any Acquisition Proposal, (ii) engage in negotiations or discussions concerning, or provide any non-public information to any Person in connection with, any Acquisition Proposal, (iii) agree to, approve, recommend or otherwise endorse or support any Acquisition Proposal, or (iv) enter into any agreement, arrangement or other understanding that could require the Seller, the Company Holders or the Companies to abandon, terminate or fail to consummate the transactions contemplated hereby . The Seller, the Company Holders and the Companies will, and will cause their Affiliates, and their respective representatives and other agents and their Affiliates, to, immediately cease any and all existing activities, discussions or negotiations with any Persons conducted heretofore with respect to any of the foregoing. The Seller will promptly advise the

Buyer in writing of the receipt of any communications any of them may receive relating to any Acquisition Proposal.

SECTION 5.07.     Interim Operations Period. During the period between the Effective Date and the Closing Date, the Companies and the Seller shall:

(a)     operate the Business in the ordinary course of business consistent with past practice and use commercially reasonable efforts to preserve the present business operations, organization, and goodwill of the Companies and Property;

(b)     comply with all applicable Laws and promptly notify Buyer in the event that the Companies or the Seller receives any notice, claim, or demand from any Governmental Authority asserting a violation of applicable Law;

(c)     maintain the Companies and the Property in good working order, consistent with past practice;

(d)     maintain and/or obtain the License and any other licenses and permits necessary or advisable for the operation of the Business and ownership or use thereof by the Companies and the Property in compliance with all applicable Laws in all material respects; and

(e)     provide all assistance reasonably requested by Buyer to perform the transactions contemplated by this Agreement and to fulfil its duties and obligations under the Cultivation and Supply Agreement.

SECTION 5.08.     Negative Covenants. Without limiting the generality of Section 5.03, Companies and Seller shall not take any of the following actions without the prior written consent of Buyer:

(a)     take any action, or fail to take any action, that is reasonably likely to result in a loss or material impairment of the Licenses or the Property;

(b)     sell, lease, license, encumber, or otherwise dispose of any of the Company Securities or the Leasehold Interests;

(c)     cause or permit any of the Companies to hire or retain any employee or independent contractor, incur any Indebtedness or any Liability or become bound by any Contract other than Contracts contemplated hereby;

(d)     cause or permit any of the Companies to make any dividend or distribution, redeem any of the Company Securities or authorize or issue any membership interest or any other equity securities;

(e)     cause or permit any of the Companies to make any Tax election or Tax reporting;

(f)     adopt a plan, or otherwise enter into or effect a, complete or partial liquidation, dissolution, restructuring, recapitalization, or other reorganization;

(g)     engage in any action with the intent to, directly or indirectly, adversely impact or delay the consummation of the transactions contemplated by this Agreement; or

(h)     agree, authorize, or commit to do any of the foregoing.

ARTICLE VI
CONDITIONS TO CLOSING

SECTION 6.01.     <u>Conditions to Obligations of Seller</u>. The obligations of the Seller to consummate the transactions contemplated by this Agreement at the Closing shall be subject to the fulfillment (or written waiver by the Seller) at or prior to the Closing, of each of the following conditions, with respect to each of the Companies:

(a)     <u>Representations, Warranties and Covenants</u>. (i) the representations and warranties of the Buyer contained in this Agreement or any certificate or instrument delivered hereunder shall be true and correct in all material respects on and as of the date of this Agreement and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all material respects, and except for the effect of any actions taken by Seller between the Effective Date and Closing Date), and (ii) the covenants and agreements contained in this Agreement to be complied with by the Buyer on or before the Closing shall have been complied with in all material respects.

(b)     <u>No Order or Action</u>. No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Governmental Order (whether temporary, preliminary or permanent), and no Action or Investigation with respect to the transactions contemplated in this Agreement shall be pending or threatened in writing, that would have the effect of making the transactions contemplated by this Agreement illegal or otherwise materially restraining or prohibiting the consummation of such transactions.

(c)     <u>Buyer Deliveries</u>. Buyer shall have made all of the deliveries set forth in Section 2.05.

(d)     <u>Buyer Closing Certificate</u>. The Seller shall have received from the Buyer a certificate, dated as of the Closing Date, signed by an executive officer of the Buyer, certifying on behalf of the Buyer that the conditions specified in the foregoing Section 6.01(a) have been satisfied with respect to the Buyer.

SECTION 6.02.     <u>Conditions to the Obligations of Buyer</u>. The obligations of the Buyer to consummate the transactions contemplated by this Agreement at Closing shall be subject to the fulfillment (or written waiver by the Buyer) at or prior to the Closing, of each of the following conditions:

(a)     Representations, Warranties and Covenants.  (i) The representations and warranties of the Seller contained in this Agreement or any certificate or instrument delivered hereunder shall be true and correct in all material respects on and as of the date of this Agreement and on and as of the Closing Date with the same effect as though made at and as of such date (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all material respects, and except for the effect of any actions taken by Buyer between the Effective Date and Closing Date or taken or not taken by Seller at the specific written direction of Buyer), and (ii) the covenants and agreements contained in this Agreement to be complied with by the Seller and the Cultivation and Supply Agreement to be complied with by the Productions Companies, in each case on or before the Closing, shall have been complied with in all material respects.

(b)     No Order or Action.  No Governmental Authority shall have enacted, issued, promulgated, enforced or entered any Law or Governmental Order (whether temporary, preliminary or permanent), and no Action or Investigation with respect to the transactions contemplated in this Agreement shall be pending or threatened in writing, that would have the effect of making the transactions contemplated by this Agreement illegal or otherwise materially restraining or prohibiting the consummation of such transactions. For the avoidance of doubt, the foregoing shall include, but shall not be limited to, a suspension or termination of the Licenses.

(c)     Consents. All of the Consents and Permits material and necessary for the Companies to operate the Property consistent with past practice, shall have been received or obtained, and, if applicable, executed counterparts thereof shall have been delivered to the Buyer at or prior to the Closing or other consents, permits and licenses, if applicable, in connection with a Replacement Property.

(d)     Estoppels.  Seller shall have obtained executed estoppel certificates from each of the landlord parties under the Leases, addressed to Buyer, and certifying (i) that the landlord party signing the estoppel is the fee owner of the applicable Acquired Property, (ii) an itemized list of lease documents attached as an exhibit to the estoppel are the only lease documents in existence with respect to the applicable Acquired Property, (iii) all sums owed under the applicable lease documents have been paid in full, (iv) the dates on which the applicable lease commenced and the date on which same is set to expire, (v) any renewal options available to Companies as tenant under the applicable lease, and (v) that Companies, as tenant under the applicable lease, have fully performed all of their obligations under the lease and that there are no existing defaults under the lease

(e)     Landlord Consent and Cooperation; Minimum Lease Term.  All landlord parties under the Leases shall have, as applicable (1) provided written consent to change in control of the Company Securities to Buyer, (2) provided written consent to Companies subleasing the Property to one or more Affiliates of Buyer, as applicable and/or (3) amended the Leases to exclude the Property and enter into new leases with the applicable Company or Affiliate of Buyer as to the Property. The Leases shall have been amended to provide for a total rental term (including unilateral tenant options) of

approximately ten (10) years from the Effective Date, with annual rent increases of not more than ten (10%).

(f)     Local Approval. The Local Approval shall have been issued in such form, terms, conditions, and substance as is acceptable to Buyer in its good faith discretion.

(g)     California Approval. The California Approval shall have been issued in such form, terms, conditions, and substance as is acceptable to Buyer in its good faith discretion.

(h)     Production. During the period between the Effective Date and the Closing Date, the Property collectively shall have produced in the aggregate Conforming Cannabis at an annual rate of at least 12,000 pounds, dried and bucked, irrespective of any external or internal cause, factor or impediment (other than direct actions or omissions of Buyer).

(i)     Deliveries of the Seller.  The Seller shall have made or caused to be delivered all of the deliveries set forth in Section 2.04.

(j)     CEQA Certificate. The Seller shall have obtained the CEQA Certificate.

(k)     Water and Land Use Due Diligence; Legal Due Diligence.  Buyer shall have completed the due diligence matters described on Schedule 6.02(k) and shall be satisfied with the results of such investigation in its reasonable discretion.  Buyer shall have received all of the documents and information set forth in this Agreement as having been "made available" or "will be made available" or "will make available," Buyer shall be satisfied in its reasonable discretion with all such documents and information (and all other review by Buyer of the assets, Liabilities, Licenses, Permits, business, operations, ownership and Taxes of the Companies and the Property) in its reasonable discretion, and the Disclosure Schedules shall be reasonably acceptable to Buyer: provided that, notwithstanding the foregoing, any matters reflected in such documents or information, or set forth on the Disclosure Schedules, disclosing any Liabilities, Liens or Indebtedness of any Company, the Company Securities or the Property, or disclosing any facts, circumstances, events or conditions that have or would reasonably be expected to have an adverse effect upon the Company Securities, the Leases, the Licenses or the Property or its intended uses as contemplated hereby or in the Cultivation and Supply Agreement, shall have to be satisfactory to Buyer in its sole and absolute discretion.  The matter reflected by the asterisk (*) on the California License Schedule and the Local License Schedule attached hereto shall have be resolved to Buyer's reasonable satisfaction unless the Buyer shall have accepted a Replacement Property hereunder.

(l)     No Material Adverse Effect.  There shall not have occurred a Material Adverse Effect with respect to any of the Companies, the Property or the Business.

(m)     Closing Certificate. The Buyer shall have received from the Seller a certificate, dated as of the Closing Date, signed by Fussell that the conditions specified in the foregoing Sections 6.02(a) and 6.02(c) have been satisfied.

For the avoidance of doubt, if the Buyer accepts a Replacement Property hereunder, any applicable deliverables for a Company hereunder may be substituted with respect thereto for such deliverables as instead relate to a Replacement Property or as may apply with respect to such Replacement Property.

<div align="center">

ARTICLE VII

INDEMNIFICATION

</div>

SECTION 7.01.    Survival of Representations and Warranties. The representations and warranties of the parties hereto contained in this Agreement shall survive for a period of the longer of (a) eighteen months following the Effective Date or (b) twelve months following the Closing Date, provided, however, that (i) the representations and warranties in Section 3.03 shall survive for a period of thirty six months after the Effective Date, and (ii) all Fundamental Representations and Warranties (defined below) shall survive the Closing and continue in full force and effect until ninety (90) days following the expiration of the applicable statute of limitations with extensions for any tolling of such statute of limitations. Notwithstanding anything herein to the contrary, if written notice of any claim for indemnification hereunder (a "Claim") has been delivered in accordance herewith prior to the expiration of the representation or warranty upon which such Claim is based, the relevant representations and warranties shall not expire, and such Claim may be pursued until the final resolution of such Claim in accordance with the provisions of this Article VII. All covenants and agreements of the parties contained herein shall survive indefinitely or for the period explicitly specified therein. Fundamental Representations and Warranties with respect to Seller shall mean 3.01 and 3.05; and Fundamental Representations and Warranties with respect to Buyer shall mean 4.01, 4.02, and 4.03.

SECTION 7.02.    Indemnification by Fussell; and Indemnity Cap and Limitations. Fussell shall defend and indemnify, and hold harmless, the Buyer and its Affiliates, and their respective officers, directors, managers, members, employees, agents, successors and assigns (each, a "Buyer Indemnified Party") from and against, and shall pay and reimburse each of them for, any and all losses, damages, claims, causes of action, costs and expenses, interest, awards, judgments and penalties (including reasonable outside attorneys' fees and expenses) (hereinafter, "Losses") actually incurred or sustained by, or imposed upon, the Buyer Indemnified Parties based upon, arising out of, with respect to or by reason of the following:

(a)    any inaccuracy in or breach of any of the representations or warranties of the Seller contained in this Agreement or in any certificate or instrument delivered by or on behalf of any Seller or any of the Company Holders pursuant to this Agreement;

(b)    any breach or nonfulfillment of any covenant, agreement or obligation to be performed by Seller or any of the Company Holders pursuant to this Agreement;

(c)    any Liability arising out of the conduct of the Business prior to the Closing or arising out of the ownership of the Companies or the Property prior to the Closing;

(d)    any claim by any Person asserting ownership rights in the Company Securities or any other equity interest in any of the Companies, or any right or entitlement to receive any portion of the Purchase Price, in any case whether directly or by way of

claim with respect to an Affiliate, predecessor, or transferor of the Companies, any Company Holder or Seller; or

(e) any Taxes of any of the Companies or Seller for taxable periods (or portions of any straddle period) ending on or before the Effective Date.

Indemnity Cap and Limitations: Notwithstanding, the foregoing, or anything to the contrary herein and without limiting the other limitations on liabilities hereunder, except in the case of fraud:

(i) in no case shall Fussell (or any Seller or Company Holder, if applicable), be liable to any Buyer Indemnified Party for Losses (A) under Section 7.02(a) in an amount to exceed twenty percent (20%) of the Effective Date Payment, or (B) under Section 7.02(c) in an amount to exceed fifty percent (50%) of the Effective Date Payment (as applicable, the "Cap"); and

(ii) in no case shall Fussell (or any Seller or Company Holder, if applicable), be liable to any Buyer Indemnified Party for Losses under Sections 7.02(b), 7.02(d) or 7.02(e) of this Agreement, or in connection with any of the Fundamental Representations (as defined herein), in an amount to exceed the Effective Date Payment and share/equity offset for other consideration received by Seller under this Agreement in respect of any Closing Payment Shares and/or Earnout Shares; and (iii) Buyer shall satisfy any Losses first by reduction of the Holdback Amount, if any. In no case shall Seller, Fussell or the Company Holders be liable to Buyer for any consequential or punitive damages. Further, Buyer Indemnified Parties shall be required to reasonably mitigate damages; no duplication of recovery or Losses shall be received by the Buyer Indemnified Parties, and recoveries for insurance (net of premiums and deductibles payments as result of an applicable claim subject to indemnity hereunder) shall offset any recoveries by the Buyer Indemnified Parties hereunder.

SECTION 7.03.    Indemnification by the Buyer. The Buyer shall defend and indemnify, and hold harmless, the Seller and his agents, heirs, successors and assigns (each, a "Seller Indemnified Party") from and against, and shall pay and reimburse each of them for, any and all Losses incurred or sustained by, or imposed upon, the Seller Indemnified Parties based upon, arising out of, with respect to or by reason of:

(a) any inaccuracy in or breach of any of the representations or warranties of the Buyer contained in this Agreement or in any certificate or instrument delivered by or on behalf of Buyer pursuant to this Agreement;

(b) any breach or nonfulfillment of any covenant, agreement or obligation to be performed by Buyer pursuant to this Agreement;

(c) the ownership and operation of the Companies and the Property by the Buyer after the Closing.

SECTION 7.04.    Notice of Loss; Third Party Claims.

(a)     An Indemnified Party will give written notification to the Indemnifying Party of the commencement of any claim or of the commencement of any Action, Investigation or other proceeding by any Governmental Authority or Person who is not a party to this Agreement or an Affiliate of a party to this Agreement ("Third Party Claim") promptly (and in any event within thirty (30) calendar days after receipt by the Indemnified Party of notice of such Third Party Claim), and will describe in reasonable detail (to the extent known by the Indemnified Party) the facts constituting the basis for such Third Party Claim and the amount of the claimed Losses; provided, however, that no delay or failure on the part of the Indemnified Party in so notifying the Indemnifying Party will relieve the Indemnifying Party of any liability or obligation hereunder except and only to the extent of any Losses or Liability sustained by the Indemnifying Party as a result of or arising out of such failure.  If any such liability is asserted against the Indemnifying Party, and the Indemnified Party notifies the Indemnifying Party thereof, the Indemnifying Party will be entitled, if it so elects by written notice delivered to the Indemnified Party within twenty (20) days (or such shorter period of time as may be necessary not to adversely affect the interests of the Indemnified Party) after the Indemnified Party delivers such notice, to assume the defense thereof, in accordance with the limitations set forth in this Agreement, with counsel reasonably satisfactory to the Indemnified Party; provided, however, that (i) the defense of such Third Party Claim by the Indemnifying Party must not, in the reasonable judgment of the Indemnified Party, have a material adverse effect on the Indemnified Party (it being agreed that any Third Party Claim involving, or that could reasonably be expected to adversely impact the Local License or the California License, in any way shall be deemed to meet this clause (i)), (ii) the Indemnifying Party must have sufficient financial resources, in the reasonable judgment of the Indemnified Party, to satisfy the amount of any adverse monetary judgment that is reasonably likely to result, (iii) the Third Party Claim must seek (and continue to seek) solely monetary damages and such Losses do not exceed the Holdback Amount, (iv) the Indemnifying Party must expressly agree in writing that as between the Indemnifying Party and the Indemnified Party, the Indemnifying Party may only satisfy and discharge the Third Party Claim in accordance with the limits of this Agreement, (v) the Indemnifying Party expressly agrees in writing that it will be directly liable for any Losses incurred by the Indemnified Party, and (vi) the Third Party Claim is not reasonably expected to have an adverse effect on, or is not likely to establish a precedential custom or practice adverse to, the continuing business, the business prospects (the conditions set forth in clauses (i) through (vi) are, collectively, the "Litigation Conditions").  If (A) any of the Litigation Conditions cease to be met or (B) the Indemnifying Party fails to take reasonable steps necessary to defend diligently such Third Party Claim, then the Indemnified Party may assume its own defense, and the Indemnifying Party will be liable for all reasonable costs or expenses paid or incurred in connection with such defense, including legal fees on a full indemnity basis and all disbursements. The Indemnified Party has the right to settle any Third Party Claim, the defense of which has not been assumed by the Indemnifying Party.  The Indemnifying Party, if it has assumed the defense of any Third Party Claim as provided in this Agreement, will not agree to a settlement of any claim which (w) provides for any relief other than the payment of monetary damages, (x) does not include as an unconditional term thereof the giving by the claimant or the plaintiff to the Indemnified Party a

complete release from all liability in respect of such Third Party Claim, (y) includes any admission of liability by the Indemnified Party or (z) may reasonably be expected to have a material adverse effect on the Indemnified Party, the Local License or the California License, in each case without the affected Indemnified Party's prior written consent, which consent will not be unreasonably withheld, delayed or conditioned.

(b)     Notwithstanding the foregoing, (i) the Indemnified Party will also have the right to employ its own counsel in any such case, but the fees and expenses of such counsel will be at the expense of the Indemnified Party; (ii) the Indemnified Party will not have any obligation to give any notice of any assertion of liability by a third party unless such assertion is in writing; and (iii) the rights of the Indemnified Party to be indemnified hereunder in respect of Third Party Claims resulting from the assertion of liability by third parties will not be adversely affected by its failure to give notice pursuant to the foregoing unless, and only to the extent that, the Indemnifying Party is materially prejudiced thereby. With respect to any assertion of liability by a third party that results in a Third Party Claim, the parties hereto will make available to each other all relevant information in their possession material to any such assertion.

(c)     If the Indemnifying Party, within twenty (20) days (or such shorter period as may be necessary so as not to adversely affect the interests of the Indemnified Party) after delivery of the aforesaid notice of an Third Party Claim, fails to assume the defense of the Indemnified Party against such Third Party Claim, the Indemnified Party will have the right to undertake the defense, compromise or settlement of such action on behalf of and for the account, risk and expense of the Indemnifying Party and all reasonable fees and expenses of such counsel will constitute Losses for all purposes hereunder; provided, however, that in the event the Indemnifying Party elects not to participate in the defense of the Third Party Claim, it will nevertheless have the right to participate in the defense of the same and, at its sole cost and expense, employ counsel of its own choosing.

SECTION 7.05.     Tax Treatment. To the extent permitted by applicable Law, the parties hereto agree to treat all indemnification payments made under this Agreement as adjustments to the Purchase Price for all Tax purposes.

SECTION 7.06.     Materiality. Each of the representations and warranties in this Agreement and each certificate or instrument delivered pursuant hereto shall be read without regard and without giving effect to any "Material Adverse Effect," "in all material respects" or other materiality qualifiers (as if such word were deleted from such representation and warranty), for purposes of calculating Losses under this Article VII but not for determining whether any breach of or inaccuracy in a representation or warranty has occurred.

SECTION 7.07.     Remedies.

(a)     If an Indemnified Party asserts the existence of a claim subject to indemnification under this Article VII, it will give written notice to the Indemnifying Party specifying in reasonable detail the nature and amount of the claim (or a good faith estimated amount to the extent known) asserted and the Indemnifying Party will respond to such claim within twenty (20) days of receipt of such notice. Except as otherwise

provided herein, any indemnification for Losses owed by an Indemnifying Party to an Indemnified Party as provided in Section 7.7 will be effected by wire transfer of immediately available funds to an account designated by the Indemnified Party, within ten (10) Business Days after the final determination by way of a final settlement among the Indemnifying Parties and the Indemnified Parties or upon a final adjudication determined by a court of competent jurisdiction in accordance with that an indemnification obligation is owing by the Indemnifying Party to the Indemnified Party (noting that Seller indemnification obligations shall be satisfied subject to the limitations in Section 7.2). Any payment that is not made within ten (10) Business Days of the determination that such obligation is owing, other than those obligations that could have been or were paid or setoff pursuant to this Agreement, shall bear interest at a rate of six percent (6%) per annum, or, if less, the maximum rate permitted by applicable Law. In addition, the Indemnifying Party shall reimburse the Indemnified Party for any and all costs or expenses of any nature or kind whatsoever (including reasonable legal fees) incurred in seeking to collect payments actually due and payable under this Article VII.

(b)     The Buyer Indemnified Parties shall provide written notice to the Seller (a "Setoff Notice"), to set off any bona fide claim for Losses under Section 7.02, against (i) the Holdback Amount, or any other amounts owed to Companies or Seller under this Agreement or the Cultivation and Supply Agreement by any Buyer Indemnified Party (collectively, the "Buyer Payments"), subject to the applicable Cap and limitations set forth herein, or (ii) the Payment Shares, valued at their fair market value per Share at time of setoff; provided, however, that the Buyer Indemnified Parties may only exercise the right of setoff in respect of claims relating to Losses that have been incurred (or are then reasonably likely to be incurred) by a Buyer Indemnified Party (in which case the amount of such setoff shall be the amount of such Losses), or in respect of bona fide Third Party Claims asserted against a Buyer Indemnified Party (in which case the amount of the setoff shall not exceed the Buyer's good faith estimate of the amount of Losses that will ultimately be payable by a Buyer Indemnified Party in respect of such Third Party Claims) and in any case, subject to the applicable Cap and limitations set forth above. Buyer will deliver to the Seller any portion of a Buyer Payment that is otherwise then due and payable and which exceeds the amount, if any, of the Losses then being claimed for setoff in the Setoff Notice made or will be made available the Seller pursuant to this Agreement. In addition, upon final resolution of an indemnity claim with respect to which Buyer has exercised setoff hereunder, Buyer will deliver to the Seller any portion of a Buyer Payment that exceeds the amount, if any, of the Losses awarded to Buyer pursuant to the final resolutions of such claim.

## ARTICLE VIII
## TERMINATION, AMENDMENT, AND WAIVER

SECTION 8.01.     Termination. This Agreement may be terminated at any time prior to the Closing:

(a)     by either the Buyer, on the one hand, or the Seller, on the other hand, in the event that any Governmental Order restraining, enjoining or otherwise prohibiting

the transactions contemplated by this Agreement shall have become final and nonappealable;

(b)     by the Seller, if the Buyer shall have breached any of its representations, warranties, covenants or other agreements contained in this Agreement which would give rise to the failure of a condition set forth in Section 6.01, which breach, cannot be cured (which includes those obligations under Section 2.05 when due after satisfaction of applicable Buyer conditions under Article VI) or has not been cured within thirty (30) days after the giving of written notice by the Seller to the Buyer specifying such breach, or if Buyer becomes insolvent or files for bankruptcy similar relief from creditors;

(c)     by the Buyer, if Seller shall have breached any of Seller's representations, warranties, covenants or other agreements contained in this Agreement which would give rise to the failure of a condition set forth in Section 6.02, which breach cannot be cured (which includes those obligations under Section 2.04 when due after satisfaction of applicable Seller conditions under Article VI) or has not been cured within thirty (30) days after the giving of written notice by the Buyer to the Seller specifying such breach;

(d)     subject to Section 2.08 (to the extent applicable), at the election of the Buyer if the Closing shall not have occurred on or before June 1, 2022; provided, that the Buyer is not then in material breach of any provision of this Agreement; or

(e)     by the mutual written consent of the Buyer and the Seller.

SECTION 8.02.     Effect of Termination.

(a)     (a)     In the event of termination of this Agreement as provided in Section 8.01, upon completion of the transactions contemplated by Section 8.02(b), this Agreement shall forthwith become void and there shall be no liability on the part of either the Buyer, on the one hand, or the Seller, on the other hand, except that (i) this Section 8.02 and Article IX shall survive such termination and (ii) nothing herein shall relieve either the Buyer, on the one hand, or the Seller, on the other hand, from liability for any breach of this Agreement by such party occurring prior to such termination.

(b)     In addition, upon termination, the following will also occur: (i) Seller will repay the Effective Date Payment to the Buyer (net of any amounts owing by Buyer to Seller, either of the Production Companies or their Affiliates under the Cultivation and Supply Agreement for goods or services provided prior to such date) and any remaining Holdback will be released by the parties to Buyer pursuant to Section 2.09, each within ten (10) Business Days of the effective date of the termination, (ii) upon receipt of the payment due under clause (i) above, Buyer will cancel the Advance Note Documents and re-convey to the Seller all of the Company Securities (if applicable) and the Cultivation Know-How license, free and clear of all Liens, (iii) the Buyer and the Seller will account to each other and economically adjust in good faith for any capital investment made by Buyer in to the Property or the Cultivation Know-How and (iv) if applicable, Buyer will cooperate, if necessary for the transfer of ownership back to the Seller for purposes of

Local License and California License including by the parties taking all commercially reasonable efforts to maintain the foregoing during such transfer.

## ARTICLE IX
## GENERAL PROVISIONS

SECTION 9.01.        <u>Expenses</u>. Except as otherwise specified in this Agreement, all costs and expenses, including fees and disbursements of counsel, financial advisors and accountants, incurred in connection with this Agreement and the transactions contemplated by this Agreement shall be paid by the party incurring such costs and expenses, whether or not the Closing shall have occurred.

SECTION 9.02.        <u>Notices</u>. All notices, requests, claims, demands and other communications hereunder shall be in writing and shall be given or made (and shall be deemed to have been duly given or made upon receipt) by delivery in person, by an internationally recognized overnight courier service, by email or registered or certified mail (postage prepaid, return receipt requested) to the respective parties hereto at the addresses below (or at such other address for a party as shall be specified in a notice given in accordance with this Section 9.02). A written notice shall be deemed to have been given to the recipient party on the earlier of (a) the date it shall be delivered to the address required by this Agreement; (b) the date delivery shall have been refused at the address required by this Agreement; (c) with respect to notices sent by mail or overnight courier, the date as of which the Postal Service or overnight courier, as the case may be, shall have indicated such notice to be undeliverable at the address required by this Agreement; or (d) with respect to a facsimile or email, the date on which the facsimile or email is sent and receipt of which is electronically confirmed. Any and all notices referred to in this Agreement, or which either party desires to give to the other, shall be addressed to the following addresses:

(a)    If to Seller:

2349 Circadian Way,
Santa Rosa, CA 95407
Attention:  Ned Fussell
Email: ned@somarosafarms.com

(b)    If to Buyer:

TPCO US Holdings Corp.
1550 Leigh Ave.
San Jose, CA 95125
Attention: General Counsel
Email: judith@theparent.co

SECTION 9.03.        <u>Public Announcements</u>. Neither party shall make, or cause to be made, any press release or public announcement (or otherwise communicate with any news media) in respect of this Agreement or the transactions contemplated by this Agreement without the prior written consent of the other party unless otherwise required by Law or applicable stock exchange

regulation, and the parties to this Agreement shall cooperate as to the timing and contents of any such press release, public announcement or communication; provided that Buyer may issue a press release concerning this Agreement upon the signing hereof provided that Buyer has provided Seller with prior notice and opportunity to review and reasonably comment on the contents of such release relating to Seller.

SECTION 9.04.    Severability. If any provision of this Agreement shall be found invalid or unenforceable for any reason, in whole or in part, then such provision shall not be rendered void and shall be deemed modified, restricted or reformulated to the extent and in the manner necessary to render the same valid and enforceable, or if such provision cannot be modified, restricted or reformulated in a manner to make such provision enforceable shall be deemed excised from this Agreement, and this Agreement shall be construed and enforced to the maximum extent permitted by law, as if such provision had been originally incorporated herein as so modified, restricted or reformulated or as if such provision had not been originally incorporated herein, as the case may be. The parties further agree that a court or other authority called upon to decide the enforceability of this Agreement shall have the power to modify this Agreement so that, once modified, it will result in an agreement that is enforceable to the maximum extent permitted by the law in existence at the time of the requested enforcement. Seller expressly acknowledges that this Agreement is reasonable and valid in all respects and irrevocably waives (and irrevocably agrees not to raise) as a defense any issue of reasonableness (including the reasonableness of the Business, the territory or the duration and scope of the restrictive provisions of this Agreement) in any proceeding to enforce any provision of this Agreement, the intention of the parties being to provide for the legitimate and reasonable protection of the interests of the Buyer and its Affiliates by providing for the broadest scope, the longest duration and the widest territory allowable by law.

SECTION 9.05.    Entire Agreement. This Agreement (including the Schedules and Exhibits hereto) constitute the entire agreement of the parties hereto with respect to the subject matter hereof and thereof and supersede all prior statements, understandings, representations, agreements and/or undertakings, whether written and oral, between the Seller, on the one hand, and the Buyer, on the other hand, with respect to the subject matter hereof and thereof, and the parties specifically disclaim reliance on any such prior statements, understandings, representations, agreements and undertakings to the extent not expressly set forth in this Agreement (including the Schedules and Exhibits hereto).

SECTION 9.06.    Assignment; Binding Effect. This Agreement may not be assigned by either party without the express written consent of the other party. This Agreement shall inure to the benefit of and be binding upon the parties hereto, including their respective successors, heirs and assigns.

SECTION 9.07.    Amendment. This Agreement may not be amended or modified except by an instrument in writing signed by, or on behalf of, the Seller and the Buyer or (b) by a waiver in accordance with Section 9.8.

SECTION 9.08.    Waiver. Either the Buyer, on the one hand, or the Seller, on the other hand, may (a) extend the time for the performance of any of the obligations or other acts of the other parties, (b) waive any inaccuracies in the representations and warranties of the other parties contained herein or in any document delivered by the other parties pursuant hereto or (c) waive

compliance with any of the agreements of the other parties or conditions to such parties' obligations contained herein. Any such extension or waiver shall be valid only if set forth in an instrument in writing signed by the party or parties to be bound thereby. Any waiver of any term or condition shall not be construed as a waiver of any subsequent breach or a subsequent waiver of the same term or condition, or a waiver of any other term or condition of this Agreement. The failure of any party hereto to assert any of its rights hereunder shall not constitute a waiver of any of such rights.

SECTION 9.09.     No Third Party Beneficiaries. This Agreement shall be binding upon and inure solely to the benefit of the parties hereto and their respective successors and permitted assigns and, except as otherwise set forth herein (including the provisions of Article VII relating to indemnified parties), nothing herein, express or implied, is intended to or shall confer upon any other Person (including any current or former employee or independent contractor of the Seller or any dependent or beneficiary thereof) any legal or equitable right, benefit or remedy of any nature whatsoever.

SECTION 9.10.     Governing Law and Jurisdiction. This Agreement and the interpretation hereof, and all issues, matters, suits, disputes, controversies and determinations regarding enforceability, shall be governed by, and construed in accordance with, the laws of the State of California, without reference to any conflict of law principles that would result in the application of the law of any other jurisdiction. As to any suit or action arising under or related to this Agreement, each of parties to this Agreement (i) consents to submit itself to the exclusive personal jurisdiction of the state or federal courts of the United States of America located in the City of San Jose, California in the event any dispute arises out of this Agreement or any transaction contemplated hereby, and agrees that the suit or action must be brought and litigated in, and decided by, the state or federal courts of the United States of America located in San Jose, California; (ii) waives any argument that personal jurisdiction or venue in any such court is improper, inappropriate or inconvenient, and agrees not to attempt to deny or defeat such personal jurisdiction by motion or other request for leave from any such court; and (iii) agrees never to assist, participate in or consent to any such suit or action being transferred to, litigated in or decided by any other court. Each party hereby consents to process being served in any such action or proceeding by the mailing of a copy thereof by certified mail, return receipt requested, as set forth in Section 9.2 and agrees that such service upon receipt shall constitute good and sufficient service of process or notice thereof. Nothing in this Section 9.10 shall affect or eliminate any right to serve process in any other manner permitted by law. THE PARTIES HERETO EACH HEREBY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (A) ARISING UNDER THIS AGREEMENT OR (B) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES IN RESPECT OF THIS AGREEMENT OR ANY OF THE TRANSACTIONS RELATED HERETO, IN EACH CASE, WHETHER NOW EXISTING OR HEREAFTER ARISING, AND WHETHER IN TORT, CONTRACT, EQUITY OR OTHERWISE. EACH OF THE PARTIES HERETO HEREBY AGREES AND CONSENTS THAT ANY SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION SHALL BE DECIDED BY COURT TRIAL WITHOUT A JURY AND THAT ANY PARTY MAY FILE A COPY OF THIS AGREEMENT WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF THEIR RIGHT TO TRIAL BY JURY.

SECTION 9.11.     Counterparts. This Agreement may be executed and delivered (including by facsimile transmission or .pdf) in counterparts, and by the different parties hereto in separate counterparts, each of which when executed shall be deemed to be an original, but all of which taken together shall constitute one and the same agreement.

SECTION 9.12.     Interpretation and Rules of Construction. In this Agreement, except to the extent otherwise provided or that the context otherwise requires:  when a reference is made in this Agreement to an Article, Section, Schedule or Exhibit, such reference is to an Article or Section of, or a Schedule or an Exhibit to, this Agreement unless otherwise indicated; the table of contents and headings for this Agreement are for reference purposes only and do not affect in any way the meaning or interpretation of this Agreement; any payment calculated or due under this Agreement is expressed in United States dollars; whenever the words "include," "includes" or "including" are used in this Agreement, they are deemed to be followed by the words "without limitation"; the words "hereof," "herein" and "hereunder" and words of similar import, when used in this Agreement, refer to this Agreement as a whole and not to any particular provision of this Agreement; all terms defined in this Agreement have the defined meanings when used in any certificate or other document made or delivered pursuant hereto, unless otherwise defined therein; the definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms; references to a Person are also to its successors and permitted assigns; the use of "or" is not intended to be exclusive unless expressly indicated otherwise; the use of "discretion" unless otherwise explicitly qualified is deemed to mean "sole and absolute" discretion; and any rule of construction to the effect that ambiguities are to be resolved against the drafting party shall not be applied in the construction or interpretation of this Agreement.

SECTION 9.13.     Specific Performance. The parties agree that irreparable damages would occur in the event any provision of this Agreement is not performed in accordance with the terms hereof and each of the parties will be entitled to specific performance of the terms hereof or injunctive relief, in addition to any other remedy at Law or in equity that may be available under applicable Law.

**[Remainder of page intentionally left blank.
Signature page follows.]**

IN WITNESS WHEREOF, the Parties have executed this Membership Interest Purchase Agreement as of the Effective Date.

**SELLER**:

DocuSigned by:

*Ned Fussell*

6FF512D1848444D...

Ned Fussell

**BUYER**:

TPCO US HOLDING, LLC

By:_____

Title: Chief Executive Officer

IN WITNESS WHEREOF, the Parties have executed this Membership Interest Purchase Agreement as of the Effective Date.

**SELLER**:

_____

Ned Fussell

**BUYER**:

TPCO US HOLDING, LLC

By:_____ Steve Allan _____
         2AB20684E98047E...

Title: Chief Executive Officer

Schedule 2.06

CONFORMING CANNABIS

Conforming Cannabis shall be consistent with or greater than the minimum volumes and potency listed in the below table, by table; provided however that Buyer may elect to adjust the number of Autoflower delivered in the form of Harvested, dried Autoflower, on the one hand, and as Autoflower biomass on the other hand.

| | | Full Term Flower (main harvest) | Harvested, dried Autoflower (early season) | Total |
|---|---|---|---|---|
| **Per/Acre** | Dried/Trimmed lbs. / Acre (Conforming A Buds) | 2,000 | 1,000 | 3,000 |
| | Dried/Trimmed lbs. / Acre (Smalls / B Buds) | 250 | 100 | 350 |
| | Dried/Trimmed lbs. / Acre (Trim) | 1,750 | 900 | 2,650 |
| | Total Dried Bucked lbs. / Acre | 4,000 | 2,000 | 6,000 |
| Potency (min THC %) | | At least 23% (Weighted Average), at full term flower harvest, with minimum auto flower of 16% | | |

**Sizing Chart:**

**Conforming A Buds**: 15mm – 50mm+

**Smalls / B Buds**: 10mm – 15mm

**Potency:** A and B buds measured separately will each have a minimum 23% (weighted average) potency (min THC %) at full term flower harvest, with a minimum at auto flower of 16%. Notwithstanding the foregoing, if during the crop year or years prior to Closing, tested THC content of the auto flower harvest product is less than 16%, Seller can cure by providing Buyer, at Seller's sole cost, with additional product that otherwise meets the Conforming Cannabis definition in an amount equal to double the percentage by which the auto flower potency is below the 16% target. For example, if average potency is only 12% (25% below the target), then Seller can cure by providing Buyer with total auto flower product, that otherwise meets the Conforming Cannabis definition, of 3,000 pounds (which is 50% greater than the total auto flower amount set forth above).

**Moisture Content:** The moisture content prior to delivery will be within 9%-13%.

**Dried and Bucked Weight**: All Conforming Cannabis will be weighed and measured on a dried and bucked basis, consistent with commonly industry best practices and standards for dried and bucked measurement.

**No Seeding**: All Conforming A Bud Cannabis will be non-seeded material, free of seeds within a 3% or less tolerance consistent with industry standards for outdoor Cannabis flower.

**Testing**: All Conforming Cannabis must pass an independent full panel R&D test (as well as an independent full panel final stage Certificate of Analysis test) including but not limited to pesticide, potency, moisture content, heavy metals, microbials for compliance with applicable law and this Agreement. Seller will coordinate the R&D testing at its sole cost and expense and will deliver the results of such testing in writing to Buyer promptly following receipt. Buyer will coordinate the Certificate of Analysis test at its sole cost and expense and will deliver the results of such testing in writing to Seller promptly upon request. At Seller's request, Buyer will use commercial reasonable efforts to use the same lab to perform the Certificate of Analysis testing that Seller uses for the R&D testing.

14357356 v13

Schedule 6.02(k)

**Land Use, Permits and Water Rights Due Diligence**

        (a)    Buyer shall conduct due diligence regarding the following matters directly relating to the Companies, the Business, the Licenses, the Permits or the Property:

            a.  Water supply quantity and quality;

            b.  Water storage, conveyance and measurement facilities;

            c.  Fish and wildlife matters;

            d.  CEQA matters;

            e.  Licenses and Permits matters; and

            f.  Sonoma County building, cannabis, fire safety, and zoning matters.

California Licenses Schedule

| ENTITY NAME | LICENSE NUMBER | LICENSE TYPE | EXPIRATION DATE | PREMISES ADDRESS |
|---|---|---|---|---|
| Digg It Gardens, LLC | CCL20-0002191 | Medicinal - Small Outdoor | 11/17/21 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Digg It Gardens, LLC | CCL20-0002190 | Medicinal - Small Outdoor | 11/17/21 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Digg It Gardens, LLC | CCL20-0002189 | Medicinal - Small Outdoor | 11/17/21 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Digg It Gardens, LLC | CCL20-0002188 | Medicinal - Small Outdoor | 11/17/21 | 3803 Spring Hill Road, Petaluma, CA 94952 |
| Potter Family Farms, LLC* | CCL20-0002187 | Medicinal - Small Outdoor | 12/15/21 | 3803 Spring Hill Road, Petaluma, CA 94952 |
| Potter Family Farms, LLC* | CCL20-0002186 | Medicinal - Small Outdoor | 12/4/21 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Potter Family Farms, LLC* | CCL20-0002183 | Medicinal - Small Outdoor | 3/12/22 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Potter Family Farms, LLC* | CCL20-0002182 | Medicinal - Small Outdoor | 12/15/21 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Rain Gardens, LLC | CCL20-0002177 | Medicinal - Small Outdoor | 2/23/22 | 3803 Spring Hill Road, Petaluma, CA 94952 |
| Rain Gardens, LLC | CCL20-0002181 | Medicinal - Small Outdoor | 11/9/21 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Rain Gardens, LLC | CCL20-0002179 | Medicinal - Small Outdoor | 11/9/21 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Rain Gardens, LLC | CCL20-0002178 | Medicinal - Small Outdoor | 11/9/21 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Wild Heart Farms, LLC | CCL20-0002176 | Medicinal - Small Outdoor | 11/20/21 | 3803 Spring Hill Road, Petaluma, CA 94952 |
| Wild Heart Farms, LLC | CCL20-0002175 | Medicinal - Small Outdoor | 11/20/21 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Wild Heart Farms, LLC | CCL20-0002174 | Medicinal - Small Outdoor | 11/20/21 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Wild Heart Farms, LLC | CCL20-0002173 | Medicinal - Small Outdoor | 11/20/21 | 4235 Spring Hill Road, Petaluma, CA 94952 |

* In process to clarify licensee entity matters

Local License Schedule

| ENTITY NAME | PERMIT NUMBER | PERMIT TYPE | EXPIRATION DATE | SITE ADDRESS |
|---|---|---|---|---|
| Digg It Gardens, LLC | APC20-0055 | Medicinal - Small Outdoor | 7/28/2021 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Digg It Gardens, LLC | APC20-0063 | Medicinal - Small Outdoor | 7/28/2021 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Digg It Gardens, LLC | APC20-0059 | Medicinal - Small Outdoor | 7/28/2021 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Digg It Gardens, LLC | APC20-0051 | Medicinal - Small Outdoor | 7/28/2021 | 3803 Spring Hill Road, Petaluma, CA 94952 |
| Potter Family Farms, LLC* | APC20-0052 | Medicinal - Small Outdoor | 7/28/2021 | 3803 Spring Hill Road, Petaluma, CA 94952 |
| Potter Family Farms, LLC* | APC20-0060 | Medicinal - Small Outdoor | 7/28/2021 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Potter Family Farms, LLC* | APC20-0056 | Medicinal - Small Outdoor | 7/28/2021 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Potter Family Farms, LLC* | APC20-0064 | Medicinal - Small Outdoor | 7/28/2021 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Rain Gardens, LLC | APC20-0053 | Medicinal - Small Outdoor | 7/28/2021 | 3803 Spring Hill Road, Petaluma, CA 94952 |
| Rain Gardens, LLC | APC20-0065 | Medicinal - Small Outdoor | 7/28/2021 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Rain Gardens, LLC | APC20-0061 | Medicinal - Small Outdoor | 7/28/2021 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Rain Gardens, LLC | APC20-0057 | Medicinal - Small Outdoor | 7/28/2021 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Wild Heart Farms, LLC | APC20-0058 | Medicinal - Small Outdoor | 7/28/2021 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Wild Heart Farms, LLC | APC20-0054 | Medicinal - Small Outdoor | 7/28/2021 | 3803 Spring Hill Road, Petaluma, CA 94952 |
| Wild Heart Farms, LLC | APC20-0062 | Medicinal - Small Outdoor | 7/28/2021 | 4235 Spring Hill Road, Petaluma, CA 94952 |
| Wild Heart Farms, LLC | APC20-0066 | Medicinal - Small Outdoor | 7/28/2021 | 4235 Spring Hill Road, Petaluma, CA 94952 |

* In process to clarify licensee entity matters

14357356 v13

# EXHIBIT 2

## NOTE AND PLEDGE AGREEMENT

**$5,650,000**                                                                 **May 21, 2021**

The undersigned, Ned Fussell, a resident of the State of California ("**Borrower**") is to become indebted to TPCO US Holding, LLC, a Delaware limited liability company (the "**Lender**") in the amount of $5,650,000 (the "**Advance**"), pursuant to that certain Membership Interest Purchase Agreement of even date herewith, executed by Borrower and Lender (the "**Purchase Agreement**"; capitalized terms used but not otherwise defined in this Note have the meanings given to such terms in the Purchase Agreement), pursuant to which Lender will advance the Effective Date Payment to Borrower, as an advance pending Closing and to be evidenced and secured by this Note and Pledge Agreement (this "**Note**").

**WHEREAS,** the Borrower is temporarily borrowing the Advance from Lender;

**WHEREAS,** the Advance reflects a portion of the Purchase Price payable by Lender to Borrower pursuant to the Purchase Agreement;

**WHEREAS,** the undersigned parties desire to reflect that for the time that the Advance has not been applied to one or more Closings under the Purchase Agreement, the Borrower shall be deemed indebted to Lender in the amount of the Advance so not applied to a Closing under the Purchase Agreement;

**NOW, THEREFORE,** to induce the Lender to pay the Advance constituting the Effective Date Payment under the Purchase Agreement and in consideration of the mutual covenants contained herein and in the Purchase Agreement, the parties hereto, each intending to be legally bound hereby, covenant and agrees as follows:

A.      **PROMISSORY NOTE**.

1.      **Terms**.  FOR VALUE RECEIVED, the Borrower hereby promises to pay to Lender, in lawful money of the United States of America, without demand, defalcation, set off or deduction, the principal sum of the Advance, or if a lesser amount is actually advanced or otherwise outstanding, the principal amount then outstanding, at the time or times stated below. Unless previously satisfied or terminated as provided herein, the outstanding balance of this Note shall mature and be due and payable in full on the earlier of (i) June 1, 2022 or (ii) Five (5) business days after the termination of the Purchase Agreement in accordance with its terms (the "Maturity Date"). Notwithstanding the foregoing, with respect to each Company subject to purchase under the Purchase Agreement, in the event that the Closing occurs with respect to such Company (or a Replacement Property), a pro rata portion of this Note will be deemed satisfied and paid in full or pro rata in part, as applicable, upon the transfer of Company Securities with respect to such Company or the transfer of such Replacement Property, as applicable, to Lender (or an affiliate or assignee thereof) in the manner called for by the Purchase Agreement (each, a "Company Closing"). For avoidance of doubt, Borrower's indebtedness hereunder will be reduced by One Million Five Hundred Thousand Dollars ($1,500,000) upon each Company Closing (e.g. upon the acquisition by Lender (or an affiliate or assignee thereof) of 100% of the membership interests of

14559149 v7

the applicable Company or Replacement Property under the Purchase Agreement). The parties acknowledge that, for tax purposes, as a result of this Note not bearing interest, Borrower may be treated under applicable tax law as having received additional purchase price (in the amount of minimal imputed interest under law) for the Company Securities from Lender.  To the extent so required by applicable tax law, Lender shall report such deemed purchase price to Borrower, subject to any applicable tax withholding and tax reporting. Notwithstanding the foregoing, the parties hereunder agree that this Note is intended to be a deposit or advance on the Purchase Price payable by Lender to Borrower under the Purchase Agreement.

2.      **Prepayments**.  Borrower may, without penalty or premium, prepay this Note in full or in part at any time.  All prepayments shall be applied to the installments in their inverse order of maturity.  All payments of under this Note shall be made to Lender at Lender's chief executive office, or such other place as Lender may designate from time to time hereafter.

3.      **Events of Default**.  The Borrower shall be in default hereunder upon the first occurrence of any of the following events (each an "**Event of Default**") if this Note has not otherwise terminated, or been satisfied in accordance with its terms prior to such events: (i) if the Borrower fails to pay any sum due hereunder on the Maturity Date;    (ii) if any written representation or warranty made by the Borrower in connection with the debt evidenced by this Note (or by any Company Holder under its Company Holder Acknowledgment Document) is false or incorrect in any material respect, Borrower is in material breach of this Note or the Purchase Agreement, any Company Holder is in breach of its Company Holder Acknowledgment Document or the Borrow or the Production Company is in material breach of the Cultivation and Supply Agreement, and any such breach or inaccuracy is not cured within fifteen (15) days after Borrower's receipt of written notice thereof from Lender; (iii) the consummation of any sale or other transfer of the Pledged Units (as defined below) by Borrower or any Company Holder to a party other than Lender (or Lender's affiliate or assignee) (e.g. other than in connection with the Closing or as contemplated under the Purchase Agreement), or (iv) an Act of Bankruptcy occurs with respect to the Borrower or any Company Holder (as used herein, "Act of Bankruptcy" means, with respect to a Person, if (i) the Person (A) applies for or consents to the appointment of, or the taking of possession by, a receiver, custodian, trustee, liquidator or the like of such Person or of all or a substantial part of the Person' property, (B) commences a voluntary case under any bankruptcy, insolvency, reorganization, arrangement, readjustment of debt, dissolution, liquidation or similar proceeding under the Laws of any jurisdiction, or (C) makes an assignment for the benefit of its creditors; or (ii) a proceeding or case is commenced, without the application or consent of such Person, and that is not dismissed within thirty (30) days after such commencement, in any court of competent jurisdiction, seeking (A) the liquidation, reorganization, dissolution, winding up or the composition or adjustment of debts of the Person, (B) the appointment of a trustee, receiver, custodian or liquidator or the like of the Person or of any part of the Person's property, or (C) similar relief in respect of the Person under any Law relating to bankruptcy, insolvency, reorganization, winding up or composition or adjustment of debts); provided that in the event of an Act of Bankruptcy with respect to a Company Holder, then the Borrower shall have the opportunity to submit a potential Replacement Property for consideration pursuant to Section 2.08 of the Purchase Agreement. Upon the occurrence of an Event of Default, which shall be continuing, interest shall accrue on the unpaid balance of this Note from the date of such default at a rate per annum equal to six percent (6%), or the highest rate allowed by applicable law, whichever is less, and the balance of this Note shall become immediately due and

- 2 -

payable (A) without any action or notice of any kind on the part of the Lender in the case of the occurrence of an Event of Default described in subparagraph (iv) above; or (B) in the case of other Events of Default, upon declaration of such default delivered to the Borrower by Lender. Upon the occurrence of an Event of Default, the Lender shall have all remedies available at law and in equity to enforce and collect this Note from Borrower, and the right at any time and from time to time to take such actions as it deems appropriate with respect to the Pledged Units and other Collateral (as defined below); accounting to Borrower for any excess amount realized on the Collateral over the amounts due in respect of this Note, and Borrower shall be personally liable for any deficiency.

B.     PLEDGE AGREEMENT

1.     As collateral security for the punctual payment and performance of all existing and future indebtedness and reimbursement obligations, absolute or contingent, direct or indirect, primary or secondary, of Borrower to Lender under this Note (all of such indebtedness and reimbursement obligations of Borrower being hereinafter sometimes referred to collectively as the **"Obligations"**), Borrower hereby grants to the Lender a continuing first security interest in and first priority lien upon, and hereby pledges to Lender for its benefit, all of its right, title and interest in and to the following, subject to, in all cases, the terms of the Company Holder Acknowledgement Documents (the Company Member Interest Purchase Agreements) signed on or around the date hereof, including, for the avoidance of doubt, section 5 thereof (the **"Company MIPAs"**): (i) all of Borrower's right, title and interest in and to the Company Securities (the **"Pledged Units"**), and all rights with respect to the Company Securities under the limited liability company operating agreement of each of the Companies (the **"Operating Agreements"**), including without limitation any distributions on account of, or any proceeds from the sale of, such Pledged Units, in accordance with and as permitted by the Operating Agreements, and (ii) all accessions to, substitutions for and replacements, products and proceeds of any of the foregoing (the property and rights in (i) and (ii) above being collectively, the **"Collateral"**). The foregoing collateral only applies until such time as this Note has been paid in full by way of either Closings as contemplated under the Purchase Agreement, repayment as contemplated hereunder or receipt of Company Profits and Proceeds as contemplated in the Company MIPAs.

2.     Until an Event of Default occurs, Borrower shall retain all rights to receive and retain tax advances pursuant to the Operating Agreements.

3.     Until the Obligations have been paid in full or otherwise satisfied or terminated hereunder, prior to each Company Closing, Borrower shall not (and shall not cause or permit any Company Holder to) sell, assign, hypothecate, pledge or otherwise Transfer all or any portion of the Pledged Units not yet conveyed as part of the Closing or pursuant to the Purchase Agreement, without Lender's prior consent.

4.     Upon Lender's receipt of the payment of or satisfaction of (or the combination thereof) the entire unpaid balance of this Note as contemplated herein or as contemplated under the Company MIPAs with respect to Company Profits and Proceeds (as defined therein), the Lender shall (1) return the Note to the Borrower and (2) release its security interest in the Collateral. Notwithstanding the foregoing, and for avoidance of doubt, upon each

14559149 v7

Company Closing, Lender will release its security interest in the portion of the Collateral conveyed to Lender in connection with such Closing.

## C.    **TERMINATION, WAIVER AND MISCELLANEOUS**.

        1.    **Waivers; Amendments**. No delay on the part of either party in exercising any of its options, powers or rights, and no partial or single exercise thereof, shall constitute a waiver thereof or of any other option, power or right. The Lender shall not be deemed by any act or omission to have waived any such right or remedy or any default by the Borrower hereunder unless such waiver is in writing and signed by the holder, and then only to the extent specifically set forth in the writing. Any such waiver shall not be construed as a continuing waiver or as a bar to or waiver of any right or remedy with respect to any other default by the Borrower. None of the terms and conditions of this Note may be amended, modified or waived orally but only in a writing signed by the Lender and the Borrower.

        2.    **Further Assurances; Immunities, etc**. With respect to the Collateral and any security interest of the Lender, the Borrower shall take all such commercially reasonable actions and file, record, make, execute and deliver all such notices and instruments as may be reasonably required by Lender in order to vest more fully in and assure to the Lender the security interest in the Collateral created hereby or intended so to be and the enforcement and realization of all of the benefits of the rights, remedies and powers of the Lender hereunder relating to the Collateral (and subject to regulatory considerations around such filings in connection with local and State cannabis regulations with respect to the Company Securities and Company structures). Without limiting the generality of the foregoing, if at any time hereafter, whether or not due to any change in circumstances (including without limitation any change in applicable law or any decision hereafter made by a court construing any applicable law), it is, in the opinion of counsel for the Lender, necessary or desirable to file or record this Note or any financing statement or other instrument relating hereto, the Borrower shall execute and deliver any instruments that the Lender may deem necessary or appropriate to make such filing or recording effective. The Borrower hereby irrevocably appoints the Lender the attorney-in-fact of the Borrower to perform, during the continuance of an Event of Default, in the name of the Borrower or the Lender or otherwise, any and all acts, that the Lender may deem necessary or appropriate to effect and continue the security created hereby or intended so to be or otherwise to preserve and protect the Collateral and the security interest of the Lender therein, but nothing herein contained or otherwise shall require the Lender to take any such action. The Lender shall not be under any duty to anyone to send any notices, perform any services, vote, exercise any options or elections with respect to, pay any taxes or charges associated with, or otherwise take any action of any kind with respect to, any of the Collateral, including the Pledged Units (unless and until such time as the Lender takes equity ownership of the Pledged Units, if applicable, at which time Lender acknowledges that it shall control the same and Borrower shall have no further obligations with respect thereto). Borrower acknowledges that there may be tax implications to the Borrower related to this Note for which Borrower shall be solely responsible.

        3.    **Payment of Expenses; Setoff**. Borrower further agrees, subject only to the limitations above and others imposed by applicable law, to pay all expenses (including reasonable outside attorneys' fees), incurred by Lender in connection with any Event of Default, including its endeavoring to collect any amounts payable hereunder which are not paid when due. Borrower

- 4 -

authorizes Lender to apply any and all amounts due and owing under this Note against (and in so doing reduce and satisfy) any amounts due and payable to Borrower from Lender or any of its Affiliates.

        4.     **Notices**. All notices, requests, demands, directions, declarations and other communications provided for herein shall be in writing and shall be deemed effectively given (a) upon personal delivery to the party to be notified, (b) three (3) days after notice shall be deposited with the United States Post Office, by registered or certified mail, postage prepaid and addressed to the party to be notified (i) if to the Borrower, at the address set forth in the Purchase Agreement, and (ii) if to the Lender, at the address designated for payments hereunder from time to time, or (c) upon confirmation that notice shall have been received by fax or electronic mail at the fax or email address number specified for such party with its address. Any party may change its address or fax number for notice purposes by giving advance notice hereunder to the other party in accordance with this Section C.4.

        5.     **Governing Law; Consent to Jurisdiction, etc**. **This Note shall be governed by and construed in accordance with the internal laws (and not the law of conflicts) of the State of California. The Borrower and Lender hereby to the state courts located in San Jose, California in any action or proceeding that may be brought against Borrower or Lender under or in connection with this Note or any of the transactions contemplated hereby or to enforce any undertaking contained herein. Without limiting the generality of the foregoing, the provisions of Section 9.10 of the Purchase Agreement are hereby incorporated herein and made a part hereof, *mutatis mutandis*.**

        6.     **Certain Waivers; Integration, etc**. Borrower, for himself and for his successors, transferees and assigns hereby irrevocably (I) waives diligence, presentment and demand for payment, protest, notice, notice of protest and nonpayment, dishonor and notice of dishonor and all other demands or notices of any and every kind whatsoever (except as otherwise expressly set forth herein) ; and (ii) agrees that this Note and any or all payments coming due hereunder may be extended from time to time in the sole discretion of Lender hereof without in any way affecting or diminishing Borrower's liabilities hereunder. This instrument, together with the Purchase Agreement and the deliverables pursuant to the Purchase Agreement state the entire agreement of the parties concerning the subject matter hereof, and it is acknowledged that there are no customs, usages, representations, or assurances referring to the subject matter, and no inducements leading to the execution or delivery hereof, other than those expressed herein.

        7.     **Miscellaneous**. This Note shall bind and inure to the benefit of the Borrower and the Lender and their respective heirs, executors, administrators, personal representatives, successors and assigns, except that Borrower shall have no right to assign any of its rights or obligations hereunder or in the Collateral without the prior written consent of the other Lender. No persons other than the Borrower and the Lender and the respective assignees of the Lender (including any creditors of Lender to which the Lender may assign its rights hereunder, which for the avoidance of doubt, would still be deemed satisfaction hereunder in respect to the release of the Advance or portions thereof from the indebtedness obligation hereunder) are intended to be benefitted hereby or shall have any rights hereunder, as third-party beneficiaries or otherwise. This Note may be executed in any number of counterparts, each of which shall be deemed an original, and all such counterparts shall together constitute but one and the same

instrument. Any provision of this Note, which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without affecting the validity or enforceability of the remainder of this Note or the validity or enforceability of such provision in any other jurisdiction. The term "Lender" shall apply equally to the initial Lender specified above and to any holder to which this Note may be assigned.

\* \* \* \* \* \*

IN WITNESS WHEREOF, Borrower and Lender have executed and delivered this Note and Pledge Agreement as of the day and year first above written.

**BORROWER**:

*Ned Fussell*

Ned Fussell

**LENDER**:

**TPCO US HOLDING, LLC**

By: _____

     Name:
     Tite: Chief Executive Officer

IN WITNESS WHEREOF, Borrower and Lender have executed and delivered this Note and Pledge Agreement as of the day and year first above written.

**BORROWER:**

_____

Ned Fussell

**LENDER:**

**TPCO US HOLDING, LLC**

By: _____
Name:
Tite: Chief Executive Officer

- 7 -

# EXHIBIT 3

Lodged Conditionally Under Seal

# EXHIBIT 4

Lodged Conditionally Under Seal

# EXHIBIT 5

Lodged Conditionally Under Seal

# EXHIBIT 6

Lodged Conditionally Under Seal

**NOTICE OF REMOVAL OF ACTION BASED ON FEDERAL-QUESTION
JURISDICTION (28 U.S.C. § 1441(a))**

Exhibit "B"

22CV408899
Santa Clara – Civil

POS-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| Krista M Enns, Esq. \| SBN: 206430<br>BENESCH FRIEDLANDER COPLAN &ARONOFF<br>100 Pine Street, Suite 3100   San Francisco, CA 94111<br><br>TELEPHONE NO.: (628) 600-2250 \| FAX NO. \| E-MAIL ADDRESS kenns@beneschlaw.com<br>ATTORNEY FOR *(Name)*:  Plaintiff: TPCO US Holding, LLC | R. Fleming<br><br>**Electronically Filed<br>by Superior Court of CA,<br>County of Santa Clara,<br>on 3/15/2023 9:59 AM<br>Reviewed By: R. Fleming<br>Case #22CV408899<br>Envelope: 11440941** |

| **Superior Court Of California, County Of Santa Clara** | |
|---|---|
| STREET ADDRESS: 191 N. 1st Street | |
| CITY AND ZIP CODE: San Jose, CA 95113 | |
| BRANCH NAME: Downtown Superior Court | |

| PLAINTIFF/PETITIONER: TPCO US Holding, LLC, a Delaware limited liability company<br>DEFENDANT/RESPONDENT: Ned Fussell, an individual, et al. | CASE NUMBER:<br>22CV408899 |
|---|---|
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   - a. ☑ Summons
   - b. ☑ Complaint
   - c. ☑ Alternative Dispute Resolution (ADR) package
   - d. ☑ Civil Case Cover Sheet
   - e. ☐ Cross-Complaint
   - f. ☑ other *(specify documents):* **See attached Document List**
3. a. Party served *(specify name of party as shown on documents served):*
   **MosaicAg. Inc., a California corporation**

   b. ☑ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*
   **Ned Fussell - Chief Executive Officer**
      **Age: 45 \| Weight: 200lbs \| Hair: Brown \| Sex: Male \| Height: 6'1 \| Eyes:  \| Race: White**

4. Address where the party was served:  **6000 Vine Hill School Rd**
   **Sebastopol, CA 95472-2027**

5. I served the party *(check proper box)*
   a. ☑ **by personal service.**  I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **3/2/2023**   (2) at *(time):* **8:05 AM**

   b. ☐ **by substituted service.**  On *(date):*  at  *(time):*  I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served.  I informed him of her of the general nature of the papers.

      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party.  I informed him or her of the general nature of the papers.

      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box.  I informed him of her of the general nature of the papers.

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):*  from *(city):*          **or** ☐ a declaration of mailing is attached.

      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| Form Approved for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10<br>**POS010-1/SF135205** |
|---|---|---|

| PETITIONER: **TPCO US Holding, LLC, a Delaware limited liability company** | CASE NUMBER: |
|---|---|
| RESPONDENT: Ned Fussell, an individual, et al. | **22CV408899** |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

    (1) on *(date):*                            (2) from *(city):*

    (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me. *(Attach completed* Notice and Acknowledgement of Receipt.*) (Code Civ. Proc., § 415.30.)*

    (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

    ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☐ as an individual defendant.

b. ☐ as the person sued under the fictitious name of *(specify):*

c. ☐ as occupant.

d. ☑ On behalf of **MosaicAg. Inc., a California corporation**
    under the following Code of Civil Procedure section:

| | | |
|---|---|---|
| ☑ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) | |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) | |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) | |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) | |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) | |
| | ☐ other: | |

7. **Person who served papers**
  a. Name: **Eric Walton - Nationwide Legal, LLC REG: 12-234648**
  b. Address: **1625 Clay Street 4th Floor  Oakland, CA 94612**
  c. Telephone number: **(510) 444-4690**
  d. **The fee** for service was: **$ 513.00**
  e. I am:

    (1) ☐ not a registered California process server.
    (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
    (3) ☑ registered California process server:
        (i) ☐ owner    ☐ employee    ☑ independent contractor.
        (ii) Registration No.: **P-413**
        (iii) County: **Sonoma**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

    or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

Date: **3/2/2023**

**N**   **Nationwide Legal, LLC**
     **1625 Clay Street 4th Floor**
     **Oakland, CA 94612**
     **(510) 444-4690**
     **www.nationwideasap.com**

_____
        **Eric Walton**                     ▶            
(NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)             (SIGNATURE)

**POS-010/SF135205**

**Nationwide Legal, LLC**
1625 Clay Street 4th Floor
Oakland, CA 94612
Phone: (510) 444-4690   Fax: (510) 444-4529

Continued from Proof of Service

**CLIENT:**   BENESCH FRIEDLANDER COPLAN &ARONOFF

**CLIENT FILE #:**   75139.6                              **DATE:**   March 02, 2023

**SUBJECT:**   MosaicAg. Inc., a California corporation

```
Summons; Complaint; Alternative Dispute (ADR) package; Civil Case
Cover Sheet; Plaintiff TPCO Us Holding, LLC's Amended Notice of
Motion to Seal Portions of Its Complaint and Certain Exhibits
Thereto; Civil Lawsuit Notice; Complaint For Breach of Contract and
Declaratory Relief (Unredacted); Declaration of Krista M. Enns In
Support of Plaintiff TPCO Us Holding, LLC's Motion  To Seal Portions
of Its Complaint and Certain Exhibits Thereto; Plaintiff TPCO Us
Holding, LLC's Notice of Motion and Motion to Seal Portions of Its
Complaint And Certain  Exhibits Thereto; Memorandum of Points and
Authorities In Support Thereof
```



Order#: SF135205/DocAtt2010

22CV408899
Santa Clara – Civil

**POS-010**

R. Fleming

| ATTORNEY OR PARTY WITHOUT ATTORNEY *(Name, State Bar number, and address)* | FOR COURT USE ONLY |
|---|---|
| Krista M Enns, Esq. | SBN: 206430<br>BENESCH FRIEDLANDER COPLAN &ARONOFF<br>100 Pine Street, Suite 3100   San Francisco, CA 94111<br><br>TELEPHONE NO.: (628) 600-2250 | FAX NO. | E-MAIL ADDRESS kenns@beneschlaw.com<br>ATTORNEY FOR *(Name):* Plaintiff: TPCO US Holding, LLC | **Electronically Filed<br>by Superior Court of CA,<br>County of Santa Clara,<br>on 3/15/2023 9:59 AM<br>Reviewed By: R. Fleming<br>Case #22CV408899<br>Envelope: 11440941** |

**Superior Court Of California, County Of Santa Clara**

STREET ADDRESS: 191 N. 1st Street
CITY AND ZIP CODE: San Jose, CA 95113
BRANCH NAME: Downtown Superior Court

| PLAINTIFF/PETITIONER: TPCO US Holding, LLC, a Delaware limited liability company<br>DEFENDANT/RESPONDENT: Ned Fussell, an individual, et al. | CASE NUMBER:<br>22CV408899 |
|---|---|
| **PROOF OF SERVICE OF SUMMONS** | Ref. No. or File No.: |

*(Separate proof of service is required for each party served.)*

1. At the time of service I was at least 18 years of age and not a party to this action.
2. I served copies of:
   a. ☑ Summons
   b. ☑ Complaint
   c. ☑ Alternative Dispute Resolution (ADR) package
   d. ☑ Civil Case Cover Sheet
   e. ☐ Cross-Complaint
   f. ☑ other *(specify documents):* **See attached Document List**
3. a. Party served *(specify name of party as shown on documents served):*
      **Ned Fussell, an individual**
      Age: 45 | Weight: 200lbs | Hair: Brown | Sex: Male | Height: 6'1 | Eyes: | Race: White

   b. ☐ Person (other than the party in item 3a) served on behalf of an entity or as an authorized agent (and not a person under item 5b on whom substituted service was made) *(specify name and relationship to the party named in item 3a):*

4. Address where the party was served:  **6000 Vine Hill School Rd**
   **Sebastopol, CA 95472-2027**
5. I served the party *(check proper box)*
   a. ☑ **by personal service.**   I personally delivered the documents listed in item 2 to the party or person authorized to receive service of process for the party (1) on *(date):* **3/2/2023**   (2) at *(time):* **8:05 AM**

   b. ☐ **by substituted service.** On *(date):*   at *(time):*   I left the documents listed in item 2 with or in the presence of *(name and title or relationship to person indicated in item 3):*

      (1) ☐ **(business)** a person at least 18 years of age apparently in charge at the office or usual place of business of the person to be served. I informed him of her of the general nature of the papers.

      (2) ☐ **(home)** a competent member of the household (at least 18 years of age) at the dwelling house or usual place of abode of the party. I informed him or her of the general nature of the papers.

      (3) ☐ **(physical address unknown)** a person at least 18 years of age apparently in charge at the usual mailing address of the person to be served, other than a United States Postal Service post office box. I informed him of her of the general nature of the papers.

      (4) ☐ I thereafter mailed (by first-class, postage prepaid) copies of the documents to the person to be served at the place where the copies were left (Code Civ. Proc., §415.20). I mailed the documents on *(date):*   from *(city):*                **or** ☐ a declaration of mailing is attached.

      (5) ☐ I attach a **declaration of diligence** stating actions taken first to attempt personal service.

Page 1 of 2

| Form Approved for Mandatory Use<br>Judicial Council of California<br>POS-010 [Rev. January 1, 2007] | **PROOF OF SERVICE OF SUMMONS** | Code of Civil Procedure, § 417.10<br>**POS010-1/SF135205A** |
|---|---|---|

| PETITIONER: TPCO US Holding, LLC, a Delaware limited liability company | CASE NUMBER: |
|---|---|
| RESPONDENT: Ned Fussell, an individual, et al. | 22CV408899 |

c. ☐ **by mail and acknowledgment of receipt of service.** I mailed the documents listed in item 2 to the party, to the address shown in item 4, by first-class mail, postage prepaid,

   (1) on *(date):*                                        (2) from *(city):*

   (3) ☐ with two copies of the *Notice and Acknowledgment of Receipt* and a postage-paid return envelope addressed to me.
        *(Attach completed* Notice and Acknowledgment of Receipt.*) (Code Civ. Proc., § 415.30.)*

   (4) ☐ to an address outside California with return receipt requested. (Code Civ. Proc., § 415.40.)

d. ☐ **by other means** *(specify means of service and authorizing code section):*

   ☐ Additional page describing service is attached.

6. The "Notice to the Person Served" (on the summons) was completed as follows:

a. ☑ as an individual defendant.
b. ☐ as the person sued under the fictitious name of *(specify):*
c. ☐ as occupant.
d. ☐ On behalf of
        under the following Code of Civil Procedure section:

| | |
|---|---|
| ☐ 416.10 (corporation) | ☐ 415.95 (business organization, form unknown) |
| ☐ 416.20 (defunct corporation) | ☐ 416.60 (minor) |
| ☐ 416.30 (joint stock company/association) | ☐ 416.70 (ward or conservatee) |
| ☐ 416.40 (association or partnership) | ☐ 416.90 (authorized person) |
| ☐ 416.50 (public entity) | ☐ 415.46 (occupant) |
| | ☐ other: |

7. **Person who served papers**
   a. Name: **Eric Walton - Nationwide Legal, LLC REG: 12-234648**
   b. Address: **1625 Clay Street 4th Floor  Oakland, CA 94612**
   c. Telephone number: **(510) 444-4690**
   d. **The fee** for service was: **$ 413.00**
   e. I am:

   (1) ☐ not a registered California process server.
   (2) ☐ exempt from registration under Business and Professions Code section 22350(b).
   (3) ☑ registered California process server:
        (i) ☐ owner   ☐ employee   ☑ independent contractor.
        (ii) Registration No.: **P-413**
        (iii) County: **Sonoma**

8. ☑ **I declare** under penalty of perjury under the laws of the State of California that the foregoing is true and correct.

   or

9. ☐ **I am a California sheriff or marshal and** I certify that the foregoing is true and correct.

   Date: **3/2/2023**

   **N** **Nationwide Legal, LLC**
   **1625 Clay Street 4th Floor**
   **Oakland, CA 94612**
   **(510) 444-4690**
   **www.nationwideasap.com**

   _____                    ▸        _____
   **Eric Walton**                                                              (SIGNATURE)
   (NAME OF PERSON WHO SERVED PAPERS/SHERIFF OR MARSHAL)

**Nationwide Legal, LLC.**
1625 Clay Street 4th Floor
Oakland, CA 94612
Phone: (510) 444-4690   Fax: (510) 444-4529

Continued from Proof of Service

**CLIENT:**   BENESCH FRIEDLANDER COPLAN &ARONOFF

**CLIENT FILE #:**   75139.6                              **DATE:**  March 02, 2023

**SUBJECT:**   Ned Fussell, an individual

```
Summons; Complaint; Alternative Dispute (ADR) package; Civil Case
Cover Sheet; Plaintiff TPCO Us Holding, LLC's Amended Notice of
Motion to Seal Portions of Its Complaint and Certain Exhibits
Thereto; Civil Lawsuit Notice; Complaint For Breach of Contract and
Declaratory Relief (Unredacted); Declaration of Krista M. Enns In
Support of Plaintiff TPCO Us Holding, LLC's Motion  To Seal Portions
of Its Complaint and Certain Exhibits Thereto; Plaintiff TPCO Us
Holding, LLC's Notice of Motion and Motion to Seal Portions of Its
Complaint And Certain  Exhibits Thereto; Memorandum of Points and
Authorities In Support Thereof
```

